# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

PATRIARCH PARTNERS XV, LLC and : 
OCTALUNA LLC, :

                Plaintiffs :

         -against- :

U.S. BANK NATIONAL ASSOCIATION and :
MBIA INSURANCE CORPORATION, :

            Defendants :

---------------------------------------------------------------X

Case No.: _____

**NOTICE OF REMOVAL**

Removed from:

Supreme Court of the State of
New York, Index No.
654819/2016

**TO:**    Clerk of the U.S. District Court for the Southern District of New York:

Pursuant to 28 U.S.C. §§ 1331, 1441, and the Edge Act, 12 U.S.C. § 632, Defendant U.S. Bank National Association ("U.S Bank" or "Trustee"), solely in its capacity as Trustee for Zohar CDO 2003-1, Ltd. (the "Issuer"), by and through its counsel, Alston & Bird LLP, with the consent of Defendant MBIA Insurance Corporation, hereby files this Notice of Removal for the purpose of removing this action from the Supreme Court of the State of New York, New York County, to the United States District Court for the Southern District of New York. In support of removal, U.S. Bank states the following:

<b><u>TIMELINESS OF REMOVAL</u></b>

1.     This Notice of Removal is timely filed within 30 days of U.S. Bank's receipt of the Complaint. *See NXIVM Corp. v. Ross*, No. 09-CV-338S, 2009 WL 1765240, at *3 (W.D.N.Y. June 22, 2009). In the alternative, the Edge Act permits removal "at any time before the trial . . . ." 12 U.S.C. § 632.

2.     U.S. Bank's time to respond to the Complaint has not expired, and it has not pled, answered, or otherwise appeared in the State Court Action (as defined below).

3.     Upon information and belief, there is currently an application for a temporary restraining order and preliminary injunction pending in the State Court Action.

4.     On September 12, 2016, Plaintiffs Patriarch Partners XV, LLC, and Octaluna LLC ("Plaintiffs") commenced an action in the Supreme Court of the State of New York, New York County, styled as *Patriarch Partners XV, LLC v. U.S. Bank, N.A.*, Index No. 654819/2016 (the "State Court Action").

5.     On September 12, 2016, U.S. Bank received the Summons and Complaint in the State Court Action. A copy of the Summons and Complaint is annexed hereto as Exhibit A.

## REMOVAL BASED ON THE EDGE ACT

6.     This is a civil action over which this Court has original jurisdiction pursuant to the Edge Act, 12 U.S.C. §§ 611-631, because it involves a party organized under the laws of the United States and arises out of "international or foreign banking" as required by 12 U.S.C. § 632, and is one that U.S. Bank may remove to this Court pursuant to 28 U.S.C. § 1441 *et seq.*

7.     Under the Edge Act, federal district courts have original jurisdiction in civil actions that (1) involve a party that is "a federally chartered corporation" and (2) "arise out of an offshore banking or financial transaction of that federally chartered corporation." *Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 712 F.3d 775, 784 (2d Cir. 2013); *see* 12 U.S.C. § 632; *see also Highland Crusader Offshore Partners, L.P. v. LifeCare Holdings, Inc.*, 627

F. Supp. 2d 730, 734 (N.D. Tex. 2008) ("Section 632 does not require that the claims themselves have a foreign character; it only requires that the lawsuit 'arise out of' transactions with a foreign aspect."). Both requirements are satisfied here, and federal courts "routinely" extend federal jurisdiction on the basis of Section 632, including "in cases based on state law causes of action and containing only an incidental connection to banking law," and "even though the international or foreign banking activity was not central to the case." *In re Lloyd's Am. Trust Fund Litig.*, 928 F. Supp. 333, 340-41 (S.D.N.Y. 1996) (collecting cases).

8. Defendant U.S. Bank is a national banking association chartered under federal law.

9. This action arises out of transactions involving international banking and/or financial operations. Specifically, this action arises out of U.S. Bank's contractual duties as a service provider to the Issuer, an exempted company with limited liability incorporated under the laws of the Cayman Islands. The assets that form the basis of the State Court Action are owned by the Issuer and were pledged by the Issuer to U.S. Bank in its capacity as Trustee. Pursuant to the Indenture, dated November 13, 2003, by and among U.S. Bank, Issuer, Zohar CDO 2003-1, Corp., as Co-Issuer, Zohar CDO 2003-1, LLC, MBIA Insurance Corporation, as Credit Enhancer, and IXIS Financial Products, Inc., as Class A-1 Note Agent and Class A-3 Note Agent (the "Indenture"), the Trustee arranged for a public auction of Issuer's assets. The State Court Action involves a dispute relating to the Trustee's disposition of these the assets, and the Plaintiffs seek to enjoin their sale. Thus, this action arises out of U.S. Bank's execution of Trust services on behalf of foreign issuers,

which is an international banking activity. *See In re Lloyd's Am. Trust Fund Litig.*, 928 F. Supp. 333, 339 (S.D.N.Y. 1996) ("Trust services constitute a banking activity under federal law.").

10.     Therefore, this action is properly removable pursuant to 12 U.S.C. § 632 and 28 U.S.C. §§ 1441, 1331.

## VENUE

11.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1441(a), 1446(a) and 112(b) because the United States District Court for the Southern District of New York is the federal judicial district and division embracing the New York Supreme Court where the State Court Action was originally filed.

## PROCEDURAL REQUIREMENTS FOR REMOVAL

12.     Pursuant to 28 U.S.C. § 1446(a), all process, pleadings, and orders received by U.S. Bank in the State Court Action are attached to this Notice as Exhibit A.

13.     Pursuant to 28 U.S.C. § 1446(b), the only other defendant, MBIA Insurance Corp., consents to this removal.  Defendant MBIA Insurance Corp. has indicated its consent to this removal through signature of its counsel on this Notice of Removal.

14.     As required under 28 U.S.C. § 1446(d), U.S. Bank will promptly file with the Clerk of Court of New York County, New York a true and correct copy of this Notice of Removal.

15.     As required under 28 U.S.C. § 1446(d), U.S. Bank will promptly serve all parties who have appeared in this action with a true and correct copy of this Notice of

Removal.  Pursuant to Federal Rule of Civil Procedure 5(d), U.S. Bank will file with this Court a Certificate of Service of Notice to Adverse Parties of Removal to Federal Court.

## **RESERVATION OF DEFENSES**

16.     U.S. Bank reserves all rights including but not limited to defenses and objections as to venue and personal jurisdiction, and the filing of this Notice of Removal is subject to, and without waiver of, any such defenses and objections.

17.     U.S. Bank reserves the right to amend or supplement this Notice of Removal.

WHEREFORE, notice is hereby given that the action is removed from the Supreme Court of New York, New York County to the United States District Court for the Southern District of New York.

Dated:     New York, New York
           September 13, 2016

                                   ALSTON & BIRD LLP


                                    /s/ Michael E. Johnson
                                   Michael E. Johnson
                                   Alexander S. Lorenzo
                                   90 Park Avenue
                                   New York, New York 10016
                                   (212) 210-9400
                                   alexander.lorenzo@alston.com
                                   michael.johnson@alston.com

                                   *Attorneys for Defendant U.S. Bank*
                                   *Bank, N.A., solely in its capacity*
                                   *as Trustee for Zohar CDO 2003-1, Ltd.*

**CONSENTED TO:**

CADWALADER, WICKERSHAM &
TAFT LLP

Jonathan M. Hoff
Joshua Arnold
One World Financial Center
New York, NY 10281
(212) 504-6000
jonathan.hoff@cwt.com
joshua.arnold@cwt.com

*Attorneys for Defendant MBIA Insurance
Corp.*

# EXHIBIT E



Global Corporate Trust Services
214 N. Tryon Street, 26th Floor
Charlotte, North Carolina 28202

## SECOND NOTICE OF PUBLIC SALE AND INVITATION TO BID

October 24, 2016

You are invited to bid on all of the assets described in items 1-133 below (the "Assets Subject To Sale" or the "Assets"; each item, an "Asset"), which will be sold at a public sale, as indicated below. The sale will be held by U.S. Bank National Association ("U.S. Bank"), not in its individual capacity, but solely as trustee (the "Trustee") under that certain Indenture, dated as of November 13, 2003 (as amended or supplemented, the "Indenture"), by and among Zohar CDO 2003-1, Limited, as Issuer (the "Issuer"), Zohar CDO 2003-1, Corp., as Co-Issuer, Zohar CDO 2003-1, LLC, as Zohar Subsidiary, MBIA Insurance Corporation, as Credit Enhancer, CDC Financial Products Inc., as Class A-1 Note Agent, and the Trustee. Capitalized terms used herein and not otherwise defined shall have the meanings assigned thereto in the Indenture.

The Trustee has retained Duff & Phelps Securities, LLC ("Duff & Phelps") to act as its liquidation agent (the "Liquidation Agent") for the Assets Subject To Sale. To request more information from the Liquidation Agent about the public sale of the Assets Subject To Sale, including how to submit bids in connection with the sale, please contact Duff & Phelps by telephone at 212-523-0355 or by e-mail at CL.ZOHARBIDS@DUFFANDPHELPS.COM, or by mail addressed to Duff & Phelps Securities, LLC, 55 East 52nd Street, Floor 31, New York, NY 10055, Attention: Zohar Bids.

The Conditions of the Public Sale Are as Follows:

1.   Assets Subject To Sale. The Assets Subject To Sale that will be sold at the public sale are the following:[1]

| Public Sale: Tuesday, November 29, 2016, 12:00 p.m. ET | | | | | | | |
|---|---|---|---|---|---|---|---|
| Loan Interests | | | | | | | |
| # | Issuer | Issue | Asset Type | Current Par Amount (Issue Currency) | Total Commitment | Current Coupon | Maturity Date |
| 1. | 180s, LLC & 180s Canada Corporation | Fully Funded Term B | Delayed Draw Loan | 2,240,328.00 | 2,242,328.00 | 2.52722 | 4/15/2019 |
| 2. | 180s, LLC & 180s Canada Corporation | Tranche A Revolver | Revolving Credit | 16,600,000.00 | 16,600,000.00 | 2.52722 | 4/15/2019 |

---

[1] Information is current as of October 21, 2016 and is subject to change. The information relating to each of items 1-133 described herein is for reference purposes only and is qualified in its entirety by reference to the related governing documents and the additional qualifications described in this Second Notice of Public Sale and Invitation to Bid.

| # | Issuer | Issue | Asset Type | Current Par Amount (Issue Currency) | Total Commitment | Current Coupon | Maturity Date |
|---|--------|-------|-----------|-------------------------------------|------------------|----------------|---------------|
| 3. | American Doors, LLC | Term Loan | Term Loan | 115,751.42 | 115,751.42 | 1.02722 | 4/15/2019 |
| 4. | American Doors, LLC | Term Loan C | Term Loan | 8,315,638.01 | 8,315,638.01 | 1.02722 | 4/15/2019 |
| 5. | American LaFrance | Delayed Draw Term Loans | Delayed Draw Loan | 509,019.73 | 509,019.73 | 0.197 | 10/31/2015 |
| 6. | American LaFrance | Fully Funded DD Term Loan A | Term Loan | 1,784,456.80 | 1,784,456.80 | 0.434 | 10/31/2015 |
| 7. | American LaFrance | Revolver | Revolving Credit | 451,290.39 | 451,290.40 | 1 | 10/31/2015 |
| 8. | American LaFrance | Term Loan 1 | Term Loan | 414,121.55 | 414,121.55 | 1 | 10/31/2015 |
| 9. | American LaFrance | Term Loan 2 | Term Loan | 42,240,641.22 | 42,240,641.22 | 1 | 10/31/2015 |
| 10. | Amweld International LLC | Delayed Draw | Delayed Draw Loan | 80,160.09 | 80,160.09 | 0 | 6/28/2016 |
| 11. | Amweld International LLC | Term Loan B | Term Loan | 5,758,739.62 | 5,758,739.62 | 0 | 10/31/2015 |
| 12. | Best Textiles Acquisition, LLC | Revolver | Revolving Credit | 5,000,000.00 | 5,000,000.00 | 2.52722 | 4/15/2019 |
| 13. | Bomar Industries International, Inc. | Revolver 2 | Revolving Credit | 3,200,000.00 | 3,200,000.00 | 0 | 6/30/2013 |
| 14. | Bomar Industries International, Inc. | Tranche A Term Loan | Term Loan | 10,000,000.00 | 10,000,000.00 | 0 | 6/30/2013 |
| 15. | Bomar Industries International, Inc. | Tranche B Term Loan | Term Loan | 3,806,930.16 | 3,806,930.16 | 0 | 6/30/2013 |
| 16. | Croscil Home | Revolver | Revolving Credit | 10,000,000.00 | 10,000,000.00 | 6.52722 | 4/15/2019 |
| 17. | Duro Textiles, LLC | Fully Funded Term Loan G | Delayed Draw Loan | 1,049,259.65 | 1,049,259.65 | 2.02722 | 4/15/2019 |
| 18. | Duro Textiles, LLC | Term B Loan | Term Loan | 7,500,000.00 | 7,500,000.00 | 2.02722 | 4/15/2019 |
| 19. | Duro Textiles, LLC | Term Loan | Term Loan | 8,000,000.00 | 8,000,000.00 | 2.02722 | 4/15/2019 |
| 20. | Duro Textiles, LLC | Term Loan K1 | Term Loan | 1,888,000.99 | 1,888,000.99 | 2.02722 | 4/15/2019 |
| 21. | East Alliance Limited | Term Loan A | Term Loan | 11,928,348.24 | 11,928,348.24 | 2.89815 | 12/31/2016 |
| 22. | Emag Solutions, LLC | Revolver | Revolving Credit | 4,062,500.04 | 4,062,500.04 | 7.52322 | 4/15/2019 |
| 23. | Fetco Home Decor, Inc. | Exchanged Security | Term Loan | 2,757,727.26 | 2,757,727.26 | 0.1702 | 4/15/2019 |
| 24. | Fetco Home Decor, Inc. | Term Loan | Term Loan | 1,082,661.77 | 1,082,661.77 | 8.52722 | 4/15/2019 |
| 25. | Galey & Lord, LLC | Fully Funded Term Loan | Term Loan | 3,000,000.00 | 3,000,000.00 | 1.52722 | 4/15/2019 |
| 26. | Galey & Lord, LLC | Revolver | Revolving Loan | 1,180,176.25 | 1,180,176.25 | 1.52722 | 4/15/2019 |
| 27. | Galey & Lord, LLC | Term Loan | Term Loan | 25,263,396.84 | 25,263,396.84 | 1.52322 | 4/15/2019 |
| 28. | Galey & Lord, LLC | Term Loan E | Term Loan | 1,600,000.00 | 1,600,000.00 | 1.52722 | 4/15/2019 |
| 29. | Galey & Lord, LLC | Term Loan K | Term Loan | 689,999.01 | 689,999.01 | 1.52722 | 4/15/2019 |
| 30. | Galey & Lord, LLC | Term Loan M | Term Loan | 800,000.00 | 800,000.00 | 1.52722 | 4/15/2019 |
| 31. | Global Automotive Systems, LLC | Term Loan | Term Loan | 9,100,000.00 | 9,100,000.00 | 6.02722 | 4/15/2019 |
| 32. | Global Automotive Systems, LLC | Term Loan A | Term Loan | 21,727,855.40 | 21,727,855.40 | 6.02722 | 4/15/2019 |
| 33. | Hartwell Industries, Inc. | DELAYED DRAW TERM LOAN C | Delayed Draw Loan | 1,500,000.00 | 1,500,000.00 | 3.02322 | 4/15/2019 |

| # | Issuer | Issue | Asset Type | Current Par Amount (Issue Currency) | Total Commitment | Current Coupon | Maturity Date |
|---|--------|-------|-----------|-------------------------------------|------------------|----------------|---------------|
| 34. | Hartwell Industries, Inc. | New Revolver | Revolving Credit | 1,927,636.19 | 1,927,639.96 | 3.02322 | 4/15/2019 |
| 35. | Hartwell Industries, Inc. | New Term Loan 2 | Term Loan | 15,060,304.48 | 15,060,304.48 | 3.02722 | 4/15/2019 |
| 36. | Hartwell Industries, Inc. | Term Loan A-1 | Term Loan | 500,000.00 | 500,000.00 | 3.02722 | 4/15/2019 |
| 37. | Heritage Aviation, Ltd. | Delayed Draw Term Loan A | Delayed Draw Loan | 9,860,000.00 | 9,970,000.00 | 4.52722 | 4/15/2019 |
| 38. | Heritage Aviation, Ltd. | Term Loan | Term Loan | 1,000,000.00 | 1,000,000.00 | 4.52722 | 4/15/2019 |
| 39. | Iconic American Trucks | Iconic American Trucks T/L B | Term Loan | 7,217,681.53 | 7,217,681.53 |  | 3/31/2019 |
| 40. | IMG Holdings, Inc. | Fully Funded Term Loan | Term Loan | 555,360.00 | 555,360.00 | 4.52722 | 4/15/2019 |
| 41. | IMG Holdings, Inc. | Revolver A | Revolving Credit | 3,999,999.97 | 4,000,000.00 | 4.52322 | 4/15/2019 |
| 42. | IMG Holdings, Inc. | Revolving Credit C | Revolving Credit | 2,000,000.35 | 2,000,000.35 | 4.52322 | 4/15/2019 |
| 43. | IMG Holdings, Inc. | Term E | Term Loan | 144,640.00 | 144,640.00 | 4.52722 | 4/15/2019 |
| 44. | IMG Holdings, Inc. | Term Loan 1A | Term Loan | 2,004,585.76 | 2,004,585.76 | 4.52722 | 4/15/2019 |
| 45. | IMG Holdings, Inc. | Term Loan 1B | Term Loan | 2,174,795.68 | 2,174,795.68 | 4.52722 | 4/15/2019 |
| 46. | IMG Holdings, Inc. | Term Loan D | Term Loan | 300,000.00 | 300,000.00 | 4.52722 | 4/15/2019 |
| 47. | Intera Group, Inc. | Exchanged Security | Note | 6,374,815.23 | 6,374,815.23 | 0 | 12/31/2016 |
| 48. | Intera Group, Inc. | Fully Funded Term C | Delayed Draw Loan | 2,586,494.53 | 2,586,494.53 | 0 | 10/31/2016 |
| 49. | Intera Group, Inc. | Restructured Term Loan | Term Loan | 869,031.69 | 869,031.69 | 0 | 10/31/2016 |
| 50. | Intera Group, Inc. | Term Loan C | Term Loan | 158,501.65 | 158,501.65 | 0 | 10/31/2016 |
| 51. | Intrepid USA | Intrepid USA R/C | Revolving Credit | 9,280,002.89 | 9,280,002.89 | 8 | 4/15/2019 |
| 52. | Intrepid USA | Term Loan B | Term Loan | 3,860,066.01 | 3,860,066.01 | 6.52722 | 4/15/2019 |
| 53. | LVD Acquisition, LLC | Term Loan | Term Loan | 9,303,993.33 | 9,303,993.33 | 4.52722 | 4/15/2019 |
| 54. | MD Helicopters, Inc. | Sub Note Term Loan | Term Loan | 11,255,271.08 | 11,255,271.08 | 2.4255 | 5/15/2019 |
| 55. | MD Helicopters, Inc. | Term A | Term Loan | 12,873,602.92 | 12,873,602.92 | 3.52722 | 4/15/2019 |
| 56. | MD Helicopters, Inc. | Term Loan | Term Loan | 25,551,724.14 | 25,551,724.14 | 3.52722 | 4/15/2019 |
| 57. | MD Helicopters, Inc. | Term Loan B | Term Loan | 16,116,674.23 | 16,116,674.23 | 3.52722 | 4/15/2019 |
| 58. | MD Helicopters, Inc. | Tranche A-3 | Term Loan | 700,000.00 | 700,000.00 | 3.52722 | 4/15/2019 |
| 59. | MD Helicopters, Inc. | Tranche A-7 | Term Loan | 1,200,000.00 | 1,200,000.00 | 3.52722 | 4/15/2019 |
| 60. | Natura Water, Inc. | Fully Funded Term B | Term Loan | 1,500,000.00 | 1,500,000.00 | 5.49565 | 4/15/2019 |
| 61. | Natura Water, Inc. | Fully Funded Term C | Term Loan | 2,200,000.00 | 2,200,000.00 | 5.49565 | 4/15/2019 |
| 62. | Natura Water, Inc. | Fully Funded Term Loan E | Term Loan | 300,000.00 | 300,000.00 | 5.49565 | 4/15/2019 |
| 63. | NetVersant Acquisition, LLC | Restructured Revolver A | Revolving Credit | 277,490.69 | 277,490.69 | 1.49565 | 4/15/2019 |
| 64. | NetVersant Acquisition, LLC | Restructured Term Loan | Term Loan | 41,585,556.76 | 41,585,556.76 | 1.52722 | 4/15/2019 |
| 65. | NetVersant Solutions, Inc. | Restructured Revolver B | Revolving Credit | 2,102,385.30 | 2,102,385.31 | 1.49565 | 4/15/2019 |

| # | Issuer | Issue | Asset Type | Current Par Amount (Issue Currency) | Total Commitment | Current Coupon | Maturity Date |
|---|--------|-------|------------|-------------------------------------|------------------|----------------|---------------|
| 66. | Petry Media Corporation | Priming Revolver | Revolving Credit | 9,212,536.60 | 9,219,801.44 | 10 | 10/31/2017 |
| 67. | Petry Media Corporation | Priming Term Loan | Term Loan | 210,397.61 | 210,397.61 | 10 | 10/31/2016 |
| 68. | Petry Media Corporation | Term Loan C | Term Loan | 1,380,775.74 | 1,380,775.74 | 10 | 10/31/2016 |
| 69. | Petry Media Corporation | Term Loan E | Term Loan | 770,092.44 | 770,092.44 | 10 | 10/31/2016 |
| 70. | Rapid Rack Industries, Inc. | Term Loan | Term Loan | 4,121,507.10 | 4,121,507.10 | 0 | 10/31/2015 |
| 71. | Red Shield Acquisition LLC | Revolver 2 | Revolving Credit | 5,000,000.00 | 5,000,000.00 | | 10/31/2016 |
| 72. | Red Shield Acquisition LLC | Term Loan | Delayed Draw Loan | 5,722,548.98 | 5,722,548.98 | | 10/31/2016 |
| 73. | Remco Maintenance, LLC | Revolver | Revolving Credit | 2,500,000.00 | 2,500,000.00 | 8.52722 | 4/15/2019 |
| 74. | Remco Maintenance, LLC | Term Loan | Term Loan | 3,362,670.50 | 3,362,670.50 | 8.52722 | 4/15/2019 |
| 75. | RM Acquisition, LLC | Preferred Security | Term Loan | 8,545,250.00 | 8,545,250.00 | 0.52667 | 5/15/2019 |
| 76. | RM Acquisition, LLC | Revolver | Revolving Credit | 2,205,882.33 | 2,205,882.35 | 10 | 4/15/2019 |
| 77. | RM Acquisition, LLC | Term Loan | Term Loan | 5,823,529.41 | 5,823,529.41 | 4.85722 | 4/15/2019 |
| 78. | S.O. Acquisition, LLC | Fully Funded Term A | Term Loan | 4,500,000.00 | 4,500,000.00 | 6.52722 | 4/15/2019 |
| 79. | S.O. Acquisition, LLC | Fully Funded Term Loan C | Term Loan | 350,000.00 | 350,000.00 | 6.52722 | 4/15/2019 |
| 80. | Silverack, LLC | Silverack R/C A | Revolving Credit | 6,000,000.00 | 6,000,000.00 | 2.52722 | 4/15/2019 |
| 81. | Silverack, LLC | Silverack T/L A | Term Loan | 3,395,487.02 | 3,395,487.02 | 2.52722 | 4/15/2019 |
| 82. | Snelling Medical Staffing | Term Loan | Term Loan | 223,000.00 | 223,000.00 | 7.52722 | 4/15/2019 |
| 83. | Transcare Corporation | Tranche B Term Loan | Term Loan | 3,500,000.00 | 3,500,000.00 | 2.52722 | 4/15/2019 |
| 84. | Trim Trends, LLC | Term Loan A | Term Loan | 6,555,380.26 | 6,555,380.26 | 6.02722 | 4/15/2019 |
| 85. | Vulcan Engineering Corporation | Revolver | Revolving Credit | 1, 428,571.43 | 2,000,000.00 | 7.52722 | 4/15/2019 |
| 86. | Xinhua Sports & Entertainment | Additional Term Loan | Term Loan | 2,394,288.89 | 2,394,288.89 | 0.2145 | 10/21/2012 |
| 87. | Xinhua Sports & Entertainment | Convertible Term Loan | Term Loan | 13,060,228.45 | 13,060,228.45 | 0.2145 | 10/21/2012 |
| 88. | Xpient Solutions, LLC | Exchanged Security | Term Loan | 318,427.84 | 318,427.84 | 4.19775 | 11/30/2019 |
| 89. | Zohar SS Acquisition, LLC | Exchanged Security | Term Loan | 2,564,102.60 | 2,564,102.60 | 0.52722 | 5/15/2019 |
| 90. | Zohar SS Acquisition, LLC | Preferred Stock | Term Loan | 256,410.26 | 256,410.26 | 9 | 5/15/2019 |
| 91. | Zohar SS Acquisition, LLC | Term Loan | Term Loan | 7,652,549.20 | 7,652,549.20 | 7.52722 | 4/15/2019 |

| Equity Interests | | |
|---|---|---|
| # | Issuer Name | Type | Commitment Settled |
|---|---|---|---|
| 92. | Automated Ductwork Manufacturing Company | Common | 100.00 |
| 93. | Felagastyring EHF | Common Stock | 63,100.00 |
| 94. | Fetco Home Decor, Inc. | Common1 | 51,263.00 |
| 95. | Fetco Home Decor, Inc. | Common2 | 25,000.00 |

| 96. | Fetco Home Decor, Inc. | Common 315619ZA7 | 76,263.00 |
|---|---|---|---|
| 97. | Fetco Home Decor, Inc. | Pref 315619ZB5 | 13,488.00 |
| 98. | Fetco Home Decor, Inc. | Common 315619ZC3 | 60,000.00 |
| 99. | Fetco Home Decor, Inc. | Preferred | 14,090.00 |
| 100. | Fetco International Hong Kong Limited | Common | 9,997.00 |
| 101. | Galey & Lord, Inc. | Common Stock | 687,547.00 |
| 102. | Galey & Lord, Inc. | Series A Preferred Interest 8/18/2012 | 39,010,000.00 |
| 103. | Glenoit Universal, Ltd. | Common Stock Class A | 12,967.00 |
| 104. | Glenoit Universal, Ltd. | Class B Common Stock | 3,527.00 |
| 105. | Glenoit Universal, Ltd. | Class A Common Stock | 12,967.00 |
| 106. | Glenoit Universal, Ltd. | Common CL B | 3,527.00 |
| 107. | Hartwell Industries, Inc. | Common CL A | 194,512.00 |
| 108. | HyperActive Technologies, Inc. | Common Stock | 85,334.00 |
| 109. | IMG Holdings, Inc. | Common Stock | 757.00 |
| 110. | Intera Group, Inc. | Preferred Stock | 5,069.42 |
| 111. | Intera Group, Inc. | Common Stock | 839.09 |
| 112. | Intera Group, Inc. | Common Stock | 839.09 |
| 113. | MD Helicopters, Inc. | Common Stock | 235.00 |
| 114. | Metalforming Technologies, Inc. | Common Stock | 175,889.00 |
| 115. | Opening Specialties and Supply Inc. | Common | 2,267.00 |
| 116. | PHC Holding Corp | Class A Common Stock | 83,460.13 |
| 117. | PHC Holding Corp | Class C Common Stock | 85,880.75 |
| 118. | PHC Holding Corp | Common | 100.00 |
| 119. | PHC Holding Corp | Class B Common Stock | 112,047.09 |
| 120. | PHC Holding Corp | Preferred Stock | 114,178.19 |
| 121. | Pleasants Hardware Company | Common CL A | 1,000.00 |
| 122. | Spectrum International Holdings, Inc. | Common | 286,103,870.07 |
| 123. | Textile Holdings, Inc. | Common | 400,000.00 |
| 124. | U.F. Holdings, Inc. | Preferred Stock | 53,810.00 |
| 125. | UF Holdings Inc. | Common | 196,020.00 |
| 126. | UI Acquisition Holding Company | Class A Common Stock | TBD[2] |
| 127. | UI Acquisition Holding Company | Class B Common Stock | TBD[2] |
| 128. | Vorumerkjastyring EHF | Common Stock | 63,100.00 |
| 129. | W.W. Holdings, LLC | Common Stock | 4,787.00 |
| 130. | Western Forest Products, Inc. | Common | 45,327.00 |
| 131. | W.W. Versat Acquisition Corporation | Common Stock | 100.00 |
| 132. | Xinhua Sports & Entertainment Limited | Common | 41,992.00 |

**Additional Assets Subject to Sale**

[2] Please refer to copies of the stock certificates for UI Acquisition Holding Co. available for review at the Liquidation Agent

| 133. | To the extent not identified in Items 1 to 132 above, Item 133 shall consist of all of the Issuer's right, title and interest in and to instruments, accounts, payment intangibles, general intangibles, letter-of-credit rights, chattel paper, electronic chattel paper, deposit accounts and investment property and other property and rights subject or intended to be subject to the lien of the Indenture for the benefit of the Secured Parties (as defined in the Indenture) as set forth in the Granting Clauses of the Indenture, including, without limitation, any and all property of any type or nature owned by the Issuer (other than Excluded Property, as defined in the Indenture) and any Equity Securities (as defined in the Indenture) and other securities or obligations owned or acquired by the Issuer and such other right, title or interest to which the Trustee may transfer or sell, including, without limitation (and for avoidance of any doubt), any commercial tort claims; provided, however, that all of the Accounts and all Cash therein (as each such term is defined in the Indenture) shall in no event be included in the Assets Subject To Sale. |
|---|---|

2.   <u>Place, Date and Time of the Public Sale</u>.  The place, date and time of the sale will be as follows:



| DATE AND TIME |
|---|
| **Public Sale: Tuesday, November 29, 2016, 12:00 p.m. ET** |
| PLACE |
| The sale will be held at: Duff & Phelps Securities 55 East 52nd Street, Floor 31 New York, NY 10055 |

***ONLY PERSONS WHO SATISFY THE FOLLOWING REQUIREMENTS WILL BE PERMITTED TO BID AT THE PUBLIC SALE***

3.   <u>Conditions of Sale</u>.  The conditions of the public sale are as follows:

(a)   Each bid must be submitted to the Liquidation Agent, either in person or using the email address noted above, and must include a signed copy of the Bid Sheet attached hereto as <u>Exhibit A</u>, together with all bids on Annex I to the Bid Sheet. No bid will be accepted unless it is accompanied by a Bid Sheet, signed by the applicable bidder, and received by the Liquidation Agent prior to the completion of the applicable public sale.  Bidding for the public sale will be held open for 30 minutes following the time identified above, or such longer time as determined by the Liquidation Agent or the Trustee.

(b)   Bidders may provide (i) bids for one or more of the Assets listed in items 1-133 above and/or (ii) a single bid to purchase all of items 1-133 above, as designated in the Bid Sheet (the "<u>Entire Portfolio</u>").  Each bid shall be in a price format set out in US dollars and shall be the offer by such bidder to purchase the one or more items upon payment by such bidder of such US dollar amount price.

(c)   The Trustee reserves the right to reject any bid which it deems to have been made by a bidder which is unable to satisfy the requirements imposed by the Trustee upon prospective bidders in connection with the public sales or to whom in the Trustee's sole judgment a sale may not lawfully be made.  The Trustee shall not be obligated to

make any sale and reserves the right to sell the Assets at a subsequent public or private sale.

(d)     Subject to Section 3(f) below, the winning bid or bids, as applicable, will be determined as follows (i) the highest bid from a qualified bidder for the Entire Portfolio shall be compared to (ii) the sum of the highest bids from qualified bidders with respect to each item listed in 1-133 above (assuming a bid of zero for any item for which no bid is received).  If (i) exceeds (ii) then the highest bid for the Entire Portfolio shall be the winning bid.  If (ii) exceeds (i) then the highest bid for each item listed in 1-133 shall be the winning bid for that item.

(e)     In the event that two or more bidders submit bids for equal amounts, and for the same Assets, and such bids are the highest bid amounts received for such Assets (not including any bids received pursuant to Section 3(f) below) (a "tie bid"), the Liquidation Agent, at its sole discretion, may request such bidders to submit an additional bid from which the highest bid amount will be determined.  In the event a tie bid remains following the conclusion of bidding, including any additional bidding as described in the preceding sentence, the winning bid (subject to Section 3(f) below) will be the earliest submitted bid.

(f)     Each Holder of a Class B Note and each Holder of a Class C Note issued pursuant to the Indenture is entitled to receive at least five Business Days' prior notice of a sale of one or more of the Assets (describing the Assets to be sold and the sale amount therefore in reasonable detail), and any Holder of a Class B Note or a Class C Note may arrange for a Person to purchase such Asset or Assets, as the case may be, within three Business Days of such notice, in an amount equal to or more favorable to the Issuer than the amount described in such notice.  By submitting a bid, a bidder acknowledges that, to the extent such bidder is the highest qualified bidder, as determined pursuant to Section 3(d) and, if applicable, Section 3(e) hereof, for an Asset or Assets, such bidder may not be awarded the particular Asset or the Entire Portfolio, as the case may be, because of the right of a Holder of a Class B Note or a Class C Note to arrange for a Person to purchase such Asset or the Entire Portfolio, as the case may be, (within the time period described above) for an amount equal to or more favorable to the Issuer than the bid submitted by such highest qualified bidder.

(g)     Some or all of the items constituting part of items 1-133 above may not have been and will not be registered under the Securities Act of 1933, as amended (the "Act"), or any applicable state securities laws and may not be sold or transferred without registration under such Act and applicable state securities law or the availability of valid exemptions from such registration requirements.  In addition to such securities laws transfer restrictions on resale, some or all of the Assets Subject To Sale may be subject to transfer restrictions under the governing documents for such items included in the Assets Subject To Sale and/or other restrictions under applicable law, including but not limited to restrictions related to the United States Investment Company Act of 1940 (as amended, the "Investment Company Act") and the United States Employee Retirement Income Security Act of 1974 (as amended, "ERISA"), each as amended from time to time.

(h)    To the extent a bidder is interested in bidding on one or more of the Assets, please contact the Liquidation Agent to receive any information with respect to the Assets which may be in the possession of the Trustee (or obtained by the Liquidation Agent from the Collateral Manager via the Trustee) but not otherwise publicly available. In order to receive such information, each prospective bidder must first execute and return to the Liquidation Agent the Investor Representations and Confidentiality Agreement in the form of Exhibit B attached hereto. Such information may include documents or financial information in the possession of the Trustee relating to the Assets, which information may include payment reports in the possession of the Trustee relating to the Assets or notices received by the Trustee regarding any defaults (and/or remedies exercised in connection with any defaults) which may have occurred in the underlying transactions. Neither the Trustee nor the Liquidation Agent makes any representation, express or implied, with respect to the accuracy, adequacy or completeness for its purposes of any information that any bidder may receive in connection with any bid on the Assets.

(i)    Certain of the Assets are loan interests or equity interests in respect of companies affiliated with the former Collateral Manager for the Issuer (and its affiliates), and such Assets may be subject to certain transfer restrictions. Loan interests may be subject to transfer restrictions identified in the related underlying instruments and such underlying instruments may provide for certain eligibility requirements for transferees of such loan interests. Equity interests may be subject to restrictions on transfer in the articles of organization of the issuer of such equity interest or in shareholder agreements or pledge agreements applicable to such equity interests. In addition, the transfer of certain of the equity interests may require the delivery of an opinion of legal counsel as to the applicability of, or exemption from, relevant securities laws in respect of such transfer. The Trustee makes no representation, express or implied, with respect to the applicability of any transfer restrictions to any of the Assets or whether any information made available by the Trustee or the Liquidation Agent to a bidder accurately or adequately describes any applicable transfer restrictions. There also exists ongoing litigation (i) between Patriarch Partners Agency Services, LLC ("PPAS") and the Issuer and the current Collateral Manager in an action styled *Patriarch Partners Agency Services, LLC v. Zohar CDO 2003-1, Ltd. et al.* 16-cv-04488-VM (S.D.N.Y.) (the "PPAS Litigation") and (ii) between the Issuer and the former Collateral Manager in an action styled *Zohar CDO 2003-1 et al v. Patriarch Partners, LLC* (Del. C. Ch.), Case No. 12247-VCS (the "Delaware Litigation") that impacts the Assets and their transferability. In particular, the PPAS Litigation includes claims by PPAS that the Issuer's replacement of PPAS as Administrative Agent under certain underlying instruments with the current Collateral Manager was ineffective because PPAS's appointment as Administrative Agent had been irrevocable. It is possible that the transferability of some or all of the underlying instruments at issue in the PPAS Litigation will be impacted by the outcome of those claims. In addition, the Delaware Litigation includes claims by the Issuer seeking documents from the former Collateral Manager related to the Assets that were not turned over after the former Collateral Manager's resignation. It is possible that the documents being sought could include information about the Assets that supplements or conflicts with the information about the Assets that is currently available to the

8

Trustee and described herein. The Delaware Litigation may also involve a dispute between the Issuer and the former Collateral Manager as to whether equity interests are within the definition of "Collateral" set forth in the Indenture. In respect of item #133 above, the Trustee and the Liquidation Agent make no representation or warranty as to (i) whether any such Assets exist or, (ii) if any such Assets exist, the value of or rights associated with any such Assets.

(j)     Management of the entities that are the subjects of the loan interests or the equity interests listed in items 1-133 are available, subject to an appropriate confidentiality agreement, to meet and confer with prospective bidders. Any prospective bidder wishing to avail itself of this opportunity should contact the Liquidation Agent.

(k)     THE ASSETS SUBJECT TO SALE WILL BE OFFERED AND SOLD BY THE TRUSTEE ON AN "AS IS AND WHERE IS" BASIS, AND WITHOUT ANY REPRESENTATIONS OR WARRANTIES (WHETHER EXPRESSED OR IMPLIED) OF ANY KIND MADE BY ANY SECURED PARTY, THE TRUSTEE, THE LIQUIDATION AGENT OR ANY OTHER PERSON ACTING FOR OR ON BEHALF OF THE TRUSTEE, AND WITHOUT ANY RECOURSE WHATSOEVER AGAINST ANY SUCH PERSON.

(l)     The highest qualified bidder for which any of the Assets are awarded, by submission of its bid, is deemed to represent and warrant that such bidder is qualified to become a transferee of such Assets under all transfer restrictions applicable to such Assets.

(m)     The Trustee will accept bids only from those persons to whom in its sole judgment such sale may lawfully be made; provided, however, that the acceptance of any such bid shall not constitute any determination on the part of the Trustee that the bidder is a permitted transferee of any of the Assets. Any person submitting a bid is hereby deemed to represent that (i) such Assets are being acquired for the account of the bidder and not with a view to resale or distribution except in compliance with applicable securities laws, and (ii) the bidder shall not resell a security constituting part of the Assets without compliance with the registration requirements of the Act, the regulations of the Securities and Exchange Commission promulgated thereunder and applicable state securities laws or pursuant to valid exemptions therefrom.

(n)     A bid by any person will be deemed to be a representation (and such person shall be required to so represent on any Bid Sheet submitted by such person) that such bidder (i) is a person or entity that qualifies for a private placement exemption from registration under the Act, (ii) has sufficient knowledge and experience in business and financial matters to evaluate properly the merits and risks of investment in the Assets, (iii) has had such access to information concerning the Assets as such bidder deems necessary to make an informed investment decision and, based on that information, has independently (and without reliance on the Trustee, Liquidation Agent or the Issuer) made its own analysis and decision to bid on the Assets, (iv) has such knowledge and experience and has made investments of a similar nature so as to be aware of the risks and uncertainties related to an

9

investment in such Assets, (v) has sufficient financial ability and net worth to bear the economic risks involved in investment in such Assets, (vi) acknowledges that no representation, express or implied, is made with respect to the accuracy, adequacy or completeness for its purposes of any information that such bidder may receive in connection with any bid on the Assets, and (vii) confirms that the sale of the Assets to the bidder will not violate the Act as a result of actions taken by the bidder or any breach of the representations contained herein or in the Bid Sheet and such bidder is qualified to become a transferee of such Assets under all transfer restrictions applicable to such Assets.   Further, such bidder may be required to establish that it is able to bear the economic risks involved in investment in the Assets.

(o)   Bids must be for the entire amount of each Asset or for the Entire Portfolio.   Partial bids in respect of individual Assets will not be accepted.

(p)   Your bid should be your "best and final" bid.   Except as otherwise set forth herein, you will not be notified of other bids prior to the determination of the winning bid nor (subject to Section 3(e) and 3(f)) will any bidder be given the opportunity to submit a subsequent higher bid.

(q)   Reserve levels may apply.

(r)   All bids submitted must be irrevocable and unconditional and held open for no less than six (6) Business Days.

(s)   Upon notification to the winning bidder, the winning bidder shall be required to deliver to the Trustee a signed counterpart of the purchase agreement (the "Purchase Agreement") substantially in the form attached hereto as Exhibit C.   The terms of such sale shall be (except in the case of a winning "Credit Bid" by the Credit Enhancer as described in subsection (u) below) payment of funds in cash or by certified or cashier's check or wire transfer after the acceptance of such bid and in accordance with the terms of the Purchase Agreement.   The winning bidder will be responsible for preparing and facilitating the execution of all necessary assignment and transfer documents, including all requirements applicable to any transfer restrictions to which the Assets may be subject.

(t)   The Trustee reserves the right to offer the Assets in any other commercially reasonable manner.   The Trustee may adjourn or cancel the public sale of any or all of the Assets or cause any such sale to be adjourned, recessed and/or reconvened from time to time, without further written notice or further publicity, by announcement at the time and place appointed for such sale or at any adjournment, recess and/or reconvening and, without further written notice or publication, such sale may be held at the time and place to which it may have been so adjourned.

(u)   Under certain circumstances, the Credit Enhancer may receive credit for the outstanding amount of the Credit Enhancer's Credit Enhancement Liabilities in connection with its bid on the Assets.

(v)     No sale will be completed until the winning bidder completes its purchase as provided herein and, in the case of any failure to complete a purchase, the Trustee may without further notice accept the next highest bid from a qualified bidder.

(w)     The Trustee reserves the right to amend, supplement or otherwise change the terms and conditions of the sale.

<u>Additional Information May Be Obtained</u>

Additional information concerning the Assets Subject To Sale and matters pertaining to the public sale may be obtained from the Liquidation Agent by contacting Duff & Phelps by telephone at 212-523-0355 or by e-mail at CL.ZOHARBIDS@DUFFANDPHELPS.COM, or by mail addressed to Duff & Phelps Securities, 55 East 52nd Street, Floor 31, New York, NY 10055, Attention: Zohar Bids.  The Indenture and the documents reflecting the Trustee's security interest in the Assets Subject To Sale are available for inspection prior to the public sale by appointment (or by other means agreed upon by the Trustee).

## EXHIBIT A

## BID SHEET

Reference is hereby made to that certain Second Notice of Public Sale and Invitation to Bid, dated as of October 24, 2016 (the "Invitation to Bid") from U.S. Bank National Association ("U.S. Bank"), not in its individual capacity but solely as trustee (in such capacity, the "Trustee") under that certain Indenture, dated as of November 13, 2003 (as amended or supplemented, the "Indenture"), by and among Zohar CDO 2003-1, Limited, as issuer (the "Issuer"), Zohar CDO 2003-1, Corp, as co-issuer, Zohar 2003-1, LLC, as Zohar subsidiary, MBIA Insurance Corporation, as Credit Enhancer, CDC Financial Products Inc., as Class A-1 Note Agent, and U.S. Bank, as Trustee, all of the terms and conditions of which are hereby acknowledged by the undersigned (the "Bidder") and incorporated herein by reference and made a part of the Bid (as defined below). All capitalized terms not defined herein but defined in the Invitation to Bid shall have the meanings given to such terms in the Invitation to Bid.

      1.    In accordance with the terms and conditions set forth in the Invitation to Bid, the Bidder hereby submits to the Trustee the following offer or bid (the "Bid") to purchase, in the bid amount noted and marked by the Bidder on Annex I attached hereto and incorporated herein by reference, (a) one or more of the Assets, and/or (b) the Entire Portfolio.

      2.    Contact information for the Bidder (must be completed in full):

Name: _____

Company: _____ Tax ID: _____

Street Address: _____

City: _____ State: _____ Zip: _____

Phone: _____ Email: _____

Bloomberg Address:   YES   NO   If "Yes", please include: _____

      3.    All Bids are subject to the terms and conditions set forth in the Invitation to Bid distributed in connection with this public sale. The Bidder hereby understands and agrees that the Assets are being sold strictly on an "AS IS, WHERE IS" basis, and without any representations or warranties (whether express or implied) of any kind made by any secured party, the Trustee, the Liquidation Agent or any other person acting for or on behalf of the Trustee, and without any recourse whatsoever against any such person.

      4.    By submitting this bid, the Bidder represents and warrants to the Trustee that it (i) is a person or entity that qualifies for a private placement exemption from registration under the Act, (ii) has sufficient knowledge and experience in business and financial matters to evaluate properly the merits and risks of investment in the Assets, (iii) has had such access to information concerning the Assets as such bidder deems necessary to make an informed investment decision and, based on that information, has independently (and without reliance on the Trustee, Liquidation Agent or the Issuer) made its own analysis and decision to bid on the Assets, (iv) has such knowledge and experience and has made investments of a similar nature so as to be aware of the risks and uncertainties related to an investment in such Assets, (v) has sufficient financial ability and net worth to bear the economic risks involved in investment in such Assets, (vi) acknowledges that no representation, express or implied, is made with respect to the accuracy, adequacy or completeness for its purposes of any information that such bidder may receive in connection with any

bid on the Assets, and (vii) confirms that the sale of the Assets to the Bidder will not violate the Act as a result of any actions taken by the Bidder or any breach of the representations contained in the Invitation to Bid or herein and such Bidder is qualified to become a transferee of each such Asset under all transfer restrictions applicable to such Asset.

       5.      By submitting this bid, the Bidder acknowledges and agrees that (i) it may not resell any securities constituting part of the Assets acquired in the public sale without compliance with the registration requirements of the Act, the regulations of the Securities and Exchange Commission promulgated thereunder, and applicable state securities laws, or pursuant to valid exemptions therefrom, (ii) some or all of the Assets that are the subject of the public sale may be subject to additional transfer restrictions under the governing documents for such Assets and/or applicable law, including but not limited to Investment Company Act restrictions and ERISA restrictions, and that the Bidder is qualified to become a transferee under all such transfer restrictions, and (iii) none of the Trustee, the Liquidation Agent nor any other person connected with the sale of Assets is a fiduciary or investment advisor to the Bidder.

       6.      There are no conditions or contingencies to this Bid. This Bid Sheet shall be governed by and construed in accordance with the laws of the State of New York for all purposes and in all respects, without giving effect to the conflict of law provisions thereof.

Executed as of this \_\_\_\_ day of _____, 2016.

_____

*(Name of Institution)*

By: _____
Name:
Title:

A-2

## ANNEX I TO THE BID SHEET

### Public Sale

| Issuer | Bid | Bid for Entire Portfolio |
|---|---|---|
| Zohar 2003-1, Limited | The Entire Portfolio [As Defined] | $XX.XX |

### AND / OR

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Loan Interest** | | | | | | | | |
| # | Issuer | Issue | Asset Type | Current Par Amount (Issue Currency) | Total Commitment | Current Coupon | Maturity Date | Bid |
| 1 | 180s, LLC & 180s Canada Corporation | Fully Funded Term B | Delayed Draw Loan | 2,240,328.00 | 2,242,328.00 | 2.52722 | 4/15/2019 | $ |
| 2 | 180s, LLC & 180s Canada Corporation | Tranche A Revolver | Revolving Credit | 16,600,000.00 | 16,600,000.00 | 2.52722 | 4/15/2019 | $ |
| 3 | American Doors, LLC | Term Loan | Term Loan | 115,751.42 | 115,751.42 | 1.02722 | 4/15/2019 | $ |
| 4 | American Doors, LLC | Term Loan C | Term Loan | 8,315,638.01 | 8,315,638.01 | 1.02722 | 4/15/2019 | $ |
| 5 | American LaFrance | Delayed Draw Term Loans | Delayed Draw Loan | 509,019.73 | 509,019.73 | 0.197 | 10/31/2015 | $ |
| 6 | American LaFrance | Fully Funded DD Term Loan A | Term Loan | 1,784,456.80 | 1,784,456.80 | 0.434 | 10/31/2015 | $ |
| 7 | American LaFrance | Revolver | Revolving Credit | 451,290.39 | 451,290.40 | 1 | 10/31/2015 | $ |
| 8 | American LaFrance | Term Loan 1 | Term Loan | 414,121.55 | 414,121.55 | 1 | 10/31/2015 | $ |
| 9 | American LaFrance | Term Loan 2 | Term Loan | 42,240,641.22 | 42,240,641.22 | 1 | 10/31/2015 | $ |
| 10 | Amweld International LLC | Delayed Draw | Delayed Draw Loan | 80,160.09 | 80,160.09 | 0 | 6/28/2016 | $ |
| 11 | Amweld International LLC | Term Loan B | Term Loan | 5,758,739.62 | 5,758,739.62 | 0 | 10/31/2015 | $ |
| 12 | Best Textiles Acquisition, LLC | Revolver | Revolving Credit | 5,000,000.00 | 5,000,000.00 | 2.52722 | 4/15/2019 | $ |
| 13 | Bomar Industries International, Inc. | Revolver 2 | Revolving Credit | 3,200,000.00 | 3,200,000.00 | 0 | 6/30/2013 | $ |
| 14 | Bomar Industries International, Inc. | Tranche A Term Loan | Term Loan | 10,000,000.00 | 10,000,000.00 | 0 | 6/30/2013 | $ |
| 15 | Bomar Industries International, Inc. | Tranche B Term Loan | Term Loan | 3,806,930.16 | 3,806,930.16 | 0 | 6/30/2013 | $ |
| 16 | Croscil Home | Revolver | Revolving Credit | 10,000,000.00 | 10,000,000.00 | 6.52722 | 4/15/2019 | $ |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 17 | Duro Textiles, LLC | Fully Funded Term Loan G | Delayed Draw Loan | 1,049,259.65 | 1,049,259.65 | 2.02722 | 4/15/2019 | $ |
| 18 | Duro Textiles, LLC | Term B Loan | Term Loan | 7,500,000.00 | 7,500,000.00 | 2.02722 | 4/15/2019 | $ |
| 19 | Duro Textiles, LLC | Term Loan | Term Loan | 8,000,000.00 | 8,000,000.00 | 2.02722 | 4/15/2019 | $ |
| 20 | Duro Textiles, LLC | Term Loan K1 | Term Loan | 1,888,000.99 | 1,888,000.99 | 2.02722 | 4/15/2019 | $ |
| 21 | East Alliance Limited | Term Loan A | Term Loan | 11,928,348.24 | 11,928,348.24 | 2.89815 | 12/31/2016 | $ |
| 22 | Emag Solutions, LLC | Revolver | Revolving Credit | 4,062,500.04 | 4,062,500.04 | 7.52322 | 4/15/2019 | $ |
| 23 | Fetco Home Decor, Inc. | Exchanged Security | Term Loan | 2,757,727.26 | 2,757,727.26 | 0.1702 | 4/15/2019 | $ |
| 24 | Fetco Home Decor, Inc. | Term Loan | Term Loan | 1,082,661.77 | 1,082,661.77 | 8.52722 | 4/15/2019 | $ |
| 25 | Galey & Lord, LLC | Fully Funded Term Loan | Term Loan | 3,000,000.00 | 3,000,000.00 | 1.52722 | 4/15/2019 | $ |
| 26 | Galey & Lord, LLC | Revolver | Revolving Loan | 1,180,176.25 | 1,180,176.25 | 1.52722 | 4/15/2019 | $ |
| 27 | Galey & Lord, LLC | Term Loan | Term Loan | 25,263,396.84 | 25,263,396.84 | 1.52322 | 4/15/2019 | $ |
| 28 | Galey & Lord, LLC | Term Loan E | Term Loan | 1,600,000.00 | 1,600,000.00 | 1.52722 | 4/15/2019 | $ |
| 29 | Galey & Lord, LLC | Term Loan K | Term Loan | 689,999.01 | 689,999.01 | 1.52722 | 4/15/2019 | $ |
| 30 | Galey & Lord, LLC | Term Loan M | Term Loan | 800,000.00 | 800,000.00 | 1.52722 | 4/15/2019 | $ |
| 31 | Global Automotive Systems, LLC | Term Loan | Term Loan | 9,100,000.00 | 9,100,000.00 | 6.02722 | 4/15/2019 | $ |
| 32 | Global Automotive Systems, LLC | Term Loan A | Term Loan | 21,727,855.40 | 21,727,855.40 | 6.02722 | 4/15/2019 | $ |
| 33 | Hartwell Industries, Inc. | DELAYED DRAW TERM LOAN C | Delayed Draw Loan | 1,500,000.00 | 1,500,000.00 | 3.02322 | 4/15/2019 | $ |
| 34 | Hartwell Industries, Inc. | New Revolver | Revolving Credit | 1,927,636.19 | 1,927,639.96 | 3.02322 | 4/15/2019 | $ |
| 35 | Hartwell Industries, Inc. | New Term Loan 2 | Term Loan | 15,060,304.48 | 15,060,304.48 | 3.02322 | 4/15/2019 | $ |
| 36 | Hartwell Industries, Inc. | Term Loan A-1 | Term Loan | 500,000.00 | 500,000.00 | 3.02722 | 4/15/2019 | $ |
| 37 | Heritage Aviation, Ltd. | Delayed Draw Term Loan A | Delayed Draw Loan | 9,860,000.00 | 9,970,000.00 | 4.52722 | 4/15/2019 | $ |
| 38 | Heritage Aviation, Ltd. | Term Loan | Term Loan | 1,000,000.00 | 1,000,000.00 | 4.52722 | 4/15/2019 | $ |
| 39 | Iconic American Trucks | Iconic American Trucks T/L B | Term Loan | 7,217,681.53 | 7,217,681.53 | | 3/31/2019 | $ |
| 40 | IMG Holdings, Inc. | Fully Funded Term Loan | Term Loan | 555,360.00 | 555,360.00 | 4.52722 | 4/15/2019 | $ |
| 41 | IMG Holdings, Inc. | Revolver A | Revolving Credit | 3,999,999.97 | 4,000,000.00 | 4.52322 | 4/15/2019 | $ |
| 42 | IMG Holdings, Inc. | Revolving Credit C | Revolving Credit | 2,000,000.35 | 2,000,000.35 | 4.52322 | 4/15/2019 | $ |
| 43 | IMG Holdings, Inc. | Term E | Term Loan | 144,640.00 | 144,640.00 | 4.52722 | 4/15/2019 | $ |
| 44 | IMG Holdings, Inc. | Term Loan 1A | Term Loan | 2,004,585.76 | 2,004,585.76 | 4.52722 | 4/15/2019 | $ |

| # | Borrower | Facility | Type | Amount 1 | Amount 2 | Rate | Maturity | $ |
|---|---|---|---|---|---|---|---|---|
| 45 | IMG Holdings, Inc. | Term Loan 1B | Term Loan | 2,174,795.68 | 2,174,795.68 | 4.52722 | 4/15/2019 | $ |
| 46 | IMG Holdings, Inc. | Term Loan D | Term Loan | 300,000.00 | 300,000.00 | 4.52722 | 4/15/2019 | $ |
| 47 | Intera Group, Inc. | Exchanged Security | Note | 6,374,815.23 | 6,374,815.23 | 0 | 12/31/2016 | $ |
| 48 | Intera Group, Inc. | Fully Funded Term C | Delayed Draw Loan | 2,486,494.53 | 2,586,494.53 | 0 | 10/31/2016 | $ |
| 49 | Intera Group, Inc. | Restructured Term Loan | Term Loan | 869,031.69 | 869,031.69 | 0 | 10/31/2016 | $ |
| 50 | Intera Group, Inc. | Term Loan C | Term Loan | 158,501.65 | 158,501.65 | 0 | 10/31/2016 | $ |
| 51 | Intrepid USA | Intrepid USA R/C | Revolving Credit | 9,280,002.89 | 9,280,002.89 | 8 | 4/15/2019 | $ |
| 52 | Intrepid USA | Term Loan B | Term Loan | 3,860,066.01 | 3,860,066.01 | 6.52722 | 4/15/2019 | $ |
| 53 | LVD Acquisition, LLC | Term Loan | Term Loan | 9,303,993.33 | 9,303,993.33 | 4.52722 | 4/15/2019 | $ |
| 54 | MD Helicopters, Inc. | Sub Note Term Loan | Term Loan | 11,255,271.08 | 11,255,271.08 | 2.4255 | 5/15/2019 | $ |
| 55 | MD Helicopters, Inc. | Term A | Term Loan | 12,873,602.92 | 12,873,602.92 | 3.52722 | 4/15/2019 | $ |
| 56 | MD Helicopters, Inc. | Term Loan | Term Loan | 25,551,724.14 | 25,551,724.14 | 3.52722 | 4/15/2019 | $ |
| 57 | MD Helicopters, Inc. | Term Loan B | Term Loan | 16,116,674.23 | 16,116,674.23 | 3.52722 | 4/15/2019 | $ |
| 58 | MD Helicopters, Inc. | Tranche A-3 | Term Loan | 700,000.00 | 700,000.00 | 3.52722 | 4/15/2019 | $ |
| 59 | MD Helicopters, Inc. | Tranche A-7 | Term Loan | 1,200,000.00 | 1,200,000.00 | 3.52722 | 4/15/2019 | $ |
| 60 | Natura Water, Inc. | Fully Funded Term B | Term Loan | 1,500,000.00 | 1,500,000.00 | 5.49565 | 4/15/2019 | $ |
| 61 | Natura Water, Inc. | Fully Funded Term C | Term Loan | 2,200,000.00 | 2,200,000.00 | 5.49565 | 4/15/2019 | $ |
| 62 | Natura Water, Inc. | Fully Funded Term Loan E | Term Loan | 300,000.00 | 300,000.00 | 5.49565 | 4/15/2019 | $ |
| 63 | NetVersant Acquisition, LLC | Restructured Revolver A | Revolving Credit | 277,490.69 | 277,490.69 | 1.49565 | 4/15/2019 | $ |
| 64 | NetVersant Acquisition, LLC | Restructured Term Loan | Term Loan | 41,585,556.76 | 41,585,556.76 | 1.52722 | 4/15/2019 | $ |
| 65 | NetVersant Solutions, Inc. | Restructured Revolver B | Revolving Credit | 2,102,385.30 | 2,102,385.31 | 1.49565 | 4/15/2019 | $ |
| 66 | Petry Media Corporation | Priming Revolver | Revolving Credit | 9,212,536.60 | 9,219,801.44 | 10 | 10/31/2017 | $ |
| 67 | Petry Media Corporation | Priming Term Loan | Term Loan | 210,397.61 | 210,397.61 | 10 | 10/31/2016 | $ |
| 68 | Petry Media Corporation | Term Loan C | Term Loan | 1,380,775.74 | 1,380,775.74 | 10 | 10/31/2016 | $ |
| 69 | Petry Media Corporation | Term Loan E | Term Loan | 770,092.44 | 770,092.44 | 10 | 10/31/2016 | $ |
| 70 | Rapid Rack Industries, Inc. | Term Loan | Term Loan | 4,121,507.10 | 4,121,507.10 | 0 | 10/31/2015 | $ |
| 71 | Red Shield Acquisition LLC | Revolver 2 | Revolving Credit | 5,000,000.00 | 5,000,000.00 | | 10/31/2016 | $ |
| 72 | Red Shield Acquisition LLC | Term Loan | Delayed Draw Loan | 5,722,548.98 | 5,722,548.98 | | 10/31/2016 | $ |
| 73 | Remco Maintenance, LLC | Revolver | Revolving Credit | 2,500,000.00 | 2,500,000.00 | 8.52722 | 4/15/2019 | $ |

| # | Issuer | Type | Loan Type | Commitment | Settled | Rate | Maturity | Bid |
|---|--------|------|-----------|-----------|---------|------|----------|-----|
| 74 | Remco Maintenance, LLC | Term Loan | Term Loan | 3,362,670.50 | 3,362,670.50 | 8.52722 | 4/15/2019 | $ |
| 75 | RM Acquisition, LLC | Preferred Security | Term Loan | 8,545,250.00 | 8,545,250.00 | 0.52667 | 5/15/2019 | $ |
| 76 | RM Acquisition, LLC | Revolver | Revolving Credit | 2,205,882.33 | 2,205,882.35 | 10 | 4/15/2019 | $ |
| 77 | RM Acquisition, LLC | Term Loan | Term Loan | 5,823,529.41 | 5,823,529.41 | 4.85722 | 4/15/2019 | $ |
| 78 | S.O. Acquisition, LLC | Fully Funded Term A | Term Loan | 4,500,000.00 | 4,500,000.00 | 6.52722 | 4/15/2019 | $ |
| 79 | S.O. Acquisition, LLC | Fully Funded Term Loan C | Term Loan | 350,000.00 | 350,000.00 | 6.52722 | 4/15/2019 | $ |
| 80 | Silverack, LLC | Silverack R/C A | Revolving Credit | 6,000,000.00 | 6,000,000.00 | 2.52722 | 4/15/2019 | $ |
| 81 | Silverack, LLC | Silverack T/L A | Term Loan | 3,395,487.02 | 3,395,487.02 | 2.52722 | 4/15/2019 | $ |
| 82 | Snelling Medical Staffing | Term Loan | Term Loan | 223,000.00 | 223,000.00 | 7.52722 | 4/15/2019 | $ |
| 83 | Transcare Corporation | Tranche B Term Loan | Term Loan | 3,500,000.00 | 3,500,000.00 | 2.52722 | 4/15/2019 | $ |
| 84 | Trim Trends, LLC | Term Loan A | Term Loan | 6,555,380.26 | 6,555,380.26 | 6.02722 | 4/15/2019 | $ |
| 85 | Vulcan Engineering Corporation | Revolver | Revolving Credit | 1,428,571.43 | 2,000,000.00 | 7.52722 | 4/15/2019 | $ |
| 86 | Xinhua Sports & Entertainment | Additional Term Loan | Term Loan | 2,394,288.89 | 2,394,288.89 | 0.2145 | 10/21/2012 | $ |
| 87 | Xinhua Sports & Entertainment | Convertible Term Loan | Term Loan | 13,060,228.45 | 13,060,228.45 | 0.2145 | 10/21/2012 | $ |
| 88 | Xpient Solutions, LLC | Exchanged Security | Term Loan | 318,427.84 | 318,427.84 | 4.19775 | 11/30/2019 | $ |
| 89 | Zohar SS Acquisition, LLC | Exchanged Security | Term Loan | 2,564,102.60 | 2,564,102.60 | 0.52722 | 5/15/2019 | $ |
| 90 | Zohar SS Acquisition, LLC | Preferred Stock | Term Loan | 256,410.26 | 256,410.26 | 9 | 5/15/2019 | $ |
| 91 | Zohar SS Acquisition, LLC | Term Loan | Term Loan | 7,652,549.20 | 7,652,549.20 | 7.52722 | 4/15/2019 | $ |

| Equity Interest | | | |
|---|---|---|---|
| # | Issuer Name | Type | Commitment Settled | Bid |
|---|---|---|---|---|
| 92 | Automated Ductwork Manufacturing Company | Common | 100 | $ |
| 93 | Felagastyring EHF | Common Stock | 63,100.00 | $ |
| 94 | Fetco Home Decor, Inc. | Common1 | 51,263.00 | $ |
| 95 | Fetco Home Decor, Inc. | Common2 | 25,000.00 | $ |
| 96 | Fetco Home Decor, Inc. | Common 315619ZA7 | 76,263.00 | $ |
| 97 | Fetco Home Decor, Inc. | Pref 315619ZB5 | 13,488.00 | $ |
| 98 | Fetco Home Decor, Inc. | Common 315619ZC3 | 60,000.00 | $ |
| 99 | Fetco Home Decor, Inc. | Preferred | 14,090.00 | $ |
| 100 | Fetco International Hong Kong Limited | Common | 9,997.00 | $ |
| 101 | Galey & Lord, Inc. | Common Stock | 687,547.00 | $ |
| 102 | Galey & Lord, Inc. | Series A Preferred Interest 8/18/2012 | 39,010,000.00 | $ |
| 103 | Glenoit Universal, Ltd. | Common Stock Class A | 12,967.00 | $ |

| 104 | Glenoit Universal, Ltd. | Class B Common Stock | 3,527.00 | $ |
| 105 | Glenoit Universal, Ltd. | Class A Common Stock | 12,967.00 | $ |
| 106 | Glenoit Universal, Ltd. | Common CL B | 3,527.00 | $ |
| 107 | Hartwell Industries, Inc. | Common CL A | 194,512.00 | $ |
| 108 | HyperActive Technologies, Inc. | Common Stock | 85,334.00 | $ |
| 109 | IMG Holdings, Inc. | Common Stock | 757 | $ |
| 110 | Intera Group, Inc. | Preferred Stock | 5,069.42 | $ |
| 111 | Intera Group, Inc. | Common Stock | 839.09 | $ |
| 112 | Intera Group, Inc. | Common Stock | 839.09 | $ |
| 113 | MD Helicopters, Inc. | Common Stock | 235 | $ |
| 114 | Metalforming Technologies, Inc. | Common Stock | 175,889.00 | $ |
| 115 | Opening Specialties and Supply Inc. | Common | 2,267.00 | $ |
| 116 | PHC Holding Corp | Class A Common Stock | 83,460.13 | $ |
| 117 | PHC Holding Corp | Class C Common Stock | 85,880.75 | $ |
| 118 | PHC Holding Corp | Common | 100 | $ |
| 119 | PHC Holding Corp | Class B Common Stock | 112,047.09 | $ |
| 120 | PHC Holding Corp | Preferred Stock | 114,178.19 | $ |
| 121 | Pleasants Hardware Company | Common CL A | 1,000.00 | $ |
| 122 | Spectrum International Holdings, Inc. | Common | 286,103,870.07 | $ |
| 123 | Textile Holdings, Inc. | Common | 400,000.00 | $ |
| 124 | U.F. Holdings, Inc. | Preferred Stock | 53,810.00 | $ |
| 125 | UF Holdings Inc. | Common | 196,020.00 | $ |
| 126 | UI Acquisition Holding Company | Class A Common Stock | TBD | $ |
| 127 | UI Acquisition Holding Company | Class B Common Stock | TBD | $ |
| 128 | Vorumerkjastyring EHF | Common Stock | 63,100.00 | $ |
| 129 | W.W. Holdings, LLC | Common Stock | 4,787.00 | $ |
| 130 | Western Forest Products, Inc. | Common | 45,327.00 | $ |
| 131 | W.W. Versat Acquisition Corporation | Common Stock | 100 | $ |
| 132 | Xinhua Sports & Entertainment Limited | Common | 41,992.00 | $ |

| Additional Assets Subject to Sale | | |
|---|---|---|
| # | | Bid |
| 133 | To the extent not identified in Items 1 to 132 above, Item 133 shall consist of all of the Issuer's right, title and interest in and to instruments, accounts, payment intangibles, general intangibles, letter-of-credit rights, chattel paper, electronic chattel paper, deposit accounts and investment property and other property and rights subject or intended to be subject to the lien of the Indenture for the benefit of the Secured Parties (as defined in the Indenture) as set forth in the Granting Clauses of the Indenture, including, without limitation, any and all property of any type or nature owned by the Issuer (other than Excluded Property, as defined in the Indenture) and any Equity Securities (as defined in the Indenture) and other securities or obligations owned or acquired by the Issuer and such other right, title or interest to which the Trustee may transfer or sell, including, without limitation (and for avoidance of any doubt), any commercial tort claims; provided, however, that all of the Accounts and all Cash therein (as each such term is defined in the Indenture) shall in no event be included in the Assets Subject To Sale. | $ |

# EXHIBIT B

## INVESTOR REPRESENTATIONS AND CONFIDENTIALITY AGREEMENT

The undersigned has expressed an interest in participating in a public sale (the "Public Sale") under the Indenture, dated as of November 13, 2003 (as amended or supplemented, the "Indenture"), by and among Zohar CDO 2003-1, Limited, as issuer (the "Issuer"), Zohar CDO 2003-1, Corp., as co-issuer, Zohar CDO 2003-1, LLC, as Zohar Subsidiary, MBIA Insurance Corporation, as Credit Enhancer, CDC Financial Products Inc., as Class A-1 Note Agent, and U.S. Bank National Association, as trustee (the "Trustee"), and has asked that the Trustee or Duff & Phelps Securities, LLC (the "Liquidation Agent") provide certain information in the Trustee's or the Liquidation Agent's possession relating to certain assets included in the Assets (as defined in the Second Notice of Public Sale and Invitation to Bid, dated October 24, 2016 (the "Invitation to Bid") from the Trustee) to be sold at the Public Sale. The Trustee is prepared to permit such participation and to provide such information in the possession of the Trustee to the undersigned so long as the undersigned executes this Investor Representations and Confidentiality Agreement (this "Agreement").

1.      The undersigned hereby represents and warrants to the Trustee that (i) to the extent that the undersigned is the successful bidder at the Public Sale, the Asset or Assets acquired thereby will be acquired for the account of the bidder and not with a view to resale or distribution except in compliance with applicable securities laws, (ii) the undersigned has sufficient business and investment knowledge and experience to effectively evaluate properly the merits and risks of investment in the Assets which are the subject of the Public Sale, (iii) the undersigned has such knowledge and experience and has made investments of a similar nature so as to be aware of the risks and uncertainties related to an investment in such Assets, (iv) the undersigned acknowledges that no representation, express or implied, is made with respect to the accuracy, adequacy or completeness for its purposes of any information that such bidder may receive in connection with any bid on the Assets, (v) the undersigned acknowledges the Trustee and the Liquidation Agent have no continuing obligation to the undersigned to update any information previously provided to it, (vi) the undersigned has sufficient financial ability and net worth to bear the economic risks involved in investment in such Assets, and (vii) the undersigned is aware of the fact that some or all of the securities constituting part of the Assets on which it is bidding have not been registered under the Securities Act of 1933, as amended (the "Act") or applicable state securities law. The undersigned hereby agrees that the undersigned may not resell any securities constituting part of the Assets acquired at the Public Sale without compliance with the registration requirements of the Act, the regulations of the Securities and Exchange Commission thereunder, and applicable state securities laws or pursuant to valid exemptions therefrom.

2.      The undersigned acknowledges and agrees that the Assets will be offered and sold by the Trustee without recourse, representations, warranties or covenants, express or implied, being made by the Trustee with respect to the Assets (except as to title to the Assets) or with respect to any other information then in the Trustee's possession, including without limitation any financial information.

3.      The undersigned agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its and its affiliates' directors, officers, employees and agents, including accountants, legal counsel, sources of funding and other advisors (it being understood that the persons to whom such disclosure is made will be

informed of the confidential nature of such Information and instructed to keep such Information confidential), (ii) to any client which agrees with the undersigned to maintain the confidentiality of such Information in the same manner as provided herein, and the undersigned accepts responsibility for the fulfillment of such agreement by any such client, (iii) to the extent requested by any regulatory authority, or (iv) to the extent required by applicable laws or regulations or by any subpoena or similar legal process. The undersigned further agrees to use the Information solely for the purposes of evaluating whether or not it desires to participate in the Public Sale and for no other purpose whatsoever.  The undersigned further acknowledges that the Information may include material non-public information, access to which may restrict the ability of the undersigned from trading in other securities related to or backed by any of the Assets.  For the purposes of this Agreement, "Information" means all information received by the undersigned relating to the Assets from the Trustee or the Liquidation Agent which is the subject of the Public Sale; provided that "Information" shall not include any information which (i) is included in the "Invitation to Bid" related to such Public Sale, which includes the identity of the Assets included in the sale, (ii) is publicly available information relating to a security constituting part of the Assets which has been issued pursuant to an effective registration statement under the Act, (iii) is or becomes publicly available other than as a result of a breach of this Agreement, or (iv) is or becomes available to the undersigned on a non-confidential basis from a source other than the Trustee or the Liquidation Agent.

4.      The undersigned hereby agrees to indemnify, defend and hold the Trustee and the Liquidation Agent harmless of, from and against any and all claims, demands, liabilities, causes of action, losses, damages, costs and expenses (including attorneys' fees) hereafter suffered or incurred by the Trustee arising out of, directly or indirectly, (i) any breach of the undersigned's representations and warranties given hereunder, (ii) the undersigned's failure to observe (and to cause its agents, contractors, employees and consultants to observe) and comply with the terms and provisions hereof, and (iii) without limiting the foregoing, any violation of the Act or other applicable securities law of any jurisdiction arising out of clauses (i) or (ii) above. The indemnification obligations of the undersigned contained herein shall survive the termination of this Agreement and shall bind the undersigned, its successors, trustees and assigns, irrespective of whether or not the undersigned elects to participate in the Public Sale or acquires any Assets pursuant to the Public Sale.

5.      The undersigned agrees to either promptly destroy or return all Information to the Trustee or the Liquidation Agent on its behalf if it does not carry through on its evaluation or is not the successful bidder at the Public Sale for any Asset for which it received Information. Notwithstanding the foregoing, to the extent required for legal or compliance purposes, the undersigned may retain any copy of the Information.

6.      This Agreement shall terminate, as it relates to any particular asset, upon the earlier of (i) undersigned's purchase of such asset or (ii) one (1) year from the date hereof.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflicts of laws provisions thereof.

Executed as of this ____ day of _____, 2016.

_(Name of Institution)_

By: _____
    Name:
    Title:

## [EXHIBIT C]

**[PURCHASE AGREEMENT]**

PURCHASE AGREEMENT

This PURCHASE AGREEMENT (this "*Agreement*") is made as of [_____] [__], 2016, between U.S. BANK NATIONAL ASSOCIATION ("*U.S. Bank*"), as Trustee pursuant to the Indenture (as hereinafter defined) (the "*Seller*"), and _____, as purchaser (the "*Purchaser*").

WITNESSETH:

WHEREAS, U.S. Bank is the Trustee pursuant to that certain Indenture, dated as of November 13, 2003 (as amended, supplemented or otherwise modified from time to time the "*Indenture*"), by and among Zohar CDO 2003-1, Limited, as Issuer (the "*Issuer*"), Zohar CDO 2003-1, Corp, as Co-Issuer (the "*Co-Issuer*", and, together with the Issuer, the "*Issuers*"), Zohar CDO 2003-1, LLC (the "*Subsidiary*"), MBIA Insurance Corporation, as Credit Enhancer, CDC Financial Products Inc., as Class A-1 Note Agent, and U.S. Bank, as Trustee, pursuant to which the Issuers have issued certain debt securities (the "*Notes*"), and capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Indenture;

WHEREAS, the Seller, as required by the Indenture, conducted an auction (the "*Auction*") of certain loans and other assets (the "*Assets*") owned by the Issuer and the Subsidiary on [_____] [__], 2016 (the "*Auction Date*");

WHEREAS, the sale of the Assets is subject to the satisfaction of the conditions described in this Agreement and in the Second Notice of Public Sale and Invitation to Bid, dated October 24, 2016, from the Seller; and

WHEREAS, the Seller desires to sell the Assets identified on Exhibit I attached hereto (collectively, the "*Purchaser Assets*") to the Purchaser;

NOW THEREFORE, in consideration of the foregoing, the parties hereto agree as follows:

1.    Agreement to Purchase and Sell.  Subject to all of the other conditions set forth herein, upon receipt by the Trustee prior to 5:00 p.m. (Eastern Time ("*ET*")) on [_____] [__], 2016 (the "*Settlement Date*") of $[**PURCHASE PRICE**] from the Purchaser (such amount, the "*Purchase Price*") the Trustee hereby irrevocably agrees to transfer, assign, grant, set over, deposit with and otherwise convey to the Purchaser, without recourse, and the Purchaser hereby irrevocably agrees to purchase and accept on the Settlement Date, all the right, title and interest of the Trustee, the Issuer and the Subsidiary in and to all of the Purchaser Assets and all payments of principal of and interest on the Purchaser Assets after the Settlement Date. Payments or distributions (whether received by set off or otherwise) of cash (including interest), notes, securities, or other property or proceeds under or in respect of the Purchaser Assets made after the Settlement Date (the "*Payments*") and received by the Trustee, on behalf of the Issuer (the "*Recipient*"), shall be remitted to the Purchaser (in accordance with its instructions) by the Recipient within a reasonable time after receipt thereof by the Recipient; *provided* that the economic benefit of not-otherwise-scheduled permanent repayments of principal and any non-ordinary course fees made after the Auction Date shall be paid to the Purchaser; *provided further* that such Payment, if received by the Seller shall be held on behalf and for the sole benefit of the Purchaser and none of the Trustee, the Issuer or the Subsidiary shall have an equitable or beneficial interest in such Payment.  If a Payment received by the Recipient includes securities or other non-cash Payment, the Recipient shall, to the extent permitted by law, endorse (without recourse, representation or warranty) or use commercially reasonable efforts (at the Purchaser's sole expense) to assist the Purchaser to cause to be registered in the Purchaser's name, or such name as the Purchaser may direct, and deliver such securities to the Purchaser or to such entity as the Purchaser may direct as soon as reasonably practicable.

C-1

2.    <u>Payment</u>. On the Settlement Date, the Purchaser shall wire transfer to the Seller in immediately available funds an amount equal to the Purchase Price prior to 5:00 p.m. ET according to the following wiring instructions:

```
Trustee Wire Instructions:
Bank:          US Bank
ABA #:         091000022
Account Name: Zohar 1
Account #:     1731-0332-2199
FFC:           743771-201
Ref:           [            ]
Attention:     [            ]
```

(a)    <u>Conditions Precedent to Sale</u>. Notwithstanding anything to the contrary, the Seller's obligation to sell the Purchaser Assets to the Purchaser is subject to the Seller's determination that after receipt of notice as required pursuant to the Indenture, no Holder of a Class B Note or Holder of a Class C Note issued pursuant to the Indenture has exercised its right under the Indenture to arrange for a Person to purchase the Assets, within three Business Days of such notice, in an amount equal to or more favorable to the Issuer than the amount described in such notice. In the event the foregoing condition is not satisfied in the reasonable determination of the Seller, (i) the sale of the Assets to the Purchaser shall be cancelled, and (ii) this Agreement shall automatically terminate (a "***Failed Settlement***").

3.    <u>Registration of Transfer of the Purchaser Assets</u>. Except as otherwise agreed to by the Seller and the Purchaser, the Purchaser agrees to use its best efforts to promptly take all actions necessary to cause the transfer and assignment of the Purchaser Assets to be effected pursuant to the underlying instruments governing such Purchaser Assets (the "***Underlying Instruments***") on the Settlement Date, including without limitation, (i) preparing, executing and delivering such transfer certificates, assignments, endorsements, administrative questionnaires and such other documents or instruments as may be required by the Underlying Instruments, (ii) obtaining such necessary consents to such transfer as may be required under the Underlying Instruments, (iii) paying any transfer and assignment fees as may be required to effect such transfer, (iv) providing such notices and legal opinions to any persons as may be required pursuant to the Underlying Instruments, in each case regardless of whether such obligation to take such action is on the part of the transferor or the transferee of such Purchaser Asset pursuant to the applicable Underlying Instruments. In the event any such requirements require actions on the part of the Seller which cannot be performed by the Purchaser as agreed to above, the Seller agrees to cooperate with the Purchaser, at the Purchaser's request and expense, to cause such transfer, including without limitation the agreement of the Seller to execute such assignments, endorsements, certificates and such other documentation reasonably requested by the Purchaser and required to effect such transfer. Except as otherwise provided in this Section 4, in no event shall the Seller be liable to the Purchaser in any manner arising from the transfer of any Purchaser Assets, it being acknowledged and agreed that the Purchaser shall have full responsibility to cause such transfer. Upon completing the transfer of the Purchaser Assets in the name of the Purchaser, the Purchaser agrees to provide prompt notice thereof to the Seller (which notice may be given by email).

4.    <u>Failed Transfer</u>. (a) Without limiting the obligation of the Purchaser to use its best efforts to promptly cause the transfer of all Purchaser Assets pursuant to the Underlying Instruments as provided in Section 4 above, in the event the Purchaser fails to effect such transfer on the Settlement Date (a "***Failed Transfer***"), the Purchaser shall continue to use its best efforts after the Settlement Date to cause the transfer and assignment of the Purchaser Assets to be effected pursuant to the Underlying Instruments in the manner provided in Section 4 above. Upon completing the transfer of all the Purchaser Assets pursuant to the Underlying Instruments, the Purchaser agrees to provide prompt notice thereof to the Seller in writing (which notice may be given by email).

C-2

(b) Without limiting any of the Purchaser's obligations hereunder, during the period following the Settlement Date for which a Failed Transfer has occurred and is continuing in respect of any Purchaser Asset (a "*Participation Period*"), the assignment and transfer in Section 2 above, during such Participation Period, shall be deemed to be the grant and conveyance of an undivided 100% participation interest in and to such Purchaser Asset (a "*Participation Interest*") subject in each case to the provisions of the relevant Underlying Instruments. The Purchaser agrees to take such further action as may be necessary (or as otherwise reasonably requested by the Seller) to effect such participation pursuant to such Underlying Instruments, including without limitation entering into a participation agreement that is satisfactory to the Seller in its sole discretion; *provided* that such participation agreement shall terminate upon a successful transfer and assignment as contemplated in Section 2 above. Promptly after the commencement of the Participation Period, the Seller shall use commercially reasonable efforts to cause all amounts owing to the Purchaser as a result of the Participation Interest to be sent directly to the Purchaser; *provided, however*, that if the Seller receives (i) any notice or other document with respect to such Purchaser Asset, then the Seller shall provide such notice or other document to the Purchaser within a reasonable time after receipt thereof or (ii) Payments with respect to such Purchaser Asset, the Seller shall (x) accept and hold such Payment for the account and sole benefit of the Purchaser, (y) have no equitable or beneficial interest in such Payment and (z) deliver such Payment (free of any withholding, setoff, recoupment, or deduction of any kind except as required by law or as may be agreed to by the Seller and the Purchaser) promptly after receipt thereof. If a Payment received by the Seller includes securities or other non-cash Payment, the Seller shall, to the extent permitted by law, endorse (without recourse, representation or warranty) or use commercially reasonable efforts (at the Purchaser's sole expense) to assist the Purchaser to cause to be registered in the Purchaser's name, or such name as the Purchaser may direct, and deliver such securities to the Purchaser or to such entity as the Purchaser may direct as soon as reasonably practicable. No adjustment to the Purchase Price paid by the Purchaser hereunder shall be made as result of a Failed Transfer.

5.      <u>Representations of the Purchaser and the Seller</u>. The Purchaser hereby represents and warrants to the Seller that:

(a)      the Purchaser is qualified under applicable law to become a transferee of the Purchaser Assets;

(b)      the Purchaser acknowledges that no representation, express or implied, is made with respect to the accuracy, adequacy or completeness for its purposes of any information that the Purchaser may have received in connection with any bid on the Purchaser Assets;

(c)      the Purchaser has determined that it satisfies and meets all the necessary qualifications, requirements and other conditions necessary to become a transferee of the Purchaser Assets (other than any necessary third-party consents required to be provided by third-parties under the Underlying Instruments);

(d)      the Purchaser is duly authorized to execute, deliver and perform this Agreement;

(e)      the Purchaser is an entity duly existing under the laws of the United States or the jurisdiction of its organization;

(f)      this Agreement constitutes the legal, valid and binding obligation of the Purchaser enforceable against the Purchaser in accordance with its terms (subject to bankruptcy, insolvency and similar laws affecting creditor's rights generally and subject, as to enforceability, to general principals of equity);

(g)      the Purchaser acknowledges that none of the Seller nor any other party connected with the sale of the Assets is a fiduciary or investment advisor to the Purchaser in connection with its purchase of the Purchaser Assets and the Purchaser has not relied upon any advice or recommendation of the Seller or any of its

affiliates, and is making its own investment decision based upon its own judgment and upon advice of such professional advisers, either employed or independently retained by the Purchaser, as it has deemed necessary to consult;

(h)     no material consent, approval, order or authorization of, or declaration, filing or registration with, any governmental entity is required to be obtained or made by the Purchaser in connection with the execution, delivery or performance by the Purchaser of this Agreement, or the consummation by it of the transactions contemplated hereby;

(i)     the sale of the Purchaser Assets to the Purchaser pursuant to this Agreement will not violate the laws or regulations of any jurisdiction applicable to it, and is permitted under the Purchaser's governing documents and internal policies;

(j)     the Purchaser understands the terms, conditions and risks of the Purchaser Assets and the Purchaser is able to provide the certificates, assignments and other applicable transfer documentation required to effect a transfer of the Purchaser Assets; and

(k)     the Purchaser acknowledges and agrees that (a) the Seller may obtain or be in possession of non-public information regarding the Purchaser Assets, the obligors under such Purchaser Assets, and the Underlying Instruments, which may not be made available to any Purchaser, (b) the Seller makes no representations with respect to any Purchaser Asset, the obligors under any Purchaser Asset, the Underlying Instruments, or the accuracy or completeness of any information regarding the foregoing, and (c) the Seller will not be obliged to disclose to the Purchaser the existence of or details of any information or documentation relating thereto, including without limitation, any and all non-public information.

The Seller hereby represents and warrants to the Purchaser that:

(a)     the Seller is duly authorized to execute, deliver and perform this Agreement;

(b)     the Seller is a national banking association duly existing under the laws of the United States of America; and

(c)     this Agreement constitutes the legal, valid and binding obligation of the Seller enforceable against the Seller in accordance with its terms (subject to bankruptcy, insolvency and similar laws affecting creditor's rights generally and subject, as to enforceability, to general principals of equity).

6.      Costs.  Each party shall bear its own costs and expenses except as provided herein.  The Purchaser will pay any commissions due its brokers, the legal fees and expenses of its attorneys, all expenses relating to any review of the Assets performed by the Purchaser and any transfer and assignment fees relating to the transfer of the Purchaser Assets, including expenses incurred with respect to the gathering of information and the preparation and execution of any documents and instruments necessary to effect such transfer to the Purchaser.

7.      Counterparts.  The signature pages to this Agreement may be executed by the Seller and the Purchaser, as the case may be, in separate counterparts. Facsimile signatures and signature pages provided in the form of a "pdf" or similar imaged document transmitted by electronic mail shall be deemed original signatures for all purposes hereunder.

8.      GOVERNING LAW.  THIS AGREEMENT, AND ALL CLAIMS OR CAUSES OF ACTION (WHETHER IN CONTRACT OR TORT) THAT MAY BE BASED UPON, ARISE OUT OF OR RELATE TO THIS AGREEMENT, OR THE NEGOTIATION, EXECUTION OR PERFORMANCE OF THIS

AGREEMENT (INCLUDING ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO ANY REPRESENTATION OR WARRANTY MADE IN OR IN CONNECTION WITH THIS AGREEMENT OR AS AN INDUCEMENT TO ENTER INTO THIS AGREEMENT), SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW), AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

9. WAIVER OF JURY TRIAL. EACH OF THE PARTIES HERETO HEREBY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN EITHER OF THEM RELATING TO OR INCIDENTAL TO THE RELATIONSHIP BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT.

10. NO RECOURSE. THE SALE OF THE PURCHASER ASSETS TO THE PURCHASER WILL BE MADE WITHOUT RECOURSE AND ON AN "AS IS AND WHERE IS" BASIS, WITHOUT ANY REPRESENTATIONS OR WARRANTIES (WHETHER EXPRESSED OR IMPLIED) OF ANY KIND MADE BY THE SELLER (OR ANY OTHER PERSON ACTING FOR OR ON BEHALF OF THE SELLER OR ANY OTHER PARTY) AND WITHOUT ANY RECOURSE WHATSOEVER AGAINST THE SELLER (OR ANY OTHER PERSON ACTING FOR OR ON BEHALF OF THE SELLER).

11. Information Provided to Purchaser. Without limiting Section 10 above, the Seller (and any of its officers, directors, employees and agents) (collectively, the *"Information Providers"*) shall have any no liability whatsoever for any information or documents provided (or not provided) to the Purchaser, including any information contained in (or omitted from) any materials relating to the Auction of the Assets and any information made available including by access to information on any of the Information Providers' web-sites. The Purchaser acknowledges that the Seller has not made and is not making any representation or warranty as to the Purchaser Assets, including, without limitation, as to the completeness, accuracy or sufficiency thereof or as to the documentation and information relating to the Purchaser Assets.

12. Indemnity. Upon the transfer, assignment and conveyance of the Purchaser Assets as contemplated herein, including in Section 3 or Section 4, the Purchaser, its successors and assigns shall at all times indemnify and hold harmless the Seller and each of its directors, officers, employees, counsel, affiliates and agents (*"Indemnified Persons"*) from and against any and all claims, actions and suits of others, and from and against any and all liabilities, losses, damages, costs, charges, reasonable counsel fees and other reasonable expenses, in each case arising out of the terms of this Agreement, the Purchaser Assets and any agreement related thereto, except to the extent (i) that such arises from such Indemnified Person's gross negligence, willful misconduct or bad faith or (ii) that such arose prior to the date hereof.

13. Release. The Purchaser, on behalf of itself and any successors and assigns, hereby releases the Seller from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever, in law or equity in any way related to this Agreement, the Purchaser Assets and any agreement related thereto, which against the Seller the Purchaser ever had, now has or hereafter can, shall or may have, for, upon, or by reason of any matter, cause or thing arising directly or indirectly from its execution of this Agreement. Nothing in this Section 13 is intended to release the Purchaser's rights under this Agreement.

14. Survival. The provisions of Sections 6, 7, 8, 9, 10, 11, 12, 13, and 15 shall survive the termination of this Agreement.

15.     <u>Benefits of Agreement</u>.   Nothing in this Agreement, express or implied, shall give to any person, other than the parties hereto, any benefit or any legal or equitable right, remedy or claim hereunder. The Indemnified Persons are express third-party beneficiaries to this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective duly authorized officers as of the day and year first written above.

U.S. BANK NATIONAL ASSOCIATION, as Trustee pursuant to the Indenture, as Seller

By: _____
Name: _____
Title: _____

_____,
as Purchaser

By: _____
Name: _____
Title: _____

EXHIBIT I

| Item # | Obligor Name | Asset Type | Purchase Price |
|--------|--------------|------------|----------------|
|        |              |            |                |
|        |              |            |                |
|        |              |            |                |
|        |              |            |                |
|        |              |            |                |
|        |              |            |                |
|        |              |            |                |
|        |              |            |                |
|        |              |            |                |
|        |              |            |                |
|        |              |            |                |
|        |              |            |                |
|        |              |            |                |
|        |              |            |                |
|        |              |            |                |
|        |              |            |                |

# EXHIBIT F



Global Corporate Trust Services
214 N. Tryon Street, 26th Floor
Charlotte, North Carolina, 28202

## THIRD NOTIFICATION OF DISPOSITION OF ASSETS

To:     Zohar CDO 2003-1, Limited, and other Persons to which
        this Notification is sent as set forth on Schedule A

From:   U.S. Bank National Association, as Trustee
        214 N. Tryon Street, 26th Floor
        Charlotte, North Carolina 28202
        Attention:  Global Corporate Trust Services – Zohar CDO 2003-1, Limited
        Telephone:  (704) 335-4564

Name of Debtor:  Zohar CDO 2003-1, Limited and Zohar CDO 2003-1, LLC

Ladies and Gentlemen:

        Zohar CDO 2003-1, Limited (the "Issuer") and Zohar CDO 2003-1, LLC (the "Zohar Subsidiary" and collectively with the Issuer, the "Debtor") have granted a security interest in all of the assets described in items 1- 133 below (the "Assets Subject to Sale" or, the "Assets") to U.S. Bank National Association ("U.S. Bank"), as trustee (in such capacity, the "Trustee") under that certain Indenture, dated as of November 13, 2003 (as amended and supplemented, the "Indenture"), among the Issuer, Zohar CDO 2003-1, Corp., as Co-Issuer, the Zohar Subsidiary, MBIA Insurance Corporation, as Credit Enhancer, CDC Financial Products Inc., as Class A-1 Note Agent, and the Trustee.  Capitalized terms used herein but not otherwise defined shall have the meaning set forth in the Indenture.

        The Trustee will conduct, at the date, time and place set forth below, a public sale of the following Assets Subject To Sale:[1]

| Public Sale: Friday, December 9, 2016, 12:00 p.m. ET |
| :---: |
| Loan Interests |

---

[1] Information is current as of November 30, 2016, and is subject to change. On November 28, 2016, the Collateral Manager provided to the Trustee additional documentation (the "Additional Documents") in respect of, or related to, the Assets Subject to Sale.  Information included in certain of the Additional Documents related to certain of the equity interests described herein appears to be inconsistent with (a) historical information maintained by the Trustee and (b) information previously provided to the Trustee by the Collateral Manager and the former Collateral Manager, which information had formed the basis for the "Assets Subject to Sale" in the Trustee's Notice Of Public Sale And Invitation To Bid, dated August 26, 2016, and Second Notice Of Public Sale And Invitation To Bid, dated October 24, 2016 and appearing below.  To the extent the Additional Documents (a) reflect additional possible ownership rights or interests in issuers identified in Items 1 to 132 of the "Assets Subject to Sale" or (b) indicate possible ownership rights or interests that are not identified in Items 1 to 132 of the "Assets Subject to Sale," such additional possible equity or other ownership rights or interests shall be deemed to be included in Item 133 of the "Assets Subject to Sale."

| # | Issuer | Issue | Asset Type | Current Par Amount (Issue Currency) | Total Commitment | Current Coupon | Maturity Date |
|---|--------|-------|-----------|-------------------------------------|------------------|----------------|---------------|
| 1. | 180s, LLC & 180s Canada Corporation | Fully Funded Term B | Delayed Draw Loan | 2,240,328.00 | 2,242,328.00 | 2.53267 | 4/15/2019 |
| 2. | 180s, LLC & 180s Canada Corporation | Tranche A Revolver | Revolving Credit | 16,600,000.00 | 16,600,000.00 | 2.53267 | 4/15/2019 |
| 3. | American Doors, LLC | Term Loan | Term Loan | 115,751.42 | 115,751.42 | 1.03267 | 4/15/2019 |
| 4. | American Doors, LLC | Term Loan C | Term Loan | 8,315,638.01 | 8,315,638.01 | 1.03267 | 4/15/2019 |
| 5. | American LaFrance | Delayed Draw Term Loans | Delayed Draw Loan | 509,019.73 | 509,019.73 | 0.197 | 10/31/2015 |
| 6. | American LaFrance | Fully Funded DD Term Loan A | Term Loan | 1,784,456.80 | 1,784,456.80 | 0.434 | 10/31/2015 |
| 7. | American LaFrance | Revolver | Revolving Credit | 451,290.39 | 451,290.40 | 1 | 10/31/2015 |
| 8. | American LaFrance | Term Loan 1 | Term Loan | 414,121.55 | 414,121.55 | 1 | 10/31/2015 |
| 9. | American LaFrance | Term Loan 2 | Term Loan | 42,240,641.22 | 42,240,641.22 | 1 | 10/31/2015 |
| 10. | Amweld International LLC | Delayed Draw | Delayed Draw Loan | 80,160.09 | 80,160.09 | 0 | 6/28/2016 |
| 11. | Amweld International LLC | Term Loan B | Term Loan | 5,758,739.62 | 5,758,739.62 | 0 | 10/31/2015 |
| 12. | Best Textiles Acquisition, LLC | Revolver | Revolving Credit | 5,000,000.00 | 5,000,000.00 | 2.53267 | 4/15/2019 |
| 13. | Bomar Industries International, Inc. | Revolver 2 | Revolving Credit | 3,200,000.00 | 3,200,000.00 | 0 | 6/30/2013 |
| 14. | Bomar Industries International, Inc. | Tranche A Term Loan | Term Loan | 10,000,000.00 | 10,000,000.00 | 0 | 6/30/2013 |
| 15. | Bomar Industries International, Inc. | Tranche B Term Loan | Term Loan | 3,806,930.16 | 3,806,930.16 | 0 | 6/30/2013 |
| 16. | Croscil Home | Revolver | Revolving Credit | 10,000,000.00 | 10,000,000.00 | 6.53267 | 4/15/2019 |
| 17. | Duro Textiles, LLC | Fully Funded Term Loan G | Delayed Draw Loan | 1,049,259.65 | 1,049,259.65 | 2.03267 | 4/15/2019 |
| 18. | Duro Textiles, LLC | Term B Loan | Term Loan | 7,500,000.00 | 7,500,000.00 | 2.03267 | 4/15/2019 |
| 19. | Duro Textiles, LLC | Term Loan | Term Loan | 8,000,000.00 | 8,000,000.00 | 2.03267 | 4/15/2019 |
| 20. | Duro Textiles, LLC | Term Loan K1 | Term Loan | 1,888,000.99 | 1,888,000.99 | 2.03267 | 4/15/2019 |
| 21. | East Alliance Limited | Term Loan A | Term Loan | 11,928,348.24 | 11,928,348.24 | 2.53267 | 12/31/2016 |
| 22. | Emag Solutions, LLC | Revolver | Revolving Credit | 4,062,500.04 | 4,062,500.04 | 7.53267 | 4/15/2019 |
| 23. | Fetco Home Decor, Inc. | Exchanged Security | Term Loan | 2,757,727.26 | 2,757,727.26 | 0.1702 | 4/15/2019 |
| 24. | Fetco Home Decor, Inc. | Term Loan | Term Loan | 1,082,661.77 | 1,082,661.77 | 8.53267 | 4/15/2019 |
| 25. | Galey & Lord, LLC | Fully Funded Term Loan | Term Loan | 3,000,000.00 | 3,000,000.00 | 1.53267 | 4/15/2019 |
| 26. | Galey & Lord, LLC | Revolver | Revolving Loan | 1,180,176.25 | 1,180,176.25 | 1.53267 | 4/15/2019 |
| 27. | Galey & Lord, LLC | Term Loan | Term Loan | 25,263,396.84 | 25,263,396.84 | 1.53267 | 4/15/2019 |
| 28. | Galey & Lord, LLC | Term Loan E | Term Loan | 1,600,000.00 | 1,600,000.00 | 1.52722 | 4/15/2019 |
| 29. | Galey & Lord, LLC | Term Loan K | Term Loan | 689,999.01 | 689,999.01 | 1.53267 | 4/15/2019 |
| 30. | Galey & Lord, LLC | Term Loan M | Term Loan | 800,000.00 | 800,000.00 | 1.53267 | 4/15/2019 |
| 31. | Global Automotive Systems, LLC | Term Loan | Term Loan | 9,100,000.00 | 9,100,000.00 | 6.03267 | 4/15/2019 |

| # | Issuer | Issue | Asset Type | Current Par Amount (Issue Currency) | Total Commitment | Current Coupon | Maturity Date |
|---|--------|-------|-----------|-------------------------------------|------------------|----------------|---------------|
| 32. | Global Automotive Systems, LLC | Term Loan A | Term Loan | 21,727,855.40 | 21,727,855.40 | 6.03267 | 4/15/2019 |
| 33. | Hartwell Industries, Inc. | DELAYED DRAW TERM LOAN C | Delayed Draw Loan | 1,500,000.00 | 1,500,000.00 | 3.03267 | 4/15/2019 |
| 34. | Hartwell Industries, Inc. | New Revolver | Revolving Credit | 1,927,636.19 | 1,927,639.96 | 3.03267 | 4/15/2019 |
| 35. | Hartwell Industries, Inc. | New Term Loan 2 | Term Loan | 15,060,304.48 | 15,060,304.48 | 3.02722 | 4/15/2019 |
| 36. | Hartwell Industries, Inc. | Term Loan A-1 | Term Loan | 500,000.00 | 500,000.00 | 3.03267 | 4/15/2019 |
| 37. | Heritage Aviation, Ltd. | Delayed Draw Term Loan A | Delayed Draw Loan | 9,860,000.00 | 9,970,000.00 | 4 | 4/15/2019 |
| 38. | Heritage Aviation, Ltd. | Term Loan | Term Loan | 1,000,000.00 | 1,000,000.00 | 4.52722 | 4/15/2019 |
| 39. | Iconic American Trucks | Iconic American Trucks T/L B | Term Loan | 7,217,681.53 | 7,217,681.53 | | 3/31/2019 |
| 40. | IMG Holdings, Inc. | Fully Funded Term Loan | Term Loan | 555,360.00 | 555,360.00 | 4.53267 | 4/15/2019 |
| 41. | IMG Holdings, Inc. | Revolver A | Revolving Credit | 3,999,999.97 | 4,000,000.00 | 4.53267 | 4/15/2019 |
| 42. | IMG Holdings, Inc. | Revolving Credit C | Revolving Credit | 2,000,000.35 | 2,000,000.35 | 4.53267 | 4/15/2019 |
| 43. | IMG Holdings, Inc. | Term E | Term Loan | 144,640.00 | 144,640.00 | 4.53267 | 4/15/2019 |
| 44. | IMG Holdings, Inc. | Term Loan 1A | Term Loan | 2,004,585.76 | 2,004,585.76 | 4.53267 | 4/15/2019 |
| 45. | IMG Holdings, Inc. | Term Loan 1B | Term Loan | 2,174,795.68 | 2,174,795.68 | 4.53267 | 4/15/2019 |
| 46. | IMG Holdings, Inc. | Term Loan D | Term Loan | 300,000.00 | 300,000.00 | 4.53267 | 4/15/2019 |
| 47. | Intera Group, Inc. | Exchanged Security | Note | 6,374,815.23 | 6,374,815.23 | 0 | 12/31/2016 |
| 48. | Intera Group, Inc. | Fully Funded Term C | Delayed Draw Loan | 2,586,494.53 | 2,586,494.53 | 0 | 10/31/2016 |
| 49. | Intera Group, Inc. | Restructured Term Loan | Term Loan | 869,031.69 | 869,031.69 | 0 | 10/31/2016 |
| 50. | Intera Group, Inc. | Term Loan C | Term Loan | 158,501.65 | 158,501.65 | 0 | 10/31/2016 |
| 51. | Intrepid USA | Intrepid USA R/C | Revolving Credit | 9,280,002.89 | 9,280,002.89 | 8 | 4/15/2019 |
| 52. | Intrepid USA | Term Loan B | Term Loan | 3,860,066.01 | 3,860,066.01 | 6.53267 | 4/15/2019 |
| 53. | LVD Acquisition, LLC | Term Loan | Term Loan | 9,303,993.33 | 9,303,993.33 | 4.53267 | 4/15/2019 |
| 54. | MD Helicopters, Inc. | Sub Note Term Loan | Term Loan | 11,255,271.08 | 11,255,271.08 | 2.4255 | 5/15/2019 |
| 55. | MD Helicopters, Inc. | Term A | Term Loan | 12,873,602.92 | 12,873,602.92 | 3.53267 | 4/15/2019 |
| 56. | MD Helicopters, Inc. | Term Loan | Term Loan | 25,551,724.14 | 25,551,724.14 | 3.53267 | 4/15/2019 |
| 57. | MD Helicopters, Inc. | Term Loan B | Term Loan | 16,116,674.23 | 16,116,674.23 | 3.53267 | 4/15/2019 |
| 58. | MD Helicopters, Inc. | Tranche A-3 | Term Loan | 700,000.00 | 700,000.00 | 3.53267 | 4/15/2019 |
| 59. | MD Helicopters, Inc. | Tranche A-7 | Term Loan | 1,200,000.00 | 1,200,000.00 | 3.53267 | 4/15/2019 |
| 60. | Natura Water, Inc. | Fully Funded Term B | Term Loan | 1,500,000.00 | 1,500,000.00 | 5.53267 | 4/15/2019 |
| 61. | Natura Water, Inc. | Fully Funded Term C | Term Loan | 2,200,000.00 | 2,200,000.00 | 5.53267 | 4/15/2019 |
| 62. | Natura Water, Inc. | Fully Funded Term Loan E | Term Loan | 300,000.00 | 300,000.00 | 5.53267 | 4/15/2019 |
| 63. | NetVersant Acquisition, LLC | Restructured Revolver A | Revolving Credit | 277,490.69 | 277,490.69 | 1.53267 | 4/15/2019 |

| # | Issuer | Issue | Asset Type | Current Par Amount (Issue Currency) | Total Commitment | Current Coupon | Maturity Date |
|---|--------|-------|-----------|-------------------------------------|------------------|----------------|---------------|
| 64. | NetVersant Acquisition, LLC | Restructured Term Loan | Term Loan | 41,585,556.76 | 41,585,556.76 | 1.53267 | 4/15/2019 |
| 65. | NetVersant Solutions, Inc. | Restructured Revolver B | Revolving Credit | 2,102,385.30 | 2,102,385.31 | 1.49565 | 4/15/2019 |
| 66. | Petry Media Corporation | Priming Revolver | Revolving Credit | 9,212,536.60 | 9,219,801.44 | 10 | 10/31/2017 |
| 67. | Petry Media Corporation | Priming Term Loan | Term Loan | 210,397.61 | 210,397.61 | 10 | 10/31/2016 |
| 68. | Petry Media Corporation | Term Loan C | Term Loan | 1,380,775.74 | 1,380,775.74 | 10 | 10/31/2016 |
| 69. | Petry Media Corporation | Term Loan E | Term Loan | 770,092.44 | 770,092.44 | 10 | 10/31/2016 |
| 70. | Rapid Rack Industries, Inc. | Term Loan | Term Loan | 4,121,507.10 | 4,121,507.10 | 0 | 10/31/2015 |
| 71. | Red Shield Acquisition LLC | Revolver 2 | Revolving Credit | 5,000,000.00 | 5,000,000.00 | | 10/31/2016 |
| 72. | Red Shield Acquisition LLC | Term Loan | Delayed Draw Loan | 5,722,548.98 | 5,722,548.98 | | 10/31/2016 |
| 73. | Remco Maintenance, LLC | Revolver | Revolving Credit | 2,500,000.00 | 2,500,000.00 | 8.53267 | 4/15/2019 |
| 74. | Remco Maintenance, LLC | Term Loan | Term Loan | 3,362,670.50 | 3,362,670.50 | 8.53267 | 4/15/2019 |
| 75. | RM Acquisition, LLC | Preferred Security | Term Loan | 8,545,250.00 | 8,545,250.00 | 0.53433 | 5/15/2019 |
| 76. | RM Acquisition, LLC | Revolver | Revolving Credit | 2,205,882.33 | 2,205,882.35 | 10 | 4/15/2019 |
| 77. | RM Acquisition, LLC | Term Loan | Term Loan | 5,823,529.41 | 5,823,529.41 | 4.86267 | 4/15/2019 |
| 78. | S.O. Acquisition, LLC | Fully Funded Term A | Term Loan | 4,500,000.00 | 4,500,000.00 | 6.53267 | 4/15/2019 |
| 79. | S.O. Acquisition, LLC | Fully Funded Term Loan C | Term Loan | 350,000.00 | 350,000.00 | 6.53267 | 4/15/2019 |
| 80. | Silverack, LLC | Silverack R/C A | Revolving Credit | 6,000,000.00 | 6,000,000.00 | 2.53267 | 4/15/2019 |
| 81. | Silverack, LLC | Silverack T/L A | Term Loan | 3,395,487.02 | 3,395,487.02 | 2.53267 | 4/15/2019 |
| 82. | Snelling Medical Staffing | Term Loan | Term Loan | 223,000.00 | 223,000.00 | 7.53267 | 4/15/2019 |
| 83. | Transcare Corporation | Tranche B Term Loan | Term Loan | 3,500,000.00 | 3,500,000.00 | 2.53267 | 4/15/2019 |
| 84. | Trim Trends, LLC | Term Loan A | Term Loan | 6,555,380.26 | 6,555,380.26 | 6.02722 | 4/15/2019 |
| 85. | Vulcan Engineering Corporation | Revolver | Revolving Credit | 1, 428,571.43 | 2,000,000.00 | 7.52722 | 4/15/2019 |
| 86. | Xinhua Sports & Entertainment | Additional Term Loan | Term Loan | 2,394,288.89 | 2,394,288.89 | 0.2145 | 10/21/2012 |
| 87. | Xinhua Sports & Entertainment | Convertible Term Loan | Term Loan | 13,060,228.45 | 13,060,228.45 | 0.2145 | 10/21/2012 |
| 88. | Xpient Solutions, LLC | Exchanged Security | Term Loan | 318,427.84 | 318,427.84 | 4.19775 | 11/30/2019 |
| 89. | Zohar SS Acquisition, LLC | Exchanged Security | Term Loan | 2,564,102.60 | 2,564,102.60 | 2 | 5/15/2019 |
| 90. | Zohar SS Acquisition, LLC | Preferred Stock | Term Loan | 256,410.26 | 256,410.26 | 7.53267 | 5/15/2019 |
| 91. | Zohar SS Acquisition, LLC | Term Loan | Term Loan | 7,652,549.20 | 7,652,549.20 | 7.53267 | 4/15/2019 |

| Equity Interests | | |
|---|---|---|
| # | Issuer Name | Type | Amount |

| 92. | Automated Ductwork Manufacturing Company | Common | 100.00 |
|---|---|---|---|
| 93. | Felagastyring EHF | Common Stock | 63,100.00 |
| 94. | Fetco Home Decor, Inc. | Common1 | 51,263.00 |
| 95. | Fetco Home Decor, Inc. | Common2 | 25,000.00 |
| 96. | Reserved | | |
| 97. | Fetco Home Decor, Inc. | Pref 315619ZB5 | 13,488.00 |
| 98. | Reserved | | |
| 99. | Fetco Home Decor, Inc. | Preferred | 14,090.00 |
| 100. | Fetco International Hong Kong Limited | Common | 9,997.00 |
| 101. | Galey & Lord, Inc. | Common Stock | 687,547.00 |
| 102. | Galey & Lord, Inc. | Series A Preferred Interest 8/18/2012 | 39,010,000.00 |
| 103. | Glenoit Universal, Ltd. | Common Stock Class A | 12,967.00 |
| 104. | Glenoit Universal, Ltd. | Class B Common Stock | 3,527.00 |
| 105. | Reserved | | |
| 106. | Reserved | | |
| 107. | Hartwell Industries, Inc. | Common CL A | 194,512.00 |
| 108. | HyperActive Technologies, Inc. | Common Stock | 85,334.00 |
| 109. | IMG Holdings, Inc. | Common Stock | 757.00 |
| 110. | Intera Group, Inc. | Preferred Stock | 5,069.42 |
| 111. | Intera Group, Inc. | Common Stock | 839.09 |
| 112. | Reserved | | |
| 113. | MD Helicopters, Inc. | Common Stock | 235.00 |
| 114. | Metalforming Technologies, Inc. | Common Stock | 175,889.00 |
| 115. | Opening Specialties and Supply Inc. | Common | 2,267.00 |
| 116. | PHC Holding Corp | Class A Common Stock | 83,460.13 |
| 117. | PHC Holding Corp | Class C Common Stock | 85,880.75 |
| 118. | PHC Holding Corp | Common | 100.00 |
| 119. | PHC Holding Corp | Class B Common Stock | 112,047.09 |
| 120. | PHC Holding Corp | Preferred Stock | 114,178.19 |
| 121. | Pleasants Hardware Company | Common CL A | 1,000.00 |
| 122. | Spectrum International Holdings, Inc. | Common | 286,103,870.07 |
| 123. | Textile Holdings, Inc. | Common | 400,000.00 |
| 124. | U.F. Holdings, Inc. | Preferred Stock | 53,810.00 |
| 125. | UF Holdings Inc. | Common | 196,020.00 |
| 126. | UI Acquisition Holding Company | Class A Common Stock | TBD[1] |
| 127. | UI Acquisition Holding Company | Class B Common Stock | TBD[1] |
| 128. | Vorumerkjastyring EHF | Common Stock | 63,100.00 |
| 129. | W.W. Holdings, LLC | Common Stock | 4,787.00 |

---

[2] Please refer to copies of the stock certificates for UI Acquisition Holding Co. available for review at the Liquidation Agent

| 130. | Western Forest Products, Inc. | Common | 45,327.00 |
| 131. | W.W. Versat Acquisition Corporation | Common Stock | 100.00 |
| 132. | Xinhua Sports & Entertainment Limited | Common | 41,992.00 |

| **Additional Assets Subject to Sale** | |
|---|---|
| 133. | To the extent not identified in Items 1 to 132 above, Item 133 shall consist of all of the Issuer's right, title and interest in and to instruments, accounts, payment intangibles, general intangibles, letter-of-credit rights, chattel paper, electronic chattel paper, deposit accounts and investment property and other property and rights subject or intended to be subject to the lien of the Indenture for the benefit of the Secured Parties (as defined in the Indenture) as set forth in the Granting Clauses of the Indenture, including, without limitation, any and all property of any type or nature owned by the Issuer (other than Excluded Property, as defined in the Indenture) and any Equity Securities (as defined in the Indenture) and other securities or obligations owned or acquired by the Issuer and such other right, title or interest to which the Trustee may transfer or sell, including, without limitation (and for avoidance of any doubt), any commercial tort claims; provided, however, that all of the Accounts and all Cash therein (as each such term is defined in the Indenture) shall in no event be included in the Assets Subject To Sale. See Note 1. |

The public sale will be conducted at the following location on the following date and time:

Date and Time:       Friday, December 9, 2016, 12:00 p.m. ET

Place:       Duff & Phelps Securities
            55 East 52nd Street, Floor 31
            New York, NY 10055

The Trustee has retained Duff & Phelps Securities, LLC ("Duff & Phelps" or the "Liquidation Agent") to act as its liquidation agent for the Assets. To request more information from the Liquidation Agent about the public sale or the Assets Subject To Sale, including how to participate in the sale, please contact Duff & Phelps by telephone at 212-523-0355 or by e-mail at CL.ZOHARBIDS@DUFFANDPHELPS.COM, or by mail addressed to Duff & Phelps Securities, LLC, 55 East 52nd Street, Floor 31, New York, NY 10055, Attention: Zohar Bids.

THE ASSETS WILL BE OFFERED AND SOLD BY THE TRUSTEE ON AN "AS IS AND WHERE IS" BASIS, AND WITHOUT ANY REPRESENTATIONS OR WARRANTIES (WHETHER EXPRESSED OR IMPLIED) OF ANY KIND MADE BY ANY SECURED PARTY, THE TRUSTEE, THE LIQUIDATION AGENT OR ANY OTHER PERSON ACTING FOR OR ON BEHALF OF THE TRUSTEE, AND WITHOUT ANY RECOURSE WHATSOEVER AGAINST ANY SUCH PERSON.

You are entitled to an accounting of the unpaid indebtedness secured by the Assets Subject To Sale that the Trustee intends to sell. If you have any questions regarding the foregoing, or if you wish to request an accounting, please contact the Trustee at 704-335-4564.

In addressing inquiries that may be directed to it by Noteholders, the Trustee or the Liquidation Agent may conclude that a specific response to a particular inquiry from an individual Noteholder is not consistent with equal and full dissemination of information to all Noteholders. Noteholders should not rely on the Trustee or the Liquidation Agent as their sole source of information. Neither the Trustee nor the Liquidation Agent makes any recommendations, and gives no investment, tax or legal advice. Each Noteholder should seek advice from its own counsel and advisors based on the Noteholder's particular circumstances.

Recipients of this notice are cautioned that this notice is not evidence that the Trustee will recognize the recipient as a Noteholder.

The Trustee expressly reserves all rights under the Indenture, including without limitation its right to payment in full of all fees and costs (including, without limitation, fees and costs incurred or to be incurred by the Trustee in performing its duties, indemnities owing or to become owing to the Trustee, compensation for Trustee time spent and reimbursement for fees and costs of counsel and other agents it employs in performing its duties or to pursue remedies) prior to any distribution to Noteholders or other parties, as provided in and subject to the applicable terms of the Indenture, and its right, prior to exercising any rights or powers vested in it by the Indenture at the request or direction of any of the Noteholders, to receive reasonable security or indemnity against the costs, expenses and liabilities which might reasonably be incurred in compliance therewith, and all rights that may be available to it under applicable law or otherwise.

U.S. BANK NATIONAL ASSOCIATION, as Trustee                    Date:  December 2, 2016

## Schedule A

The Debtor:

Zohar CDO 2003-1, Limited
c/o Fund Fiduciary Partners Limited
2nd Floor, Harbour Centre
42 North Church Street
Grand Cayman, Cayman Islands

Zohar CDO 2003-1, LLC
c/o Puglisi & Associates
850 Library Avenue, Suite 204
Newark, Delaware 19711
Attention:  Donald J. Puglisi
Email: dpuglisi@puglisiassoc.com
Facsimile: (302) 738-7210

Other Persons:

Holders of Notes and Preference Shares issued by Zohar CDO 2003-1, Limited and, as applicable, Zohar CDO 2003-1, Corp., as follows:

| Class | CUSIP[3] |
|---|---|
| Class A-1 Notes | 98976XAA9 |
| Class A-2 Notes | 98976XAB7 |
| Class A-3a Notes | 98976XAC5 |
| Class A-3b Notes | 98976XAD3 |
| Class B Notes | 98976WAB9 |
| Preference Shares | N/A |

Zohar CDO 2003-1, Corp.
c/o Puglisi & Associates
850 Library Avenue, Suite 204
Newark, Delaware 19711
Attention:  Donald J. Puglisi
Email: dpuglisi@puglisiassoc.com
Facsimile: (302) 738-7210

---

[3] The CUSIP numbers appearing herein are included solely for the convenience of the Holders. The Trustee is not responsible for the selection or use of CUSIP numbers, or for the accuracy or correctness of CUSIP numbers printed on any Notes or as indicated in this notice.

Alvarez & Marsal Zohar Management, LLC
600 Madison Avenue
New York, New York 10022
Attention: Elizabeth LaPuma and General Counsel

MBIA Insurance Corporation
1 Manhattanville Road
Suite 301
Purchase, New York 10577
Attention: Insurance Portfolio Management – CDO Group
                    (ZOHAR CDO 2003-1, LIMITED)
Facsimile:  (914) 765-3131
Confirmation: (914) 765-3068
Telephone: (914) 765-3118
Email: ipmcdotrusteereports@mbia.com
            keith.borelli@mbia.com

# EXHIBIT G



Global Corporate Trust Services
214 N. Tryon Street, 26th Floor
Charlotte, North Carolina 28202

## NOTICE OF RESCHEDULING OF PUBLIC SALE

## AND

## FOURTH NOTICE OF PUBLIC SALE AND INVITATION TO BID

December 8, 2016

Reference is made to the "Third Notice of Public Sale and Invitation to Bid" (the "Third Notice"), dated December 2, 2016, from U.S. Bank National Association, in its capacity as trustee (the "Trustee") under that certain Indenture, dated as of November 13, 2003 (as amended or supplemented, the "Indenture"), by and among Zohar CDO 2003-1, Limited, as Issuer (the "Issuer"), Zohar CDO 2003-1, Corp., as Co-Issuer, Zohar CDO 2003-1, LLC, as Zohar Subsidiary, MBIA Insurance Corporation, as Credit Enhancer, CDC Financial Products Inc., as Class A-1 Note Agent, and the Trustee.

The Trustee has rescheduled to 12:00 p.m. ET on Wednesday, December 21, 2016 the public sale referenced in the Third Notice, originally scheduled to occur at 12:00 p.m. ET on Friday, December 9, 2016 at the office of Duff & Phelps Securities, LLC, 55 East 52nd Street, Floor 31, New York, NY 10055.

This rescheduling is by order of the United States District Court, Southern District of New York in the action styled *Patriarch Partners XV, LLC, et al. v. U.S. Bank National Association, et al.* 16-cv-7128 (JSR). On December 7, 2016, the Court ordered: "The auction closing date will be extended to December 21st. The trustee is free to represent to all bidders that the extension is by court order but that the Court has also ordered that no further extensions will be granted under any set of circumstances whatsoever, so that date is firm, fixed and final."

Further to the above, you are invited to bid on all of the assets described in items 1-133 below (the "Assets Subject To Sale" or the "Assets"; each item, an "Asset"), which will be sold at a public sale, as indicated below. The sale will be held by U.S. Bank National Association ("U.S. Bank"), not in its individual capacity, but solely as Trustee under the Indenture. Capitalized terms used herein and not otherwise defined shall have the meanings assigned thereto in the Indenture.

The Trustee has retained Duff & Phelps Securities, LLC ("Duff & Phelps") to act as its liquidation agent (the "Liquidation Agent") for the Assets Subject To Sale. To request more information from the Liquidation Agent about the public sale of the Assets Subject To Sale, including how to submit bids in connection with the sale, please contact Duff & Phelps by telephone at 212-523-0355 or by e-mail at CL.ZOHARBIDS@DUFFANDPHELPS.COM, or by mail addressed to Duff & Phelps Securities, LLC, 55 East 52nd Street, Floor 31, New York, NY 10055, Attention: Zohar Bids.

<u>The Conditions of the Public Sale Are as Follows:</u>

1.   <u>Assets Subject To Sale.</u>  The Assets Subject To Sale that will be sold at the public sale are the following:[1]

| | | | | | | |
|---|---|---|---|---|---|---|
| colspan on | | | | | | |

| # | Issuer | Issue | Asset Type | Current Par Amount (Issue Currency) | Total Commitment | Current Coupon | Maturity Date |
|---|---|---|---|---|---|---|---|
| | **Public Sale: Wednesday, December 21, 2016, 12:00 p.m. ET** | | | | | | |
| | **Loan Interests** | | | | | | |
| 1. | 180s, LLC & 180s Canada Corporation | Fully Funded Term B | Delayed Draw Loan | 2,240,328.00 | 2,242,328.00 | 2.53267 | 4/15/2019 |
| 2. | 180s, LLC & 180s Canada Corporation | Tranche A Revolver | Revolving Credit | 16,600,000.00 | 16,600,000.00 | 2.53267 | 4/15/2019 |
| 3. | American Doors, LLC | Term Loan | Term Loan | 115,751.42 | 115,751.42 | 1.03267 | 4/15/2019 |
| 4. | American Doors, LLC | Term Loan C | Term Loan | 8,315,638.01 | 8,315,638.01 | 1.03267 | 4/15/2019 |
| 5. | American LaFrance | Delayed Draw Term Loans | Delayed Draw Loan | 509,019.73 | 509,019.73 | 0.197 | 10/31/2015 |
| 6. | American LaFrance | Fully Funded DD Term Loan A | Term Loan | 1,784,456.80 | 1,784,456.80 | 0.434 | 10/31/2015 |
| 7. | American LaFrance | Revolver | Revolving Credit | 451,290.39 | 451,290.40 | 1 | 10/31/2015 |
| 8. | American LaFrance | Term Loan 1 | Term Loan | 414,121.55 | 414,121.55 | 1 | 10/31/2015 |
| 9. | American LaFrance | Term Loan 2 | Term Loan | 42,240,641.22 | 42,240,641.22 | 1 | 10/31/2015 |
| 10. | Amweld International LLC | Delayed Draw | Delayed Draw Loan | 80,160.09 | 80,160.09 | 0 | 6/28/2016 |
| 11. | Amweld International LLC | Term Loan B | Term Loan | 5,758,739.62 | 5,758,739.62 | 0 | 10/31/2015 |
| 12. | Best Textiles Acquisition, LLC | Revolver | Revolving Credit | 5,000,000.00 | 5,000,000.00 | 2.53267 | 4/15/2019 |
| 13. | Bomar Industries International, Inc. | Revolver 2 | Revolving Credit | 3,200,000.00 | 3,200,000.00 | 0 | 6/30/2013 |
| 14. | Bomar Industries International, Inc. | Tranche A Term Loan | Term Loan | 10,000,000.00 | 10,000,000.00 | 0 | 6/30/2013 |

[1] Information is current as of November 30, 2016 and is subject to change. The information relating to each of items 1-133 described herein is for reference purposes only and is qualified in its entirety by reference to the related governing documents and the additional qualifications described in this Notice of Rescheduling of Public Sale and Fourth Notice of Public Sale and Invitation to Bid. In addition, on November 28, 2016, the Collateral Manager provided to the Trustee additional documentation (the "<u>Additional Documents</u>") in respect of, or related to, the Assets Subject to Sale. Information included in certain of the Additional Documents related to certain of the equity interests described herein appears to be inconsistent with (a) historical information maintained by the Trustee and (b) information previously provided to the Trustee by the Collateral Manager and the former Collateral Manager, which information had formed the basis for the "Assets Subject to Sale" in the Trustee's Notice Of Public Sale And Invitation To Bid, dated August 26, 2016, and Second Notice Of Public Sale And Invitation To Bid, dated October 24, 2016 and appearing below. To the extent the Additional Documents (a) reflect additional possible ownership rights or interests in issuers identified in Items 1 to 132 of the "Assets Subject to Sale" or (b) indicate possible ownership rights or interests that are not identified in Items 1 to 132 of the "Assets Subject to Sale," such additional possible equity or other ownership rights or interests shall be deemed to be included in Item 133 of the "Assets Subject to Sale." See Sections 3(i) and 3(j) hereof. The Additional Documents are available for review by request to the Liquidation Agent as provided in this Notice of Rescheduling of Public Sale and Fourth Notice Of Public Sale And Invitation To Bid.

| # | Issuer | Issue | Asset Type | Current Par Amount (Issue Currency) | Total Commitment | Current Coupon | Maturity Date |
|---|--------|-------|-----------|------------------------------------|------------------|----------------|---------------|
| 15. | Bomar Industries International, Inc. | Tranche B Term Loan | Term Loan | 3,806,930.16 | 3,806,930.16 | 0 | 6/30/2013 |
| 16. | Croscil Home | Revolver | Revolving Credit | 10,000,000.00 | 10,000,000.00 | 6.53267 | 4/15/2019 |
| 17. | Duro Textiles, LLC | Fully Funded Term Loan G | Delayed Draw Loan | 1,049,259.65 | 1,049,259.65 | 2.03267 | 4/15/2019 |
| 18. | Duro Textiles, LLC | Term B Loan | Term Loan | 7,500,000.00 | 7,500,000.00 | 2.03267 | 4/15/2019 |
| 19. | Duro Textiles, LLC | Term Loan | Term Loan | 8,000,000.00 | 8,000,000.00 | 2.03267 | 4/15/2019 |
| 20. | Duro Textiles, LLC | Term Loan K1 | Term Loan | 1,888,000.99 | 1,888,000.99 | 2.03267 | 4/15/2019 |
| 21. | East Alliance Limited | Term Loan A | Term Loan | 11,928,348.24 | 11,928,348.24 | 2.53627 | 12/31/2016 |
| 22. | Emag Solutions, LLC | Revolver | Revolving Credit | 4,062,500.04 | 4,062,500.04 | 7.53267 | 4/15/2019 |
| 23. | Fetco Home Decor, Inc. | Exchanged Security | Term Loan | 2,757,727.26 | 2,757,727.26 | 0.1702 | 4/15/2019 |
| 24. | Fetco Home Decor, Inc. | Term Loan | Term Loan | 1,082,661.77 | 1,082,661.77 | 8.53267 | 4/15/2019 |
| 25. | Galey & Lord, LLC | Fully Funded Term Loan | Term Loan | 3,000,000.00 | 3,000,000.00 | 1.53267 | 4/15/2019 |
| 26. | Galey & Lord, LLC | Revolver | Revolving Loan | 1,180,176.25 | 1,180,176.25 | 1.53267 | 4/15/2019 |
| 27. | Galey & Lord, LLC | Term Loan | Term Loan | 25,263,396.84 | 25,263,396.84 | 1.53267 | 4/15/2019 |
| 28. | Galey & Lord, LLC | Term Loan E | Term Loan | 1,600,000.00 | 1,600,000.00 | 1.52722 | 4/15/2019 |
| 29. | Galey & Lord, LLC | Term Loan K | Term Loan | 689,999.01 | 689,999.01 | 1.53267 | 4/15/2019 |
| 30. | Galey & Lord, LLC | Term Loan M | Term Loan | 800,000.00 | 800,000.00 | 1.53267 | 4/15/2019 |
| 31. | Global Automotive Systems, LLC | Term Loan | Term Loan | 9,100,000.00 | 9,100,000.00 | 6.03267 | 4/15/2019 |
| 32. | Global Automotive Systems, LLC | Term Loan A | Term Loan | 21,727,855.40 | 21,727,855.40 | 6.03267 | 4/15/2019 |
| 33. | Hartwell Industries, Inc. | DELAYED DRAW TERM LOAN C | Delayed Draw Loan | 1,500,000.00 | 1,500,000.00 | 3.03267 | 4/15/2019 |
| 34. | Hartwell Industries, Inc. | New Revolver | Revolving Credit | 1,927,636.19 | 1,927,639.96 | 3.03267 | 4/15/2019 |
| 35. | Hartwell Industries, Inc. | New Term Loan 2 | Term Loan | 15,060,304.48 | 15,060,304.48 | 3.02722 | 4/15/2019 |
| 36. | Hartwell Industries, Inc. | Term Loan A-1 | Term Loan | 500,000.00 | 500,000.00 | 3.03267 | 4/15/2019 |
| 37. | Heritage Aviation, Ltd. | Delayed Draw Term Loan A | Delayed Draw Loan | 9,860,000.00 | 9,970,000.00 | 4 | 4/15/2019 |
| 38. | Heritage Aviation, Ltd. | Term Loan | Term Loan | 1,000,000.00 | 1,000,000.00 | 4.52722 | 4/15/2019 |
| 39. | Iconic American Trucks | Iconic American Trucks T/L B | Term Loan | 7,217,681.53 | 7,217,681.53 | | 3/31/2019 |
| 40. | IMG Holdings, Inc. | Fully Funded Term Loan | Term Loan | 555,360.00 | 555,360.00 | 4.53267 | 4/15/2019 |
| 41. | IMG Holdings, Inc. | Revolver A | Revolving Credit | 3,999,999.97 | 4,000,000.00 | 4.53267 | 4/15/2019 |
| 42. | IMG Holdings, Inc. | Revolving Credit C | Revolving Credit | 2,000,000.35 | 2,000,000.35 | 4.53267 | 4/15/2019 |
| 43. | IMG Holdings, Inc. | Term E | Term Loan | 144,640.00 | 144,640.00 | 4.53267 | 4/15/2019 |
| 44. | IMG Holdings, Inc. | Term Loan 1A | Term Loan | 2,004,585.76 | 2,004,585.76 | 4.53267 | 4/15/2019 |
| 45. | IMG Holdings, Inc. | Term Loan 1B | Term Loan | 2,174,795.68 | 2,174,795.68 | 4.53267 | 4/15/2019 |

| # | Issuer | Issue | Asset Type | Current Par Amount (Issue Currency) | Total Commitment | Current Coupon | Maturity Date |
|---|--------|-------|-----------|-------------------------------------|------------------|----------------|---------------|
| 46. | IMG Holdings, Inc. | Term Loan D | Term Loan | 300,000.00 | 300,000.00 | 4.53267 | 4/15/2019 |
| 47. | Intera Group, Inc. | Exchanged Security | Note | 6,374,815.23 | 6,374,815.23 | 0 | 12/31/2016 |
| 48. | Intera Group, Inc. | Fully Funded Term C | Delayed Draw Loan | 2,586,494.53 | 2,586,494.53 | 0 | 10/31/2016 |
| 49. | Intera Group, Inc. | Restructured Term Loan | Term Loan | 869,031.69 | 869,031.69 | 0 | 10/31/2016 |
| 50. | Intera Group, Inc. | Term Loan C | Term Loan | 158,501.65 | 158,501.65 | 0 | 10/31/2016 |
| 51. | Intrepid USA | Intrepid USA R/C | Revolving Credit | 9,280,002.89 | 9,280,002.89 | 8 | 4/15/2019 |
| 52. | Intrepid USA | Term Loan B | Term Loan | 3,860,066.01 | 3,860,066.01 | 6.53267 | 4/15/2019 |
| 53. | LVD Acquisition, LLC | Term Loan | Term Loan | 9,303,993.33 | 9,303,993.33 | 4.53267 | 4/15/2019 |
| 54. | MD Helicopters, Inc. | Sub Note Term Loan | Term Loan | 11,255,271.08 | 11,255,271.08 | 2.4255 | 5/15/2019 |
| 55. | MD Helicopters, Inc. | Term A | Term Loan | 12,873,602.92 | 12,873,602.92 | 3.53267 | 4/15/2019 |
| 56. | MD Helicopters, Inc. | Term Loan | Term Loan | 25,551,724.14 | 25,551,724.14 | 3.53267 | 4/15/2019 |
| 57. | MD Helicopters, Inc. | Term Loan B | Term Loan | 16,116,674.23 | 16,116,674.23 | 3.53267 | 4/15/2019 |
| 58. | MD Helicopters, Inc. | Tranche A-3 | Term Loan | 700,000.00 | 700,000.00 | 3.53267 | 4/15/2019 |
| 59. | MD Helicopters, Inc. | Tranche A-7 | Term Loan | 1,200,000.00 | 1,200,000.00 | 3.53267 | 4/15/2019 |
| 60. | Natura Water, Inc. | Fully Funded Term B | Term Loan | 1,500,000.00 | 1,500,000.00 | 5.53267 | 4/15/2019 |
| 61. | Natura Water, Inc. | Fully Funded Term C | Term Loan | 2,200,000.00 | 2,200,000.00 | 5.53267 | 4/15/2019 |
| 62. | Natura Water, Inc. | Fully Funded Term Loan E | Term Loan | 300,000.00 | 300,000.00 | 5.53267 | 4/15/2019 |
| 63. | NetVersant Acquisition, LLC | Restructured Revolver A | Revolving Credit | 277,490.69 | 277,490.69 | 1.53267 | 4/15/2019 |
| 64. | NetVersant Acquisition, LLC | Restructured Term Loan | Term Loan | 41,585,556.76 | 41,585,556.76 | 1.53267 | 4/15/2019 |
| 65. | NetVersant Solutions, Inc. | Restructured Revolver B | Revolving Credit | 2,102,385.30 | 2,102,385.31 | 1.49565 | 4/15/2019 |
| 66. | Petry Media Corporation | Priming Revolver | Revolving Credit | 9,212,536.60 | 9,219,801.44 | 10 | 10/31/2017 |
| 67. | Petry Media Corporation | Priming Term Loan | Term Loan | 210,397.61 | 210,397.61 | 10 | 10/31/2016 |
| 68. | Petry Media Corporation | Term Loan C | Term Loan | 1,380,775.74 | 1,380,775.74 | 10 | 10/31/2016 |
| 69. | Petry Media Corporation | Term Loan E | Term Loan | 770,092.44 | 770,092.44 | 10 | 10/31/2016 |
| 70. | Rapid Rack Industries, Inc. | Term Loan | Term Loan | 4,121,507.10 | 4,121,507.10 | 0 | 10/31/2015 |
| 71. | Red Shield Acquisition LLC | Revolver 2 | Revolving Credit | 5,000,000.00 | 5,000,000.00 | | 10/31/2016 |
| 72. | Red Shield Acquisition LLC | Term Loan | Delayed Draw Loan | 5,722,548.98 | 5,722,548.98 | | 10/31/2016 |
| 73. | Remco Maintenance, LLC | Revolver | Revolving Credit | 2,500,000.00 | 2,500,000.00 | 8.53267 | 4/15/2019 |
| 74. | Remco Maintenance, LLC | Term Loan | Term Loan | 3,362,670.50 | 3,362,670.50 | 8.53267 | 4/15/2019 |
| 75. | RM Acquisition, LLC | Preferred Security | Term Loan | 8,545,250.00 | 8,545,250.00 | 0.53433 | 5/15/2019 |
| 76. | RM Acquisition, LLC | Revolver | Revolving Credit | 2,205,882.33 | 2,205,882.35 | 10 | 4/15/2019 |
| 77. | RM Acquisition, LLC | Term Loan | Term Loan | 5,823,529.41 | 5,823,529.41 | 4.86267 | 4/15/2019 |

| # | Issuer | Issue | Asset Type | Current Par Amount (Issue Currency) | Total Commitment | Current Coupon | Maturity Date |
|---|---|---|---|---|---|---|---|
| 78. | S.O. Acquisition, LLC | Fully Funded Term A | Term Loan | 4,500,000.00 | 4,500,000.00 | 6.53267 | 4/15/2019 |
| 79. | S.O. Acquisition, LLC | Fully Funded Term Loan C | Term Loan | 350,000.00 | 350,000.00 | 6.53267 | 4/15/2019 |
| 80. | Silverack, LLC | Silverack R/C A | Revolving Credit | 6,000,000.00 | 6,000,000.00 | 2.53267 | 4/15/2019 |
| 81. | Silverack, LLC | Silverack T/L A | Term Loan | 3,395,487.02 | 3,395,487.02 | 2.53267 | 4/15/2019 |
| 82. | Snelling Medical Staffing | Term Loan | Term Loan | 223,000.00 | 223,000.00 | 7.53267 | 4/15/2019 |
| 83. | Transcare Corporation | Tranche B Term Loan | Term Loan | 3,500,000.00 | 3,500,000.00 | 2.53267 | 4/15/2019 |
| 84. | Trim Trends, LLC | Term Loan A | Term Loan | 6,555,380.26 | 6,555,380.26 | 6.02722 | 4/15/2019 |
| 85. | Vulcan Engineering Corporation | Revolver | Revolving Credit | 1,428,571.43 | 2,000,000.00 | 7.52722 | 4/15/2019 |
| 86. | Xinhua Sports & Entertainment | Additional Term Loan | Term Loan | 2,394,288.89 | 2,394,288.89 | 0.2145 | 10/21/2012 |
| 87. | Xinhua Sports & Entertainment | Convertible Term Loan | Term Loan | 13,060,228.45 | 13,060,228.45 | 0.2145 | 10/21/2012 |
| 88. | Xpient Solutions, LLC | Exchanged Security | Term Loan | 318,427.84 | 318,427.84 | 4.19775 | 11/30/2019 |
| 89. | Zohar SS Acquisition, LLC | Exchanged Security | Term Loan | 2,564,102.60 | 2,564,102.60 | 2 | 5/15/2019 |
| 90. | Zohar SS Acquisition, LLC | Preferred Stock | Term Loan | 256,410.26 | 256,410.26 | 7.53267 | 5/15/2019 |
| 91. | Zohar SS Acquisition, LLC | Term Loan | Term Loan | 7,652,549.20 | 7,652,549.20 | 7.53267 | 4/15/2019 |

| Equity Interests | | | |
|---|---|---|---|
| # | Issuer Name | Type | Amount |
| 92. | Automated Ductwork Manufacturing Company | Common | 100.00 |
| 93. | Felagastyring EHF | Common Stock | 63,100.00 |
| 94. | Fetco Home Decor, Inc. | Common1 | 51,263.00 |
| 95. | Fetco Home Decor, Inc. | Common2 | 25,000.00 |
| 96. | Reserved | | |
| 97. | Fetco Home Decor, Inc. | Pref 315619ZB5 | 13,488.00 |
| 98. | Reserved | | |
| 99. | Fetco Home Decor, Inc. | Preferred | 14,090.00 |
| 100. | Fetco International Hong Kong Limited | Common | 9,997.00 |
| 101. | Galey & Lord, Inc. | Common Stock | 687,547.00 |
| 102. | Galey & Lord, Inc. | Series A Preferred Interest 8/18/2012 | 39,010,000.00 |
| 103. | Glenoit Universal, Ltd. | Common Stock Class A | 12,967.00 |
| 104. | Glenoit Universal, Ltd. | Class B Common Stock | 3,527.00 |
| 105. | Reserved | | |
| 106. | Reserved | | |
| 107. | Hartwell Industries, Inc. | Common CL A | 194,512.00 |
| 108. | HyperActive Technologies, Inc. | Common Stock | 85,334.00 |
| 109. | IMG Holdings, Inc. | Common Stock | 757.00 |
| 110. | Intera Group, Inc. | Preferred Stock | 5,069.42 |

| 111. | Intera Group, Inc. | Common Stock | 839.09 |
| 112. | Reserved | | |
| 113. | MD Helicopters, Inc. | Common Stock | 235.00 |
| 114. | Metalforming Technologies, Inc. | Common Stock | 175,889.00 |
| 115. | Opening Specialties and Supply Inc. | Common | 2,267.00 |
| 116. | PHC Holding Corp | Class A Common Stock | 83,460.13 |
| 117. | PHC Holding Corp | Class C Common Stock | 85,880.75 |
| 118. | PHC Holding Corp | Common | 100.00 |
| 119. | PHC Holding Corp | Class B Common Stock | 112,047.09 |
| 120. | PHC Holding Corp | Preferred Stock | 114,178.19 |
| 121. | Pleasants Hardware Company | Common CL A | 1,000.00 |
| 122. | Spectrum International Holdings, Inc. | Common | 286,103,870.07 |
| 123. | Textile Holdings, Inc. | Common | 400,000.00 |
| 124. | U.F. Holdings, Inc. | Preferred Stock | 53,810.00 |
| 125. | UF Holdings Inc. | Common | 196,020.00 |
| 126. | UI Acquisition Holding Company | Class A Common Stock | TBD[2] |
| 127. | UI Acquisition Holding Company | Class B Common Stock | TBD[2] |
| 128. | Vorumerkjastyring EHF | Common Stock | 63,100.00 |
| 129. | W.W. Holdings, LLC | Common Stock | 4,787.00 |
| 130. | Western Forest Products, Inc. | Common | 45,327.00 |
| 131. | W.W. Versat Acquisition Corporation | Common Stock | 100.00 |
| 132. | Xinhua Sports & Entertainment Limited | Common | 41,992.00 |

| **Additional Assets Subject to Sale** | |
|---|---|
| 133. | To the extent not identified in Items 1 to 132 above, Item 133 shall consist of all of the Issuer's right, title and interest in and to instruments, accounts, payment intangibles, general intangibles, letter-of-credit rights, chattel paper, electronic chattel paper, deposit accounts and investment property and other property and rights subject or intended to be subject to the lien of the Indenture for the benefit of the Secured Parties (as defined in the Indenture) as set forth in the Granting Clauses of the Indenture, including, without limitation, any and all property of any type or nature owned by the Issuer (other than Excluded Property, as defined in the Indenture) and any Equity Securities (as defined in the Indenture) and other securities or obligations owned or acquired by the Issuer and such other right, title or interest to which the Trustee may transfer or sell, including, without limitation (and for avoidance of any doubt), any commercial tort claims; provided, however, that all of the Accounts and all Cash therein (as each such term is defined in the Indenture) shall in no event be included in the Assets Subject To Sale. See Note 1 and Sections 3(i) and 3(j) hereof. |

2. <u>Place, Date and Time of the Public Sale.</u>  The place, date and time of the sale will be as follows:

| **DATE AND TIME** |
|---|
| **Public Sale: Wednesday, December 21, 2016, 12:00 p.m. ET** |
| **PLACE** |

[2] Please refer to copies of the stock certificates for UI Acquisition Holding Co. available for review at the Liquidation Agent

> The sale will be held at:
> Duff & Phelps Securities
> 55 East 52nd Street, Floor 31
> New York, NY 10055

***ONLY PERSONS WHO SATISFY THE FOLLOWING REQUIREMENTS WILL BE PERMITTED TO BID AT THE PUBLIC SALE***

3.   <u>Conditions of Sale</u>.  The conditions of the public sale are as follows:

   (a)   Each bid must be submitted to the Liquidation Agent, either in person or using the email address noted above, and must include a signed copy of the Bid Sheet attached hereto as <u>Exhibit A</u>, together with all bids on Annex I to the Bid Sheet. No bid will be accepted unless it is accompanied by a Bid Sheet, signed by the applicable bidder, and received by the Liquidation Agent prior to the completion of the applicable public sale.  Bidding for the public sale will be held open for 30 minutes following the time identified above, or such longer time as determined by the Liquidation Agent or the Trustee.

   (b)   Bidders may provide (i) bids for one or more of the Assets listed in items 1-133 above and/or (ii) a single bid to purchase all of items 1-133 above, as designated in the Bid Sheet (the "Entire Portfolio"). Each bid shall be in a price format set out in US dollars and shall be the offer by such bidder to purchase the one or more items upon payment by such bidder of such US dollar amount price.

   (c)   The Trustee reserves the right to reject any bid which it deems to have been made by a bidder which is unable to satisfy the requirements imposed by the Trustee upon prospective bidders in connection with the public sales or to whom in the Trustee's sole judgment a sale may not lawfully be made. The Trustee shall not be obligated to make any sale and reserves the right to sell the Assets at a subsequent public or private sale.

   (d)   Subject to Section 3(f) below, the winning bid or bids, as applicable, will be determined as follows (i) the highest bid from a qualified bidder for the Entire Portfolio shall be compared to (ii) the sum of the highest bids from qualified bidders with respect to each item listed in 1-133 above (assuming a bid of zero for any item for which no bid is received). If (i) exceeds (ii) then the highest bid for the Entire Portfolio shall be the winning bid. If (ii) exceeds (i) then the highest bid for each item listed in 1-133 shall be the winning bid for that item.

   (e)   In the event that two or more bidders submit bids for equal amounts, and for the same Assets, and such bids are the highest bid amounts received for such Assets (not including any bids received pursuant to Section 3(f) below) (a "tie bid"), the Liquidation Agent, at its sole discretion, may request such bidders to submit an additional bid from which the highest bid amount will be determined. In the event a tie bid remains following the conclusion of bidding, including any additional

7

bidding as described in the preceding sentence, the winning bid (subject to Section 3(f) below) will be the earliest submitted bid.

(f)     Each Holder of a Class B Note and each Holder of a Class C Note issued pursuant to the Indenture is entitled to receive at least five Business Days' prior notice of a sale of one or more of the Assets (describing the Assets to be sold and the sale amount therefore in reasonable detail), and any Holder of a Class B Note or a Class C Note may arrange for a Person to purchase such Asset or Assets, as the case may be, within three Business Days of such notice, in an amount equal to or more favorable to the Issuer than the amount described in such notice.  By submitting a bid, a bidder acknowledges that, to the extent such bidder is the highest qualified bidder, as determined pursuant to Section 3(d) and, if applicable, Section 3(e) hereof, for an Asset or Assets, such bidder may not be awarded the particular Asset or the Entire Portfolio, as the case may be, because of the right of a Holder of a Class B Note or a Class C Note to arrange for a Person to purchase such Asset or the Entire Portfolio, as the case may be, (within the time period described above) for an amount equal to or more favorable to the Issuer than the bid submitted by such highest qualified bidder.

(g)     Some or all of the items constituting part of items 1-133 above may not have been and will not be registered under the Securities Act of 1933, as amended (the "Act"), or any applicable state securities laws and may not be sold or transferred without registration under such Act and applicable state securities law or the availability of valid exemptions from such registration requirements. In addition to such securities laws transfer restrictions on resale, some or all of the Assets Subject To Sale may be subject to transfer restrictions under the governing documents for such items included in the Assets Subject To Sale and/or other restrictions under applicable law, including but not limited to restrictions related to the United States Investment Company Act of 1940 (as amended, the "Investment Company Act") and the United States Employee Retirement Income Security Act of 1974 (as amended, "ERISA"), each as amended from time to time.

(h)     To the extent a bidder is interested in bidding on one or more of the Assets, please contact the Liquidation Agent to receive any information with respect to the Assets which may be in the possession of the Trustee (or obtained by the Liquidation Agent from the Collateral Manager via the Trustee) but not otherwise publicly available. In order to receive such information, each prospective bidder must first execute and return to the Liquidation Agent the Investor Representations and Confidentiality Agreement in the form of Exhibit B attached hereto.  Such information may include documents or financial information in the possession of the Trustee relating to the Assets, which information may include payment reports in the possession of the Trustee relating to the Assets or notices received by the Trustee regarding any defaults (and/or remedies exercised in connection with any defaults) which may have occurred in the underlying transactions. Additional information in respect of the Assets may become available after the date hereof. Such additional information will be made available to potential bidders by the Liquidation Agent as provided herein; however, neither the Trustee nor the Liquidation Agent undertakes to notify any potential bidder of the availability of any such additional information.  Neither the Trustee nor the

Liquidation Agent makes any representation, express or implied, with respect to the accuracy, adequacy or completeness for its purposes of any information that any bidder may receive in connection with any bid on the Assets.

(i)    Certain of the Assets are loan interests or equity interests in respect of companies affiliated with the former Collateral Manager for the Issuer (and its affiliates), and such Assets may be subject to certain transfer restrictions. Loan interests may be subject to transfer restrictions identified in the related underlying instruments and such underlying instruments may provide for certain eligibility requirements for transferees of such loan interests. Equity interests may be subject to restrictions on transfer in the articles of organization or limited liability company agreements of the issuer of such equity interest or in shareholder agreements or pledge agreements applicable to such equity interests. In addition, the transfer of the equity interests may require the delivery of an opinion of legal counsel as to the applicability of, or exemption from, relevant securities laws in respect of such transfer. The Trustee makes no representation, express or implied, with respect to the applicability of any transfer restrictions to any of the Assets or whether any information made available by the Trustee or the Liquidation Agent to a bidder accurately or adequately describes any applicable transfer restrictions. There also exists ongoing litigation (i) between Patriarch Partners Agency Services, LLC ("PPAS") and the Issuer and the current Collateral Manager in an action styled *Patriarch Partners Agency Services, LLC v. Zohar CDO 2003-1, Ltd. et al.* 16-cv-04488-VM (S.D.N.Y.) (the "PPAS Litigation") and (ii) between the Issuer and the former Collateral Manager in an action styled *Zohar CDO 2003-1 et al v. Patriarch Partners, LLC* (Del. C. Ch.), Case No. 12247-VCS (the "Delaware Books and Records Litigation") that impacts the Assets and their transferability. In particular, the PPAS Litigation includes claims by PPAS that the Issuer's replacement of PPAS as Administrative Agent under certain underlying instruments with the current Collateral Manager was ineffective because PPAS's appointment as Administrative Agent had been irrevocable. It is possible that the transferability of some or all of the underlying instruments at issue in the PPAS Litigation will be impacted by the outcome of those claims. In addition, the Delaware Books and Records Litigation includes claims by the Issuer seeking documents from the former Collateral Manager related to the Assets that were not turned over after the former Collateral Manager's resignation. It is possible that the documents being sought could include information about the Assets that supplements or conflicts with the information about the Assets that is currently available to the Trustee and described herein. The Delaware Books and Records Litigation may also involve a dispute between the Issuer and the former Collateral Manager as to whether equity interests are within the definition of "Collateral" set forth in the Indenture. The Delaware Court of Chancery, after a trial, issued an opinion and order in favor of the Issuer, requiring the former Collateral Manager to provide the successor Collateral Manager with documents concerning equity interests in which the Issuer may have rights or interests. Certain information provided by the successor Collateral Manager concerning such equity interests are included in the Additional Documents. The former Collateral Manager has filed a notice of appeal to the Supreme Court of Delaware. On November 28, 2016, the Trustee received correspondence from counsel to certain affiliates of the former Collateral Manager asserting that the Trustee has no

authority to transfer any equity interest purportedly held by the Issuer and disputing the ownership by the Issuer of such equity interests. In addition, there also exists ongoing litigation brought by Zohar II 2005-1, Limited and Zohar III, Limited in an action styled *Zohar II 2005-1, Limited et al v. FSAR Holdings, Inc. et al* (Del. C. Ch.), Case No. 12946- (the "Delaware Consent Litigation") that could impact certain of the Assets and their transferability. The Delaware Consent Litigation concerns action taken by written consent by the plaintiffs, who allege that they own stock certificates representing a majority of the voting stock of three corporations, to remove the current directors of those corporations and to elect new directors. Affiliates of the former Collateral Manager, purporting to act on behalf of the corporations, objected to the action by written consent. The plaintiffs in the Delaware Consent Litigation seek a judgment from the Delaware Court of Chancery that their action by written consent to remove and replace the directors of the corporations is valid. The Issuer also owns stock certificates in two of the corporations that are the subject of the Delaware Consent Litigation. See Items 103, 104, 126, and 127 of the "Assets Subject to Sale" and information contained in the Additional Documents. In respect of item #133 above, the Trustee and the Liquidation Agent make no representation or warranty as to (i) whether any such Assets exist or, (ii) if any such Assets exist, the value of or rights associated with any such Assets.

(j)     Information included in certain of the Additional Documents related to certain of the equity interests described herein appears to be inconsistent with (a) historical information maintained by the Trustee and (b) information previously provided to the Trustee by the Collateral Manager and the former Collateral Manager, which information had formed the basis for the "Assets Subject to Sale" in the Trustee's Notice Of Public Sale And Invitation To Bid, dated August 26, 2016, and Second Notice Of Public Sale And Invitation To Bid, dated October 24, 2016 and this Third Notice Of Public Sale And Invitation To Bid. To the extent the Additional Documents (a) reflect additional possible ownership rights or interests in issuers identified in Items 1 to 132 of the "Assets Subject to Sale" or (b) indicate possible ownership rights or interests that are not identified in Items 1 to 132 of the "Assets Subject to Sale," such additional possible equity or other ownership rights or interests shall be deemed to be included in Item 133 of the "Assets Subject to Sale." The Additional Documents are available for review by request to the Liquidation Agent as provided in this Third Notice Of Public Sale And Invitation To Bid.

(k)     Management of the entities that are the subjects of the loan interests or the equity interests listed in items 1-133 are available, subject to an appropriate confidentiality agreement, to meet and confer with prospective bidders. Any prospective bidder wishing to avail itself of this opportunity should contact the Liquidation Agent.

(l)     THE ASSETS SUBJECT TO SALE WILL BE OFFERED AND SOLD BY THE TRUSTEE ON AN "AS IS AND WHERE IS" BASIS, AND WITHOUT ANY REPRESENTATIONS OR WARRANTIES (WHETHER EXPRESSED OR IMPLIED) OF ANY KIND MADE BY ANY SECURED PARTY, THE TRUSTEE, THE LIQUIDATION AGENT OR ANY OTHER PERSON ACTING

FOR OR ON BEHALF OF THE TRUSTEE, AND WITHOUT ANY RECOURSE WHATSOEVER AGAINST ANY SUCH PERSON.

(m)     The highest qualified bidder for which any of the Assets are awarded, by submission of its bid, is deemed to represent and warrant that such bidder is qualified to become a transferee of such Assets under all transfer restrictions applicable to such Assets.

(n)     The Trustee will accept bids only from those persons to whom in its sole judgment such sale may lawfully be made; provided, however, that the acceptance of any such bid shall not constitute any determination on the part of the Trustee that the bidder is a permitted transferee of any of the Assets. Any person submitting a bid is hereby deemed to represent that (i) such Assets are being acquired for the account of the bidder and not with a view to resale or distribution except in compliance with applicable securities laws, and (ii) the bidder shall not resell a security constituting part of the Assets without compliance with the registration requirements of the Act, the regulations of the Securities and Exchange Commission promulgated thereunder and applicable state securities laws or pursuant to valid exemptions therefrom.

(o)     A bid by any person will be deemed to be a representation (and such person shall be required to so represent on any Bid Sheet submitted by such person) that such bidder (i) is a person or entity that qualifies for a private placement exemption from registration under the Act, (ii) has sufficient knowledge and experience in business and financial matters to evaluate properly the merits and risks of investment in the Assets, (iii) has had such access to information concerning the Assets as such bidder deems necessary to make an informed investment decision and, based on that information, has independently (and without reliance on the Trustee, Liquidation Agent or the Issuer) made its own analysis and decision to bid on the Assets, (iv) has such knowledge and experience and has made investments of a similar nature so as to be aware of the risks and uncertainties related to an investment in such Assets, (v) has sufficient financial ability and net worth to bear the economic risks involved in investment in such Assets, (vi) acknowledges that no representation, express or implied, is made with respect to the accuracy, adequacy or completeness for its purposes of any information that such bidder may receive in connection with any bid on the Assets, and (vii) confirms that the sale of the Assets to the bidder will not violate the Act as a result of actions taken by the bidder or any breach of the representations contained herein or in the Bid Sheet and such bidder is qualified to become a transferee of such Assets under all transfer restrictions applicable to such Assets. Further, such bidder may be required to establish that it is able to bear the economic risks involved in investment in the Assets.

(p)     Bids must be for the entire amount of each Asset or for the Entire Portfolio. Partial bids in respect of individual Assets will not be accepted.

(q)     Your bid should be your "best and final" bid. Except as otherwise set forth herein, you will not be notified of other bids prior to the determination of the winning bid

nor (subject to Section 3(e) and 3(f)) will any bidder be given the opportunity to submit a subsequent higher bid.

(r)     Reserve levels may apply.

(s)     All bids submitted must be irrevocable and unconditional and held open for no less than six (6) Business Days.

(t)     Upon notification to the winning bidder, the winning bidder shall be required to deliver to the Trustee a signed counterpart of the purchase agreement (the "Purchase Agreement") substantially in the form attached hereto as Exhibit C (with such modifications as may be agreed to between such winning bidder and the Trustee). The terms of such sale shall be (except in the case of a winning "Credit Bid" by the Credit Enhancer as described in subsection (v) below) payment of funds in cash or by certified or cashier's check or wire transfer after the acceptance of such bid and in accordance with the terms of the Purchase Agreement. The winning bidder will be responsible for preparing and facilitating the execution of all necessary assignment and transfer documents, including all requirements applicable to any transfer restrictions to which the Assets may be subject.

(u)     The Trustee reserves the right to offer the Assets in any other commercially reasonable manner. The Trustee may adjourn or cancel the public sale of any or all of the Assets or cause any such sale to be adjourned, recessed and/or reconvened from time to time, without further written notice or further publicity, by announcement at the time and place appointed for such sale or at any adjournment, recess and/or reconvening and, without further written notice or publication, such sale may be held at the time and place to which it may have been so adjourned.

(v)     Under certain circumstances, the Credit Enhancer may receive credit for the outstanding amount of the Credit Enhancer's Credit Enhancement Liabilities in connection with its bid on the Assets.

(w)     No sale will be completed until the winning bidder completes its purchase as provided herein and, in the case of any failure to complete a purchase, the Trustee may without further notice accept the next highest bid from a qualified bidder.

(x)     The Trustee reserves the right to amend, supplement or otherwise change the terms and conditions of the sale.

<u>Additional Information May Be Obtained</u>

Additional information concerning the Assets Subject To Sale and matters pertaining to the public sale may be obtained from the Liquidation Agent by contacting Duff & Phelps by telephone at 212-523-0355 or by e-mail at CL.ZOHARBIDS@DUFFANDPHELPS.COM, or by mail addressed to Duff & Phelps Securities, 55 East 52nd Street, Floor 31, New York, NY 10055, Attention: Zohar Bids. The Indenture and the documents reflecting the Trustee's security interest in the Assets Subject To Sale are available for inspection prior to the public sale by appointment (or by other means agreed upon by the Trustee).

## EXHIBIT A

## BID SHEET

Reference is hereby made to that certain Notice of Rescheduling of Public Sale and Fourth Notice of Public Sale and Invitation to Bid, dated as of December 8, 2016 (the "Invitation to Bid") from U.S. Bank National Association ("U.S. Bank"), not in its individual capacity but solely as trustee (in such capacity, the "Trustee") under that certain Indenture, dated as of November 13, 2003 (as amended or supplemented, the "Indenture"), by and among Zohar CDO 2003-1, Limited, as issuer (the "Issuer"), Zohar CDO 2003-1, Corp, as co-issuer, Zohar 2003-1, LLC, as Zohar subsidiary, MBIA Insurance Corporation, as Credit Enhancer, CDC Financial Products Inc., as Class A-1 Note Agent, and U.S. Bank, as Trustee, all of the terms and conditions of which are hereby acknowledged by the undersigned (the "Bidder") and incorporated herein by reference and made a part of the Bid (as defined below). All capitalized terms not defined herein but defined in the Invitation to Bid shall have the meanings given to such terms in the Invitation to Bid.

1.      In accordance with the terms and conditions set forth in the Invitation to Bid, the Bidder hereby submits to the Trustee the following offer or bid (the "Bid") to purchase, in the bid amount noted and marked by the Bidder on Annex I attached hereto and incorporated herein by reference, (a) one or more of the Assets, and/or (b) the Entire Portfolio.

2.      Contact information for the Bidder (must be completed in full):

Name: _____

Company: _____ Tax ID: _____

Street Address: _____

City: _____ State: _____ Zip: _____

Phone: _____ Email: _____

Bloomberg Address:   YES   NO    If "Yes", please include: _____

3.      All Bids are subject to the terms and conditions set forth in the Invitation to Bid distributed in connection with this public sale. The Bidder hereby understands and agrees that the Assets are being sold strictly on an "AS IS, WHERE IS" basis, and without any representations or warranties (whether express or implied) of any kind made by any secured party, the Trustee, the Liquidation Agent or any other person acting for or on behalf of the Trustee, and without any recourse whatsoever against any such person.

4.      By submitting this bid, the Bidder represents and warrants to the Trustee that it (i) is a person or entity that qualifies for a private placement exemption from registration under the Act, (ii) has sufficient knowledge and experience in business and financial matters to evaluate properly the merits and risks of investment in the Assets, (iii) has had such access to information concerning the Assets as such bidder deems necessary to make an informed investment decision and, based on that information, has independently (and without reliance on the Trustee, Liquidation Agent or the Issuer) made its own analysis and decision to bid on the Assets, (iv) has such knowledge and experience and has made investments of a similar nature so as to be aware of the risks and uncertainties related to an investment in such Assets, (v) has sufficient financial ability and net worth to bear the economic risks involved in investment in such Assets, (vi) acknowledges that no representation, express or implied, is made with respect to the accuracy, adequacy

or completeness for its purposes of any information that such bidder may receive in connection with any bid on the Assets, and (vii) confirms that the sale of the Assets to the Bidder will not violate the Act as a result of any actions taken by the Bidder or any breach of the representations contained in the Invitation to Bid or herein and such Bidder is qualified to become a transferee of each such Asset under all transfer restrictions applicable to such Asset.

     5.     By submitting this bid, the Bidder acknowledges and agrees that (i) it may not resell any securities constituting part of the Assets acquired in the public sale without compliance with the registration requirements of the Act, the regulations of the Securities and Exchange Commission promulgated thereunder, and applicable state securities laws, or pursuant to valid exemptions therefrom, (ii) some or all of the Assets that are the subject of the public sale may be subject to additional transfer restrictions under the governing documents for such Assets and/or applicable law, including but not limited to Investment Company Act restrictions and ERISA restrictions, and that the Bidder is qualified to become a transferee under all such transfer restrictions, and (iii) none of the Trustee, the Liquidation Agent nor any other person connected with the sale of Assets is a fiduciary or investment advisor to the Bidder.

     6.     There are no conditions or contingencies to this Bid.  This Bid Sheet shall be governed by and construed in accordance with the laws of the State of New York for all purposes and in all respects, without giving effect to the conflict of law provisions thereof.

Executed as of this ____ day of _____, 2016.

_____

*(Name of Institution)*

By: _____
Name:
Title:

A-2

## ANNEX I TO THE BID SHEET

## Public Sale

| Issuer | Bid | Bid for Entire Portfolio |
|---|---|---|
| Zohar 2003-1, Limited | The Entire Portfolio [As Defined] | $XX.XX |

## AND / OR

| | | | | Loan Interest | | | | |
|---|---|---|---|---|---|---|---|---|
| # | Issuer | Issue | Asset Type | Current Par Amount (Issue Currency) | Total Commitment | Current Coupon | Maturity Date | Bid |
| 1 | 180s, LLC & 180s Canada Corporation | Fully Funded Term B | Delayed Draw Loan | 2,240,328.00 | 2,242,328.00 | 2.53267 | 4/15/2019 | $ |
| 2 | 180s, LLC & 180s Canada Corporation | Tranche A Revolver | Revolving Credit | 16,600,000.00 | 16,600,000.00 | 2.53267 | 4/15/2019 | $ |
| 3 | American Doors, LLC | Term Loan | Term Loan | 115,751.42 | 115,751.42 | 1.03267 | 4/15/2019 | $ |
| 4 | American Doors, LLC | Term Loan C | Term Loan | 8,315,638.01 | 8,315,638.01 | 1.03267 | 4/15/2019 | $ |
| 5 | American LaFrance | Delayed Draw Term Loans | Delayed Draw Loan | 509,019.73 | 509,019.73 | 0.197 | 10/31/2015 | $ |
| 6 | American LaFrance | Fully Funded DD Term Loan A | Term Loan | 1,784,456.80 | 1,784,456.80 | 0.434 | 10/31/2015 | $ |
| 7 | American LaFrance | Revolver | Revolving Credit | 451,290.39 | 451,290.40 | 1 | 10/31/2015 | $ |
| 8 | American LaFrance | Term Loan 1 | Term Loan | 414,121.55 | 414,121.55 | 1 | 10/31/2015 | $ |
| 9 | American LaFrance | Term Loan 2 | Term Loan | 42,240,641.22 | 42,240,641.22 | 1 | 10/31/2015 | $ |
| 10 | Amweld International LLC | Delayed Draw | Delayed Draw Loan | 80,160.09 | 80,160.09 | 0 | 6/28/2016 | $ |
| 11 | Amweld International LLC | Term Loan B | Term Loan | 5,758,739.62 | 5,758,739.62 | 0 | 10/31/2015 | $ |
| 12 | Best Textiles Acquisition, LLC | Revolver | Revolving Credit | 5,000,000.00 | 5,000,000.00 | 2.53267 | 4/15/2019 | $ |
| 13 | Bomar Industries International, Inc. | Revolver 2 | Revolving Credit | 3,200,000.00 | 3,200,000.00 | 0 | 6/30/2013 | $ |
| 14 | Bomar Industries International, Inc. | Tranche A Term Loan | Term Loan | 10,000,000.00 | 10,000,000.00 | 0 | 6/30/2013 | $ |
| 15 | Bomar Industries International, Inc. | Tranche B Term Loan | Term Loan | 3,806,930.16 | 3,806,930.16 | 0 | 6/30/2013 | $ |
| 16 | Croscil Home | Revolver | Revolving Credit | 10,000,000.00 | 10,000,000.00 | 6.53267 | 4/15/2019 | $ |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 17 | Duro Textiles, LLC | Fully Funded Term Loan G | Delayed Draw Loan | 1,049,259.65 | 1,049,259.65 | 2.03267 | 4/15/2019 | $ |
| 18 | Duro Textiles, LLC | Term B Loan | Term Loan | 7,500,000.00 | 7,500,000.00 | 2.03267 | 4/15/2019 | $ |
| 19 | Duro Textiles, LLC | Term Loan | Term Loan | 8,000,000.00 | 8,000,000.00 | 2.03267 | 4/15/2019 | $ |
| 20 | Duro Textiles, LLC | Term Loan K1 | Term Loan | 1,888,000.99 | 1,888,000.99 | 2.03267 | 4/15/2019 | $ |
| 21 | East Alliance Limited | Term Loan A | Term Loan | 11,928,348.24 | 11,928,348.24 | 2.53267 | 12/31/2016 | $ |
| 22 | Emag Solutions, LLC | Revolver | Revolving Credit | 4,062,500.04 | 4,062,500.04 | 7.53267 | 4/15/2019 | $ |
| 23 | Fetco Home Decor, Inc. | Exchanged Security | Term Loan | 2,757,727.26 | 2,757,727.26 | 0.1702 | 4/15/2019 | $ |
| 24 | Fetco Home Decor, Inc. | Term Loan | Term Loan | 1,082,661.77 | 1,082,661.77 | 8.53267 | 4/15/2019 | $ |
| 25 | Galey & Lord, LLC | Fully Funded Term Loan | Term Loan | 3,000,000.00 | 3,000,000.00 | 1.53267 | 4/15/2019 | $ |
| 26 | Galey & Lord, LLC | Revolver | Revolving Loan | 1,180,176.25 | 1,180,176.25 | 1.53267 | 4/15/2019 | $ |
| 27 | Galey & Lord, LLC | Term Loan | Term Loan | 25,263,396.84 | 25,263,396.84 | 1.53267 | 4/15/2019 | $ |
| 28 | Galey & Lord, LLC | Term Loan E | Term Loan | 1,600,000.00 | 1,600,000.00 | 1.52722 | 4/15/2019 | $ |
| 29 | Galey & Lord, LLC | Term Loan K | Term Loan | 689,999.01 | 689,999.01 | 1.53267 | 4/15/2019 | $ |
| 30 | Galey & Lord, LLC | Term Loan M | Term Loan | 800,000.00 | 800,000.00 | 1.53267 | 4/15/2019 | $ |
| 31 | Global Automotive Systems, LLC | Term Loan | Term Loan | 9,100,000.00 | 9,100,000.00 | 6.03267 | 4/15/2019 | $ |
| 32 | Global Automotive Systems, LLC | Term Loan A | Term Loan | 21,727,855.40 | 21,727,855.40 | 6.03267 | 4/15/2019 | $ |
| 33 | Hartwell Industries, Inc. | DELAYED DRAW TERM LOAN C | Delayed Draw Loan | 1,500,000.00 | 1,500,000.00 | 3.03267 | 4/15/2019 | $ |
| 34 | Hartwell Industries, Inc. | New Revolver | Revolving Credit | 1,927,636.19 | 1,927,639.96 | 3.03267 | 4/15/2019 | $ |
| 35 | Hartwell Industries, Inc. | New Term Loan 2 | Term Loan | 15,060,304.48 | 15,060,304.48 | 3.02722 | 4/15/2019 | $ |
| 36 | Hartwell Industries, Inc. | Term Loan A-1 | Term Loan | 500,000.00 | 500,000.00 | 3.03267 | 4/15/2019 | $ |
| 37 | Heritage Aviation, Ltd. | Delayed Draw Term Loan A | Delayed Draw Loan | 9,860,000.00 | 9,970,000.00 | 4 | 4/15/2019 | $ |
| 38 | Heritage Aviation, Ltd. | Term Loan | Term Loan | 1,000,000.00 | 1,000,000.00 | 4.52722 | 4/15/2019 | $ |
| 39 | Iconic American Trucks | Iconic American Trucks T/L B | Term Loan | 7,217,681.53 | 7,217,681.53 | | 3/31/2019 | $ |
| 40 | IMG Holdings, Inc. | Fully Funded Term Loan | Term Loan | 555,360.00 | 555,360.00 | 4.53267 | 4/15/2019 | $ |
| 41 | IMG Holdings, Inc. | Revolver A | Revolving Credit | 3,999,999.97 | 4,000,000.00 | 4.53267 | 4/15/2019 | $ |
| 42 | IMG Holdings, Inc. | Revolving Credit C | Revolving Credit | 2,000,000.35 | 2,000,000.35 | 4.53267 | 4/15/2019 | $ |
| 43 | IMG Holdings, Inc. | Term E | Term Loan | 144,640.00 | 144,640.00 | 4.53267 | 4/15/2019 | $ |
| 44 | IMG Holdings, Inc. | Term Loan 1A | Term Loan | 2,004,585.76 | 2,004,585.76 | 4.53267 | 4/15/2019 | $ |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 45 | IMG Holdings, Inc. | Term Loan 1B | Term Loan | 2,174,795.68 | 2,174,795.68 | 4.53267 | 4/15/2019 | $ |
| 46 | IMG Holdings, Inc. | Term Loan D | Term Loan | 300,000.00 | 300,000.00 | 4.53267 | 4/15/2019 | $ |
| 47 | Intera Group, Inc. | Exchanged Security | Note | 6,374,815.23 | 6,374,815.23 | 0 | 12/31/2016 | $ |
| 48 | Intera Group, Inc. | Fully Funded Term C | Delayed Draw Loan | 2,486,494.53 | 2,586,494.53 | 0 | 10/31/2016 | $ |
| 49 | Intera Group, Inc. | Restructured Term Loan | Term Loan | 869,031.69 | 869,031.69 | 0 | 10/31/2016 | $ |
| 50 | Intera Group, Inc. | Term Loan C | Term Loan | 158,501.65 | 158,501.65 | 0 | 10/31/2016 | $ |
| 51 | Intrepid USA | Intrepid USA R/C | Revolving Credit | 9,280,002.89 | 9,280,002.89 | 8 | 4/15/2019 | $ |
| 52 | Intrepid USA | Term Loan B | Term Loan | 3,860,066.01 | 3,860,066.01 | 6.53267 | 4/15/2019 | $ |
| 53 | LVD Acquisition, LLC | Term Loan | Term Loan | 9,303,993.33 | 9,303,993.33 | 4.53267 | 4/15/2019 | $ |
| 54 | MD Helicopters, Inc. | Sub Note Term Loan | Term Loan | 11,255,271.08 | 11,255,271.08 | 2.4255 | 5/15/2019 | $ |
| 55 | MD Helicopters, Inc. | Term A | Term Loan | 12,873,602.92 | 12,873,602.92 | 3.53267 | 4/15/2019 | $ |
| 56 | MD Helicopters, Inc. | Term Loan | Term Loan | 25,551,724.14 | 25,551,724.14 | 3.53267 | 4/15/2019 | $ |
| 57 | MD Helicopters, Inc. | Term Loan B | Term Loan | 16,116,674.23 | 16,116,674.23 | 3.53267 | 4/15/2019 | $ |
| 58 | MD Helicopters, Inc. | Tranche A-3 | Term Loan | 700,000.00 | 700,000.00 | 3.53267 | 4/15/2019 | $ |
| 59 | MD Helicopters, Inc. | Tranche A-7 | Term Loan | 1,200,000.00 | 1,200,000.00 | 3.53267 | 4/15/2019 | $ |
| 60 | Natura Water, Inc. | Fully Funded Term B | Term Loan | 1,500,000.00 | 1,500,000.00 | 5.53267 | 4/15/2019 | $ |
| 61 | Natura Water, Inc. | Fully Funded Term C | Term Loan | 2,200,000.00 | 2,200,000.00 | 5.53267 | 4/15/2019 | $ |
| 62 | Natura Water, Inc. | Fully Funded Term Loan E | Term Loan | 300,000.00 | 300,000.00 | 5.53267 | 4/15/2019 | $ |
| 63 | NetVersant Acquisition, LLC | Restructured Revolver A | Revolving Credit | 277,490.69 | 277,490.69 | 1.53267 | 4/15/2019 | $ |
| 64 | NetVersant Acquisition, LLC | Restructured Term Loan | Term Loan | 41,585,556.76 | 41,585,556.76 | 1.53267 | 4/15/2019 | $ |
| 65 | NetVersant Solutions, Inc. | Restructured Revolver B | Revolving Credit | 2,102,385.30 | 2,102,385.31 | 1.49565 | 4/15/2019 | $ |
| 66 | Petry Media Corporation | Priming Revolver | Revolving Credit | 9,212,536.60 | 9,219,801.44 | 10 | 10/31/2017 | $ |
| 67 | Petry Media Corporation | Priming Term Loan | Term Loan | 210,397.61 | 210,397.61 | 10 | 10/31/2016 | $ |
| 68 | Petry Media Corporation | Term Loan C | Term Loan | 1,380,775.74 | 1,380,775.74 | 10 | 10/31/2016 | $ |
| 69 | Petry Media Corporation | Term Loan E | Term Loan | 770,092.44 | 770,092.44 | 10 | 10/31/2016 | $ |
| 70 | Rapid Rack Industries, Inc. | Term Loan | Term Loan | 4,121,507.10 | 4,121,507.10 | 0 | 10/31/2015 | $ |
| 71 | Red Shield Acquisition LLC | Revolver 2 | Revolving Credit | 5,000,000.00 | 5,000,000.00 | | 10/31/2016 | $ |
| 72 | Red Shield Acquisition LLC | Term Loan | Delayed Draw Loan | 5,722,548.98 | 5,722,548.98 | | 10/31/2016 | $ |
| 73 | Remco Maintenance, LLC | Revolver | Revolving Credit | 2,500,000.00 | 2,500,000.00 | 8.53267 | 4/15/2019 | $ |

| # | Issuer Name | Type | | Amount | Amount | Rate | Date | Bid |
|---|---|---|---|---|---|---|---|---|
| 74 | Remco Maintenance, LLC | Term Loan | Term Loan | 3,362,670.50 | 3,362,670.50 | 8.53267 | 4/15/2019 | $ |
| 75 | RM Acquisition, LLC | Preferred Security | Term Loan | 8,545,250.00 | 8,545,250.00 | 0.53433 | 5/15/2019 | $ |
| 76 | RM Acquisition, LLC | Revolver | Revolving Credit | 2,205,882.33 | 2,205,882.35 | 10 | 4/15/2019 | $ |
| 77 | RM Acquisition, LLC | Term Loan | Term Loan | 5,823,529.41 | 5,823,529.41 | 4.86267 | 4/15/2019 | $ |
| 78 | S.O. Acquisition, LLC | Fully Funded Term A | Term Loan | 4,500,000.00 | 4,500,000.00 | 6.53267 | 4/15/2019 | $ |
| 79 | S.O. Acquisition, LLC | Fully Funded Term Loan C | Term Loan | 350,000.00 | 350,000.00 | 6.53267 | 4/15/2019 | $ |
| 80 | Silverack, LLC | Silverack R/C A | Revolving Credit | 6,000,000.00 | 6,000,000.00 | 2.53267 | 4/15/2019 | $ |
| 81 | Silverack, LLC | Silverack T/L A | Term Loan | 3,395,487.02 | 3,395,487.02 | 2.53267 | 4/15/2019 | $ |
| 82 | Snelling Medical Staffing | Term Loan | Term Loan | 223,000.00 | 223,000.00 | 7.53267 | 4/15/2019 | $ |
| 83 | Transcare Corporation | Tranche B Term Loan | Term Loan | 3,500,000.00 | 3,500,000.00 | 2.53267 | 4/15/2019 | $ |
| 84 | Trim Trends, LLC | Term Loan A | Term Loan | 6,555,380.26 | 6,555,380.26 | 6.02722 | 4/15/2019 | $ |
| 85 | Vulcan Engineering Corporation | Revolver | Revolving Credit | 1, 428,571.43 | 2,000,000.00 | 7.52722 | 4/15/2019 | $ |
| 86 | Xinhua Sports & Entertainment | Additional Term Loan | Term Loan | 2,394,288.89 | 2,394,288.89 | 0.2145 | 10/21/2012 | $ |
| 87 | Xinhua Sports & Entertainment | Convertible Term Loan | Term Loan | 13,060,228.45 | 13,060,228.45 | 0.2145 | 10/21/2012 | $ |
| 88 | Xpient Solutions, LLC | Exchanged Security | Term Loan | 318,427.84 | 318,427.84 | 4.19775 | 11/30/2019 | $ |
| 89 | Zohar SS Acquisition, LLC | Exchanged Security | Term Loan | 2,564,102.60 | 2,564,102.60 | 2 | 5/15/2019 | $ |
| 90 | Zohar SS Acquisition, LLC | Preferred Stock | Term Loan | 256,410.26 | 256,410.26 | 7.53267 | 5/15/2019 | $ |
| 91 | Zohar SS Acquisition, LLC | Term Loan | Term Loan | 7,652,549.20 | 7,652,549.20 | 7.53267 | 4/15/2019 | $ |

| Equity Interest | | | | |
|---|---|---|---|---|
| # | Issuer Name | Type | Amount | Bid |
| 92 | Automated Ductwork Manufacturing Company | Common | 100 | $ |
| 93 | Felagastyring EHF | Common Stock | 63,100.00 | $ |
| 94 | Fetco Home Decor, Inc. | Common1 | 51,263.00 | $ |
| 95 | Fetco Home Decor, Inc. | Common2 | 25,000.00 | $ |
| 96 | Reserved | | | |
| 97 | Fetco Home Decor, Inc. | Pref 315619ZB5 | 13,488.00 | $ |
| 98 | Reserved | | | |
| 99 | Fetco Home Decor, Inc. | Preferred | 14,090.00 | $ |
| 100 | Fetco International Hong Kong Limited | Common | 9,997.00 | $ |
| 101 | Galey & Lord, Inc. | Common Stock | 687,547.00 | $ |
| 102 | Galey & Lord, Inc. | Series A Preferred Interest 8/18/2012 | 39,010,000.00 | $ |
| 103 | Glenoit Universal, Ltd. | Common Stock Class A | 12,967.00 | $ |

| # | | | | |
|---|---|---|---|---|
| 104 | Glenoit Universal, Ltd. | Class B Common Stock | 3,527.00 | $ |
| 105 | Reserved | | | |
| 106 | Reserved | | | |
| 107 | Hartwell Industries, Inc. | Common CL A | 194,512.00 | $ |
| 108 | HyperActive Technologies, Inc. | Common Stock | 85,334.00 | $ |
| 109 | IMG Holdings, Inc. | Common Stock | 757 | $ |
| 110 | Intera Group, Inc. | Preferred Stock | 5,069.42 | $ |
| 111 | Intera Group, Inc. | Common Stock | 839.09 | $ |
| 112 | Reserved | | | |
| 113 | MD Helicopters, Inc. | Common Stock | 235 | $ |
| 114 | Metalforming Technologies, Inc. | Common Stock | 175,889.00 | $ |
| 115 | Opening Specialties and Supply Inc. | Common | 2,267.00 | $ |
| 116 | PHC Holding Corp | Class A Common Stock | 83,460.13 | $ |
| 117 | PHC Holding Corp | Class C Common Stock | 85,880.75 | $ |
| 118 | PHC Holding Corp | Common | 100 | $ |
| 119 | PHC Holding Corp | Class B Common Stock | 112,047.09 | $ |
| 120 | PHC Holding Corp | Preferred Stock | 114,178.19 | $ |
| 121 | Pleasants Hardware Company | Common CL A | 1,000.00 | $ |
| 122 | Spectrum International Holdings, Inc. | Common | 286,103,870.07 | $ |
| 123 | Textile Holdings, Inc. | Common | 400,000.00 | $ |
| 124 | U.F. Holdings, Inc. | Preferred Stock | 53,810.00 | $ |
| 125 | UF Holdings Inc. | Common | 196,020.00 | $ |
| 126 | UI Acquisition Holding Company | Class A Common Stock | TBD | $ |
| 127 | UI Acquisition Holding Company | Class B Common Stock | TBD | $ |
| 128 | Vorumerkjastyring EHF | Common Stock | 63,100.00 | $ |
| 129 | W.W. Holdings, LLC | Common Stock | 4,787.00 | $ |
| 130 | Western Forest Products, Inc. | Common | 45,327.00 | $ |
| 131 | W.W. Versat Acquisition Corporation | Common Stock | 100 | $ |
| 132 | Xinhua Sports & Entertainment Limited | Common | 41,992.00 | $ |

| Additional Assets Subject to Sale | | |
|---|---|---|
| # | | Bid |
| 133 | To the extent not identified in Items 1 to 132 above, Item 133 shall consist of all of the Issuer's right, title and interest in and to instruments, accounts, payment intangibles, general intangibles, letter-of-credit rights, chattel paper, electronic chattel paper, deposit accounts and investment property and other property and rights subject or intended to be subject to the lien of the Indenture for the benefit of the Secured Parties (as defined in the Indenture) as set forth in the Granting Clauses of the Indenture, including, without limitation, any and all property of any type or nature owned by the Issuer (other than Excluded Property, as defined in the Indenture) and any Equity Securities (as defined in the Indenture) and other securities or obligations owned or acquired by the Issuer and such other right, title or interest to which the Trustee may transfer or sell, including, without limitation (and for avoidance of any doubt), any commercial tort claims; provided, however, that all of the Accounts and all Cash therein (as each such term is defined in the Indenture) shall in no event be included in the Assets Subject To Sale. | $ |

**EXHIBIT B**

**INVESTOR REPRESENTATIONS AND CONFIDENTIALITY AGREEMENT**

The undersigned has expressed an interest in participating in a public sale (the "Public Sale") under the Indenture, dated as of November 13, 2003 (as amended or supplemented, the "Indenture"), by and among Zohar CDO 2003-1, Limited, as issuer (the "Issuer"), Zohar CDO 2003-1, Corp., as co-issuer, Zohar CDO 2003-1, LLC, as Zohar Subsidiary, MBIA Insurance Corporation, as Credit Enhancer, CDC Financial Products Inc., as Class A-1 Note Agent, and U.S. Bank National Association, as trustee (the "Trustee"), and has asked that the Trustee or Duff & Phelps Securities, LLC (the "Liquidation Agent") provide certain information in the Trustee's or the Liquidation Agent's possession relating to certain assets included in the Assets (as defined in the Notice of Rescheduling of Public Sale and Fourth Notice of Public Sale and Invitation to Bid, dated December 8, 2016 (the "Invitation to Bid") from the Trustee) to be sold at the Public Sale. The Trustee is prepared to permit such participation and to provide such information in the possession of the Trustee to the undersigned so long as the undersigned executes this Investor Representations and Confidentiality Agreement (this "Agreement").

1.        The undersigned hereby represents and warrants to the Trustee that (i) to the extent that the undersigned is the successful bidder at the Public Sale, the Asset or Assets acquired thereby will be acquired for the account of the bidder and not with a view to resale or distribution except in compliance with applicable securities laws, (ii) the undersigned has sufficient business and investment knowledge and experience to effectively evaluate properly the merits and risks of investment in the Assets which are the subject of the Public Sale, (iii) the undersigned has such knowledge and experience and has made investments of a similar nature so as to be aware of the risks and uncertainties related to an investment in such Assets, (iv) the undersigned acknowledges that no representation, express or implied, is made with respect to the accuracy, adequacy or completeness for its purposes of any information that such bidder may receive in connection with any bid on the Assets, (v) the undersigned acknowledges the Trustee and the Liquidation Agent have no continuing obligation to the undersigned to update any information previously provided to it, (vi) the undersigned has sufficient financial ability and net worth to bear the economic risks involved in investment in such Assets, and (vii) the undersigned is aware of the fact that some or all of the securities constituting part of the Assets on which it is bidding have not been registered under the Securities Act of 1933, as amended (the "Act") or applicable state securities law. The undersigned hereby agrees that the undersigned may not resell any securities constituting part of the Assets acquired at the Public Sale without compliance with the registration requirements of the Act, the regulations of the Securities and Exchange Commission thereunder, and applicable state securities laws or pursuant to valid exemptions therefrom.

2.        The undersigned acknowledges and agrees that the Assets will be offered and sold by the Trustee without recourse, representations, warranties or covenants, express or implied, being made by the Trustee with respect to the Assets or with respect to any other information then in the Trustee's possession, including without limitation any financial information.

3.        The undersigned agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its and its affiliates' directors, officers, employees and agents, including accountants, legal counsel, sources of funding and other advisors (it being understood that the persons to whom such disclosure is made will be

informed of the confidential nature of such Information and instructed to keep such Information confidential), (ii) to any client which agrees with the undersigned to maintain the confidentiality of such Information in the same manner as provided herein, and the undersigned accepts responsibility for the fulfillment of such agreement by any such client, (iii) to the extent requested by any regulatory authority, or (iv) to the extent required by applicable laws or regulations or by any subpoena or similar legal process. The undersigned further agrees to use the Information solely for the purposes of evaluating whether or not it desires to participate in the Public Sale and for no other purpose whatsoever.  The undersigned further acknowledges that the Information may include material non-public information, access to which may restrict the ability of the undersigned from trading in other securities related to or backed by any of the Assets.  For the purposes of this Agreement, "Information" means all information received by the undersigned relating to the Assets from the Trustee or the Liquidation Agent which is the subject of the Public Sale; provided that "Information" shall not include any information which (i) is included in the "Invitation to Bid" related to such Public Sale, which includes the identity of the Assets included in the sale, (ii) is publicly available information relating to a security constituting part of the Assets which has been issued pursuant to an effective registration statement under the Act, (iii) is or becomes publicly available other than as a result of a breach of this Agreement, or (iv) is or becomes available to the undersigned on a non-confidential basis from a source other than the Trustee or the Liquidation Agent.

4.	The undersigned hereby agrees to indemnify, defend and hold the Trustee and the Liquidation Agent harmless of, from and against any and all claims, demands, liabilities, causes of action, losses, damages, costs and expenses (including attorneys' fees) hereafter suffered or incurred by the Trustee arising out of, directly or indirectly, (i) any breach of the undersigned's representations and warranties given hereunder, (ii) the undersigned's failure to observe (and to cause its agents, contractors, employees and consultants to observe) and comply with the terms and provisions hereof, and (iii) without limiting the foregoing, any violation of the Act or other applicable securities law of any jurisdiction arising out of clauses (i) or (ii) above. The indemnification obligations of the undersigned contained herein shall survive the termination of this Agreement and shall bind the undersigned, its successors, trustees and assigns, irrespective of whether or not the undersigned elects to participate in the Public Sale or acquires any Assets pursuant to the Public Sale.

5.	The undersigned agrees to either promptly destroy or return all Information to the Trustee or the Liquidation Agent on its behalf if it does not carry through on its evaluation or is not the successful bidder at the Public Sale for any Asset for which it received Information. Notwithstanding the foregoing, to the extent required for legal or compliance purposes, the undersigned may retain any copy of the Information.

6.	This Agreement shall terminate, as it relates to any particular asset, upon the earlier of (i) undersigned's purchase of such asset or (ii) one (1) year from the date hereof. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflicts of laws provisions thereof.

Executed as of this ____ day of _____, 2016.

_(Name of Institution)_

By: _____

     Name:

     Title:

# [EXHIBIT C]

## [PURCHASE AGREEMENT]

PURCHASE AGREEMENT

This PURCHASE AGREEMENT (this *"Agreement"*) is made as of [_____] [__], 2016, between U.S. BANK NATIONAL ASSOCIATION (*"U.S. Bank"*), as Trustee pursuant to the Indenture (as hereinafter defined) (the *"Seller"*), and _____, as purchaser (the *"Purchaser"*).

WITNESSETH:

WHEREAS, U.S. Bank is the Trustee pursuant to that certain Indenture, dated as of November 13, 2003 (as amended, supplemented or otherwise modified from time to time the *"Indenture"*), by and among Zohar CDO 2003-1, Limited, as Issuer (the *"Issuer"*), Zohar CDO 2003-1, Corp, as Co-Issuer (the "*Co-Issuer*", and, together with the Issuer, the *"Issuers"*), Zohar CDO 2003-1, LLC (the *"Subsidiary"*), MBIA Insurance Corporation, as Credit Enhancer, CDC Financial Products Inc., as Class A-1 Note Agent, and U.S. Bank, as Trustee, pursuant to which the Issuers have issued certain debt securities (the *"Notes"*), and capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Indenture;

WHEREAS, the Seller, as required by the Indenture, conducted an auction (the *"Auction"*) of certain loans and other assets (the *"Assets"*) owned by the Issuer and the Subsidiary on [_____] [__], 2016 (the *"Auction Date"*);

WHEREAS, the sale of the Assets is subject to the satisfaction of the conditions described in this Agreement and in the Notice of Rescheduling of Public Sale and Fourth Notice of Public Sale and Invitation to Bid, dated December 8, 2016, from the Seller; and

WHEREAS, the Seller desires to sell the Assets identified on Exhibit I attached hereto (collectively, the *"Purchaser Assets"*) to the Purchaser;

NOW THEREFORE, in consideration of the foregoing, the parties hereto agree as follows:

    1.    <u>Agreement to Purchase and Sell</u>.  Subject to all of the other conditions set forth herein, upon receipt by the Trustee prior to 5:00 p.m. (Eastern Time (*"ET"*)) on [_____] [__], 2016 (the *"Settlement Date"*) of $[**PURCHASE PRICE**] from the Purchaser (such amount, the *"Purchase Price"*) the Trustee hereby irrevocably agrees to transfer, assign, grant, set over, deposit with and otherwise convey to the Purchaser, without recourse, and the Purchaser hereby irrevocably agrees to purchase and accept on the Settlement Date, all the right, title and interest of the Trustee, the Issuer and the Subsidiary in and to all of the Purchaser Assets and all payments of principal of and interest on the Purchaser Assets after the Settlement Date. Payments or distributions (whether received by set off or otherwise) of cash (including interest), notes, securities, or other property or proceeds under or in respect of the Purchaser Assets made after the Settlement Date (the *"Payments"*) and received by the Trustee, on behalf of the Issuer (the *"Recipient"*), shall be remitted to the Purchaser (in accordance with its instructions) by the Recipient within a reasonable time after receipt thereof by the Recipient; *provided* that the economic benefit of not-otherwise-scheduled permanent repayments of principal and any non-ordinary course fees made after the Auction Date shall be paid to the Purchaser; *provided further* that such Payment, if received by the Seller shall be held on behalf and for the sole benefit of the Purchaser and none of the Trustee, the Issuer or the Subsidiary shall have an equitable or beneficial interest in such Payment.  If a Payment received by the Recipient includes securities or other non-cash Payment, the Recipient shall, to the extent permitted by law, endorse (without recourse, representation or warranty) or use commercially reasonable efforts (at the Purchaser's sole expense) to assist the Purchaser to cause to be registered in the Purchaser's name, or such name as the Purchaser may direct, and deliver such securities to the Purchaser or to such entity as the Purchaser may direct as soon as reasonably practicable.

    2.     Payment.  On the Settlement Date, the Purchaser shall wire transfer to the Seller in immediately available funds an amount equal to the Purchase Price prior to 5:00 p.m. ET according to the following wiring instructions:

> Trustee Wire Instructions:
> Bank:         US Bank
> ABA #:        091000022
> Account Name: Zohar 1
> Account #:     1731-0332-2199
> FFC:          743771-201
> Ref:          [_____]
> Attention:     [_____]

    (a)     Conditions Precedent to Sale.  Notwithstanding anything to the contrary, the Seller's obligation to sell the Purchaser Assets to the Purchaser is subject to the Seller's determination that after receipt of notice as required pursuant to the Indenture, no Holder of a Class B Note or Holder of a Class C Note issued pursuant to the Indenture has exercised its right under the Indenture to arrange for a Person to purchase the Assets, within three Business Days of such notice, in an amount equal to or more favorable to the Issuer than the amount described in such notice.  In the event the foregoing condition is not satisfied in the reasonable determination of the Seller, (i) the sale of the Assets to the Purchaser shall be cancelled, and (ii) this Agreement shall automatically terminate (a "*Failed Settlement*").

    3.     Registration of Transfer of the Purchaser Assets.  Except as otherwise agreed to by the Seller and the Purchaser, the Purchaser agrees to use its best efforts to promptly take all actions necessary to cause the transfer and assignment of the Purchaser Assets to be effected pursuant to the underlying instruments governing such Purchaser Assets (the "*Underlying Instruments*") on the Settlement Date, including without limitation, (i) preparing, executing and delivering such transfer certificates, assignments, endorsements, administrative questionnaires and such other documents or instruments as may be required by the Underlying Instruments, (ii) obtaining such necessary consents to such transfer as may be required under the Underlying Instruments, (iii) paying any transfer and assignment fees as may be required to effect such transfer, (iv) providing such notices and legal opinions to any persons as may be required pursuant to the Underlying Instruments, in each case regardless of whether such obligation to take such action is on the part of the transferor or the transferee of such Purchaser Asset pursuant to the applicable Underlying Instruments.  In the event any such requirements require actions on the part of the Seller which cannot be performed by the Purchaser as agreed to above, the Seller agrees to cooperate with the Purchaser, at the Purchaser's request and expense, to cause such transfer, including without limitation the agreement of the Seller to execute such assignments, endorsements, certificates and such other documentation reasonably requested by the Purchaser and required to effect such transfer.  Except as otherwise provided in this Section 4, in no event shall the Seller be liable to the Purchaser in any manner arising from the transfer of any Purchaser Assets, it being acknowledged and agreed that the Purchaser shall have full responsibility to cause such transfer.  Upon completing the transfer of the Purchaser Assets in the name of the Purchaser, the Purchaser agrees to provide prompt notice thereof to the Seller (which notice may be given by email).

    4.     Failed Transfer.  (a)  Without limiting the obligation of the Purchaser to use its best efforts to promptly cause the transfer of all Purchaser Assets pursuant to the Underlying Instruments as provided in Section 4 above, in the event the Purchaser fails to effect such transfer on the Settlement Date (a "*Failed Transfer*"), the Purchaser shall continue to use its best efforts after the Settlement Date to cause the transfer and assignment of the Purchaser Assets to be effected pursuant to the Underlying Instruments in the manner provided in Section 4 above.  Upon completing the transfer of all the Purchaser Assets pursuant to the Underlying Instruments, the Purchaser agrees to provide prompt notice thereof to the Seller in writing (which notice may be given by email).

(b) Without limiting any of the Purchaser's obligations hereunder, during the period following the Settlement Date for which a Failed Transfer has occurred and is continuing in respect of any Purchaser Asset (a "*Participation Period*"), the assignment and transfer in Section 2 above, during such Participation Period, shall be deemed to be the grant and conveyance of an undivided 100% participation interest in and to such Purchaser Asset (a "*Participation Interest*") subject in each case to the provisions of the relevant Underlying Instruments. The Purchaser agrees to take such further action as may be necessary (or as otherwise reasonably requested by the Seller) to effect such participation pursuant to such Underlying Instruments, including without limitation entering into a participation agreement that is satisfactory to the Seller in its sole discretion; *provided* that such participation agreement shall terminate upon a successful transfer and assignment as contemplated in Section 2 above. Promptly after the commencement of the Participation Period, the Seller shall use commercially reasonable efforts to cause all amounts owing to the Purchaser as a result of the Participation Interest to be sent directly to the Purchaser; *provided, however*, that if the Seller receives (i) any notice or other document with respect to such Purchaser Asset, then the Seller shall provide such notice or other document to the Purchaser within a reasonable time after receipt thereof or (ii) Payments with respect to such Purchaser Asset, the Seller shall (x) accept and hold such Payment for the account and sole benefit of the Purchaser, (y) have no equitable or beneficial interest in such Payment and (z) deliver such Payment (free of any withholding, setoff, recoupment, or deduction of any kind except as required by law or as may be agreed to by the Seller and the Purchaser) promptly after receipt thereof. If a Payment received by the Seller includes securities or other non-cash Payment, the Seller shall, to the extent permitted by law, endorse (without recourse, representation or warranty) or use commercially reasonable efforts (at the Purchaser's sole expense) to assist the Purchaser to cause to be registered in the Purchaser's name, or such name as the Purchaser may direct, and deliver such securities to the Purchaser or to such entity as the Purchaser may direct as soon as reasonably practicable. No adjustment to the Purchase Price paid by the Purchaser hereunder shall be made as result of a Failed Transfer.

5.    <u>Representations of the Purchaser and the Seller</u>. The Purchaser hereby represents and warrants to the Seller that:

(a)    the Purchaser is qualified under applicable law to become a transferee of the Purchaser Assets;

(b)    the Purchaser acknowledges that no representation, express or implied, is made with respect to the accuracy, adequacy or completeness for its purposes of any information that the Purchaser may have received in connection with any bid on the Purchaser Assets;

(c)    the Purchaser has determined that it satisfies and meets all the necessary qualifications, requirements and other conditions necessary to become a transferee of the Purchaser Assets (other than any necessary third-party consents required to be provided by third-parties under the Underlying Instruments);

(d)    the Purchaser is duly authorized to execute, deliver and perform this Agreement;

(e)    the Purchaser is an entity duly existing under the laws of the United States or the jurisdiction of its organization;

(f)    this Agreement constitutes the legal, valid and binding obligation of the Purchaser enforceable against the Purchaser in accordance with its terms (subject to bankruptcy, insolvency and similar laws affecting creditor's rights generally and subject, as to enforceability, to general principals of equity);

(g)    the Purchaser acknowledges that none of the Seller nor any other party connected with the sale of the Assets is a fiduciary or investment advisor to the Purchaser in connection with its purchase of the Purchaser Assets and the Purchaser has not relied upon any advice or recommendation of the Seller or any of its

affiliates, and is making its own investment decision based upon its own judgment and upon advice of such professional advisers, either employed or independently retained by the Purchaser, as it has deemed necessary to consult;

        (h)     no material consent, approval, order or authorization of, or declaration, filing or registration with, any governmental entity is required to be obtained or made by the Purchaser in connection with the execution, delivery or performance by the Purchaser of this Agreement, or the consummation by it of the transactions contemplated hereby;

        (i)     the sale of the Purchaser Assets to the Purchaser pursuant to this Agreement will not violate the laws or regulations of any jurisdiction applicable to it, and is permitted under the Purchaser's governing documents and internal policies;

        (j)     the Purchaser understands the terms, conditions and risks of the Purchaser Assets and the Purchaser is able to provide the certificates, assignments and other applicable transfer documentation required to effect a transfer of the Purchaser Assets; and

        (k)     the Purchaser acknowledges and agrees that (a) the Seller may obtain or be in possession of non-public information regarding the Purchaser Assets, the obligors under such Purchaser Assets, and the Underlying Instruments, which may not be made available to any Purchaser, (b) the Seller makes no representations with respect to any Purchaser Asset, the obligors under any Purchaser Asset, the Underlying Instruments, or the accuracy or completeness of any information regarding the foregoing, and (c) the Seller will not be obliged to disclose to the Purchaser the existence of or details of any information or documentation relating thereto, including without limitation, any and all non-public information.

The Seller hereby represents and warrants to the Purchaser that:

        (a)     the Seller is duly authorized to execute, deliver and perform this Agreement;

        (b)     the Seller is a national banking association duly existing under the laws of the United States of America; and

        (c)     this Agreement constitutes the legal, valid and binding obligation of the Seller enforceable against the Seller in accordance with its terms (subject to bankruptcy, insolvency and similar laws affecting creditor's rights generally and subject, as to enforceability, to general principals of equity).

        6.     Costs.  Each party shall bear its own costs and expenses except as provided herein.  The Purchaser will pay any commissions due its brokers, the legal fees and expenses of its attorneys, all expenses relating to any review of the Assets performed by the Purchaser and any transfer and assignment fees relating to the transfer of the Purchaser Assets, including expenses incurred with respect to the gathering of information and the preparation and execution of any documents and instruments necessary to effect such transfer to the Purchaser.

        7.     Counterparts.  The signature pages to this Agreement may be executed by the Seller and the Purchaser, as the case may be, in separate counterparts. Facsimile signatures and signature pages provided in the form of a "pdf" or similar imaged document transmitted by electronic mail shall be deemed original signatures for all purposes hereunder.

        8.     GOVERNING LAW.  THIS AGREEMENT, AND ALL CLAIMS OR CAUSES OF ACTION (WHETHER IN CONTRACT OR TORT) THAT MAY BE BASED UPON, ARISE OUT OF OR RELATE TO THIS AGREEMENT, OR THE NEGOTIATION, EXECUTION OR PERFORMANCE OF THIS

AGREEMENT (INCLUDING ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO ANY REPRESENTATION OR WARRANTY MADE IN OR IN CONNECTION WITH THIS AGREEMENT OR AS AN INDUCEMENT TO ENTER INTO THIS AGREEMENT), SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW), AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

9.     WAIVER OF JURY TRIAL.  EACH OF THE PARTIES HERETO HEREBY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN EITHER OF THEM RELATING TO OR INCIDENTAL TO THE RELATIONSHIP BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT.

10.     NO RECOURSE.  THE SALE OF THE PURCHASER ASSETS TO THE PURCHASER WILL BE MADE WITHOUT RECOURSE AND ON AN "AS IS AND WHERE IS" BASIS, WITHOUT ANY REPRESENTATIONS OR WARRANTIES (WHETHER EXPRESSED OR IMPLIED) OF ANY KIND MADE BY THE SELLER (OR ANY OTHER PERSON ACTING FOR OR ON BEHALF OF THE SELLER OR ANY OTHER PARTY) AND WITHOUT ANY RECOURSE WHATSOEVER AGAINST THE SELLER (OR ANY OTHER PERSON ACTING FOR OR ON BEHALF OF THE SELLER).

11.     Information Provided to Purchaser.  Without limiting Section 10 above, the Seller (and any of its officers, directors, employees and agents) (collectively, the *"Information Providers"*) shall have any no liability whatsoever for any information or documents provided (or not provided) to the Purchaser, including any information contained in (or omitted from) any materials relating to the Auction of the Assets and any information made available including by access to information on any of the Information Providers' web-sites. The Purchaser acknowledges that the Seller has not made and is not making any representation or warranty as to the Purchaser Assets, including, without limitation, as to the completeness, accuracy or sufficiency thereof or as to the documentation and information relating to the Purchaser Assets.

12.     Indemnity.  Upon the transfer, assignment and conveyance of the Purchaser Assets as contemplated herein, including in Section 3 or Section 4, the Purchaser, its successors and assigns shall at all times indemnify and hold harmless the Seller and each of its directors, officers, employees, counsel, affiliates and agents (*"Indemnified Persons"*) from and against any and all claims, actions and suits of others, and from and against any and all liabilities, losses, damages, costs, charges, reasonable counsel fees and other reasonable expenses, in each case arising out of the terms of this Agreement, the Purchaser Assets and any agreement related thereto, except to the extent (i) that such arises from such Indemnified Person's gross negligence, willful misconduct or bad faith or (ii) that such arose prior to the date hereof.

13.     Release.  The Purchaser, on behalf of itself and any successors and assigns, hereby releases the Seller from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever, in law or equity in any way related to this Agreement, the Purchaser Assets and any agreement related thereto, which against the Seller the Purchaser ever had, now has or hereafter can, shall or may have, for, upon, or by reason of any matter, cause or thing arising directly or indirectly from its execution of this Agreement.  Nothing in this Section 13 is intended to release the Purchaser's rights under this Agreement.

14.     Survival.  The provisions of Sections 6, 7, 8, 9, 10, 11, 12, 13, and 15 shall survive the termination of this Agreement.

15.     <u>Benefits of Agreement</u>.   Nothing in this Agreement, express or implied, shall give to any person, other than the parties hereto, any benefit or any legal or equitable right, remedy or claim hereunder. The Indemnified Persons are express third-party beneficiaries to this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective duly authorized officers as of the day and year first written above.

U.S. BANK NATIONAL ASSOCIATION, as Trustee pursuant to the Indenture, as Seller

By: _____

Name: _____

Title: _____

_____,

as Purchaser

By: _____

Name: _____

Title: _____

[Signature Page to Purchase Agreement, dated as of [_____] [__], 2016]

EXHIBIT I

| Item # | Obligor Name | Asset Type | Purchase Price |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

# EXHIBIT H

GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Randy M. Mastro
Direct: +1 212.351.3825
Fax: +1 212.351.5219
RMastro@gibsondunn.com

December 27, 2016

The Honorable Jed S. Rakoff
United States District Judge
United States Courthouse
500 Pearl Street, Room 1340
New York, NY 10007-1312

Re:    *Patriarch Partners* et al. *v. US Bank* et al.

Dear Judge Rakoff:

We represent plaintiffs Patriarch Partners and Octaluna I ("Plaintiffs") in the above-captioned case and, with the Court's permission, seek leave to amend and/or supplement the Amended Complaint. Such leave is to be liberally granted, particularly where, as here, it is based primarily on "recent factual developments" subsequent to the filing of the prior complaint. *See Effie Film, LLC v. Murphy*, 2012 WL 716556, at *2 (S.D.N.Y. Mar. 6, 2012).

Today, Plaintiffs learned that, as they feared all along, the December 21 auction was a sham process that delivered all of the Zohar I Collateral—as well as assets that the Trustee had no right to sell—to MBIA on its paper credit bid alone, for not one penny more than its existing investment, thereby purporting to strip others, including our clients, of their substantial rights and interests. Because the auction Plaintiffs had sought to enjoin has occurred, and the assets in which Plaintiffs have an interest have now been sold in a manner and on terms that Plaintiffs believe are commercially unreasonable, they seek leave: (1) to add allegations and claims based on the completion of the auction and other events that post-date the filing of the prior complaint; (2) to seek damages in connection with the claims asserted in their prior pleading for which they sought injunctive and declaratory relief; and (3) for Ms. Tilton to join the action as a plaintiff, and for Zohar I to be joined as a defendant, given that Ms. Tilton is Plaintiffs' ultimate owner, and the one ultimately bearing the financial harm here, while Zohar I permitted her equity interests to be improperly sold and was enriched at her expense.

## I.    Background & Developments Since the Filing of the Amended Complaint

Defendants contrived a sham sale process from the very beginning. Despite this Court's intervention, Defendants found ways to ensure it remained a sham.

Plaintiffs filed a complaint on September 12, 2016 seeking a temporary restraining order and preliminary injunction of the auction scheduled for September 15. After the TRO was granted, the Trustee proposed to modify the auction process in some respects, but continued to insist that the sale occur on a commercially unreasonable timetable, that Portfolio Company equity ultimately owned and controlled by Ms. Tilton be included in the sale, and that unspecified interests and potential liabilities ("Other Collateral") also be included.

Beijing · Brussels · Century City · Dallas · Denver · Dubai · Frankfurt · Hong Kong · London · Los Angeles · Munich

New York · Orange County · Palo Alto · Paris · San Francisco · São Paulo · Singapore · Washington, D.C.

**GIBSON DUNN**

The Honorable Jed S. Rakoff
December 27, 2016
Page 2

On October 10, 2016, the Court held a preliminary injunction hearing, after which Your Honor ordered the Trustee to re-notice the sale on October 24 (to remain open for at least 30 days), to distribute the notice to a "reasonably wide group of prospective bidders," and, in all other respects, to conduct the auction on the modified terms proposed by the Trustee. The Trustee then noticed a rescheduled auction to be held on November 29, 2016. But the day of the rescheduled auction, Defendants unilaterally postponed the sale. *See* Second Notice of Postponement of Public Sale. On December 2, 2016, the Trustee re-noticed the auction for one week later, *see* Third Notice of Public Sale and Invitation to Bid, and uploaded to the Data Room additional materials containing confidential information about the Portfolio Companies not properly included or adequately protected from disclosure. At a December 7 hearing, Your Honor ordered that the closing date for the auction be extended to December 21, 2016. While the Liquidation Agent purported the next day to reschedule the auction, it later came to light that it had distributed only a Notification of Rescheduling of Disposition of Assets—which was addressed solely to the Issuer and Noteholders—rather than a public bid package containing the complete terms of sale and required bid-submission documents.

In an attempt to paper over its failure to properly notice the December 21 auction date, the Liquidation Agent circulated an email on December 20 stating that the auction scheduled for the next day was proceeding, along with a "[c]orrection" to "refer to the attached Fourth Notice of Public Sale and Invitation to Bid," rather than the December 2 Third Notice, which had been attached to a "[r]eminder" email sent earlier on December 20. Thus, the afternoon before the auction, bidders for the first time received the Fourth Notice of Public Sale and Invitation to Bid, which—incredibly—had been back-dated to December 8. Over Plaintiffs' objection, the auction took place on December 21. Defendants are still playing games: Today, Plaintiffs received notice that the winning bid for the portfolio was $149,840,994— the exact amount of MBIA's credit bid—but the notice did not identify the winning bidder.

## II. Leave to Amend or Supplement the Amended Complaint Should be Granted

Plaintiffs seek to amend and supplement their prior pleading to address the developments discussed above, to assert additional claims relating to the completion of the sale, to request money damages now that the harms they sought to enjoin have come to pass, and to join Ms. Tilton as a plaintiff and Zohar I as a defendant. Such leave should be "freely granted," absent "undue delay, bad faith, dilatory tactics, undue prejudice to the party to be served with the proposed pleading, or futility." *Aktiebolag v. Andrx Pharm. Inc.*, 695 F. Supp. 2d 21, 25 (S.D.N.Y. 2010). Here, for at least four reasons, there is no colorable basis to deny leave.

First, Defendants' actions since the filing of the Amended Complaint have exacerbated the commercial unreasonableness of the auction, particularly the way the Trustee has shifted the auction dates again and again without adequate explanation or notice—dampening bidder interest and undermining bidders' opportunity to properly evaluate the assets—culminating in the lack of adequate notice for the December 21st date and Defendants' clumsy (and

## GIBSON DUNN

The Honorable Jed S. Rakoff
December 27, 2016
Page 3

transparent) retroactive "correction."  Plaintiffs should have the opportunity to supplement their allegations accordingly in support of each of the claims they asserted in their prior pleading.  Defendants' improper placement of additional Portfolio Company financial information in the still-open Data Room provides additional grounds for the existing claims.

Second, Plaintiffs should be permitted to add claims that have materialized or become more concrete because the auction has now occurred.  These include that the Trustee purported to sell equity interests in the Portfolio Companies that Plaintiffs (and through them, Ms. Tilton) ultimately own and properly control—including auction Items 92-132—sans a determination that such items are Collateral of Zohar I, and that the auction included other unspecified interests (and potential liabilities) as to which bidders could not conduct adequate diligence (Item 133).  Any such transfers would require Ms. Tilton's express consent, which she advised in advance of the auction that she would not give—yet they were auctioned anyway.  The new claims will be for rescission of the auction, unjust enrichment (based on Zohar I's non-payment for Plaintiffs' investment in, and payment of taxes for, the Portfolio Companies), violation of gift conditions/breach of gift contract (the conditions to which Zohar I agreed in accepting Ms. Tilton's gift of upside interests in the Portfolio Company equity), a resulting equitable trust, and tortious interference.  These claims will be adequately pleaded, and none will be futile, in light of the allegations of the prior pleading, the testimony at the preliminary injunction hearing, and the developments outlined above.[1]

Third, Plaintiffs should be permitted to seek money damages in connection with the claims for which they previously requested only equitable relief (as well as in the new claims).  Equitable relief cannot make them whole now that the auction has occurred.  Plaintiffs have also suffered damages from Defendants' placement of confidential Portfolio Company information in the data room and from their failure to close the data room after the auction.

Finally, Ms. Tilton should be permitted to join the complaint as a plaintiff, and Plaintiffs should be allowed to add Zohar I as a defendant.  Joinder of parties is permissive and liberal.  *See* Fed. R. Civ. P. 21 & 22.  Ms. Tilton is the ultimate owner of Plaintiffs, and through them of Zohar I and the portfolio company equity purportedly sold at the auction.  She ultimately bears the financial harm caused by Defendants' actions, and Defendants owe her fiduciary duties.  Zohar I, meanwhile, violated the conditions of the parties' agreements with respect to Portfolio Company equity and was unjustly enriched at Plaintiffs' and Ms. Tilton's expense.[2]

For the foregoing reasons, Plaintiffs respectfully request that the Court grant leave to amend and supplement their Amended Complaint.

---

[1]  Given page-limit constraints, Plaintiffs do not here detail the elements of, and allegations that will support, each proposed new claim, but will do so with the Court's permission.

[2]  Plaintiffs may need to further amend their complaint if discovery reveals that Alvarez & Marsal Zohar Management played an improper behind-the-scenes role in the auction.

**GIBSON DUNN**

The Honorable Jed S. Rakoff
December 27, 2016
Page 4

Respectfully,

*/s/ Randy M. Mastro*


Randy M. Mastro

cc: Counsel of Record

# EXHIBIT I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
PATRIARCH PARTNERS XV, LLC and        :
OCTALUNA LLC,                         :
                                      :        16 Civ. 7128 (JSR)
       Plaintiffs,                    :
                                      :            ORDER
       -v-                            :
                                      :
U.S. BANK NATIONAL ASSOCIATION and    :
MBIA INSURANCE CORPORATION,           :
                                      :
       Defendants.                    :
----------------------------------------x

JED S. RAKOFF, U.S.D.J.

       After vigorously litigating the preliminary stages of this

case, plaintiffs, now well into the discovery phase of the case

(which is scheduled to be ready for trial on April 10, 2017), seek

to again amend their complaint, this time in five different ways.

While some of the proposed amendments are relatively minor, at least

one – the proposal to now seek damages in addition to injunctive

relief – would alter the entire case in ways that would materially

increase discovery and substantially derail its expeditious

conclusion. Furthermore, while plaintiffs suggest that the

amendments are the product of "new developments," in fact virtually

all of the amendments relate to matters that could have been fully

foreseen at the time the plaintiffs filed their first amended

complaint on October 15, 2016. The Court concludes that the proposed

amendments are simply a litigation tactic that, if permitted, would

be highly prejudicial to defendants and contrary to this Court's

obligation to move cases forward with reasonable alacrity.

Accordingly, for those reasons, as well as the reasons set forth in defendants' letters of December 29, 2016, the motion to amend is denied.

    SO ORDERED.

Dated:    New York, NY
          December 30, 2016

                                    _____
                                    JED S. RAKOFF, U.S.D.J.

# EXHIBIT J

*Rakoff, J*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATRIARCH PARTNERS XV, LLC and
OCTALUNA LLC,

        Plaintiff(s),

       v.

U.S. BANK NATIONAL ASSOCIATION, and
MBIA INSURANCE CORPORATION,

        Defendants.

No. 1:16-cv-07128 (JSR)

## STIPULATION AND [PROPOSED] ORDER

IT IS HEREBY STIPULATED AND AGREED, by and between the parties to this

action, that this action is hereby dismissed as moot pursuant to Rule 41(a)(1)(A)(ii) of the

Federal Rules of Civil Procedure, without costs or fees to any party;

AND IT IS FURTHER STIPULATED AND AGREED that, whereas this action is

hereby being dismissed as moot, no party shall be entitled to payment of any costs or damages as

against the Undertaking on Temporary Restraining Order filed on September 15, 2016, Bond No.

800-028-082, issued by the Atlantic Specialty Insurance Company, as surety, and filed with the

Clerk of Court by Plaintiffs (ECF Doc. No. 17) (the "Undertaking on Temporary Restraining

Order"), and the Undertaking on Temporary Restraining Order is hereby fully and finally

released and discharged in all respects;

AND IT IS FURTHER STIPULATED AND AGREED that the Atlantic Specialty

Insurance Company is hereby discharged as surety in this action, and the Clerk of Court is

directed to release the original Undertaking on Temporary Restraining Order to a representative

of Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, New York 10166, counsel for

the Plaintiffs in this action;

AND IT IS FURTHER STIPULATED AND AGREED that Defendant U.S. Bank

National Association, solely in its capacity as trustee for Zohar CDO 2003-1, Ltd., shall pay A-

3a and A-3b Senior Interest owed to the Class A-3 Noteholders in the amount of $4,763,496.99

on or before January 20, 2017.

Dated:  New York, New York
         January 19, 2017

GIBSON, DUNN & CRUTCHER LLP

By: _____
      Randy M. Mastro
      Mark A. Kirsch
      Robert F. Serio

200 Park Avenue
New York, NY 10166
Tel.: (212) 351-4000

*Attorneys for Plaintiffs Patriarch Partners XV, LLC
and Octaluna LLC*

ALSTON & BIRD LLP

By: _____
      Brett D. Jaffe
      Alexander S. Lorenzo

90 Park Avenue
New York, NY 10016
Tel.: (212) 210-9400

*Attorneys for Defendant U.S. Bank National
Association, solely in its capacity as trustee for
Zohar CDO 2003-1, Ltd.*

2

CADWALADER, WICKERSHAM & TAFT LLP

By: _____
Jonathan M. Hoff
Joshua P. Arnold

One World Financial Center
New York, NY 10281
Tel.: (212) 504-6000

*Attorneys for Defendant*
*MBIA Insurance Corporation*

SO ORDERED:

_____
U.S.D.J.
1-20-17

102239521.5

3

# EXHIBIT K

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
ZOHAR CDO 2003-1, LTD.; ZOHAR II            :
2005-1, LTD.; and ZOHAR III, LTD.,          :
                                            :
            Plaintiffs,                     :
                                            :
      - v -                                 :
                                            :
PATRIARCH PARTNERS, LLC;                    :     17 Civ. _____
PATRIARCH PARTNERS VIII, LLC;               :
PATRIARCH PARTNERS XIV, LLC;                :     **COMPLAINT**
PATRIARCH PARTNERS XV, LLC;                 :
OCTALUNA LLC; OCTALUNA II LLC;              :
OCTALUNA III LLC; ARK II CLO 2001-1,        :
LLC; ARK INVESTMENT PARTNERS II,            :
L.P.; and LYNN TILTON,                      :
                                            :
            Defendants.                     :
-------------------------------------------------------- X

        Plaintiffs Zohar CDO 2003-1, Ltd. ("Zohar I"), Zohar II 2005-1, Ltd. ("Zohar II"), and

Zohar III, Ltd. ("Zohar III," and together with Zohar I and Zohar II, the "Zohar Funds"), by and

through their undersigned counsel, allege as follows:

                                    **<u>INTRODUCTION</u>**

        1.      This case concerns an egregious fraudulent scheme among Defendants Lynn

Tilton and numerous entities created and dominated by her to abuse certain of those entities'

roles as fiduciaries for the Plaintiff Zohar Funds in order to pillage ***more than a billion dollars*** in

cash and valuable assets that have lined Ms. Tilton's pockets while leaving the Zohar Funds on a

collision course to default on obligations to their own investors.  Plaintiffs bring this action

seeking, among other relief, a declaration of their rights in the assets that they properly own as

well as treble damages in recompense for the Defendants' fraudulent and illegal scheme

implemented through a pattern of racketeering activity.

2.     Ms. Tilton's fraudulent scheme, conducted at her direction by and through the other Defendants, emanated from the management of the Plaintiff Zohar Funds, three special purpose vehicles that were created by Ms. Tilton in 2003, 2005, and 2007.  The Zohar Funds were created to raise money through selling a form of notes called collateralized loan obligations ("CLOs") to investors that was then used to extend loans to dozens of distressed mid-size companies (the "Portfolio Companies"), often in connection with the acquisition of those companies out of bankruptcy under the guise of "restructuring" them.  In many (if not most) instances, in connection with the extension of credit, the Zohar Funds took substantial equity positions in the Portfolio Companies, which Ms. Tilton has touted as being more valuable to the Zohar Funds than the loans they extended to the Portfolio Companies.  The Zohar Funds raised more than $2.5 billion from CLO note investors to fund these loan and equity positions, with the investors entitled to repayment on their CLO notes from the proceeds from Portfolio Company loans and any distributions on, or ultimate monetization of, the Portfolio Company equity.

3.     While the Portfolio Companies are owned largely or entirely by the Zohar Funds, Ms. Tilton fraudulently asserted ownership over the equity of those companies, relying on that fictitious assertion of ownership to install and maintain herself or entities that she owned in multiple fundamentally conflicted roles with respect to the Zohar Funds.  For example, Ms. Tilton routinely appointed herself as chief executive and sole director or managing member of the Portfolio Companies, thus acting on behalf of the Zohar Funds' contractual counterparties under numerous loan and equity agreements.  At the same time, Defendants Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, and Patriarch Partners XV, LLC (together, the "Patriarch Managers") were appointed to act as collateral managers responsible for overseeing and managing the Zohar Funds' investments for Zohar I, Zohar II, and Zohar III, respectively.

The Patriarch Managers—which were empowered by Collateral Management Agreements ("CMAs") to enter into agreements and otherwise generally act as agents on behalf of the Zohar Funds—were subject to express fiduciary and contractual duties to exercise their management authority in the best interests of the Zohar Funds and their investors.  Likewise, Patriarch Partners Agency Services ("PPAS") was appointed as the Zohar Funds' agent in administering its loan agreements with the Portfolio Companies, imbued with substantial authority over the Zohar Funds' loan assets.  Meanwhile Patriarch Partners Management Group ("PPMG") was hired for lucrative management consulting roles at the Portfolio Companies.  The roles that Ms. Tilton assumed for herself were so extensive and conflicted that the Zohar Funds would routinely enter into agreements where Ms. Tilton would be the single signatory executing on behalf of every party to the agreement.

4.      Taking advantage of this fundamentally conflicted structure, Ms. Tilton has engaged in a longstanding campaign to divert to herself massive amounts of money and other valuable assets that, absent the wrongdoing described herein, would have been retained for the benefit of the Zohar Funds and their investors.  For example, as part of this scheme, for the purpose of benefitting herself at the expense of the Zohar Funds, Ms. Tilton, both individually and through her controlled entities:

- Used capital provided by the Zohar Funds to obtain equity in the Portfolio Companies in the names of the Zohar Funds, including majority or total ownership stakes in numerous Portfolio Companies, and then falsely asserted ownership over that equity—going so far as to sue one of the Zohar Funds, accusing it of attempting to steal its own equity, when it sought to auction off the equity following default;

- Sought to abscond with the equity holdings of the Zohar Funds by disguising or misrepresenting those equity interests as "owned" by Ms. Tilton (or Octaluna LLC, Octaluna II LLC, or Octaluna III LLC ("the Octaluna Defendants")) even though the equity holdings were unambiguously owned by and in the names of the Zohar Funds, and, in one notable instance, selling a company Defendants had acknowledged was owned by Zohar II and keeping the *approximately $300 million in profits* for herself;

- Misappropriated *tens of millions of dollars or more* in equity distributions on those equity interests, which belonged to the Zohar Funds;

- Extracted over *$700 million* in collateral management fees and preference share distributions from the Zohar Funds notwithstanding that the Patriarch Managers were faithless fiduciaries who routinely served to facilitate Ms. Tilton's interests over the interests of the Zohar Funds' investors;

- Caused the Patriarch Managers to falsely report the creditworthiness of the Portfolio Companies in order to manipulate the results of certain "overcollateralization" tests that were used to determine eligibility for performance-based collateral management fees, thereby procuring *hundreds of millions of dollars* in fees to which they were not entitled;

- Mischaracterized restructurings of Portfolio Company loans from the Zohar Funds so as to avoid triggering events of default that would have caused the removal of the Patriarch Managers, and halted Ms. Tilton's lucrative fee income, not to mention her ongoing misappropriation of fund assets;

- Extracted hundreds of millions of dollars in fees from the Portfolio Companies, funds that otherwise could have been used to make payments on outstanding debt, in

supposed exchange for Ms. Tilton's corporate management services, notwithstanding that under her management, many of the Portfolio Companies underperformed with numerous Companies ultimately defaulting and closing down;

- Routinely caused the Zohar Funds to waive, forbear, or restructure amounts owed to them under loan agreements (1) even where the borrower Portfolio Company was still required to pay onerous fees for Ms. Tilton's corporate management services, and (2) so that Ms. Tilton could then siphon that money in the form of distributions on equity interests that were owned by the Zohar Funds;

- Extracted tens of millions in fees from the Portfolio Companies for the provision of "administrative agent" services that included little more than the periodic ministerial generation of invoices to the Portfolio Companies of amounts owed under loan agreements;

- Caused the Zohar Funds to consent to valuable control rights over their equity holdings being *irrevocably* transferred to certain of the Defendants without any consideration provided in exchange, in an effort to render Ms. Tilton immune from removal from her lucrative positions as sole director or managing member of the Portfolio Companies; and

- Caused the Zohar Funds to consent to amendments to credit agreements that solely benefited other investment funds owned by Ms. Tilton, including Defendants Ark II CLO 2001-1, LLC and Ark Investment Partners II, L.P., such as through granting them priority liens on Portfolio Company assets ahead of the Zohar Funds.

5. Thus, rather than manage the Zohar Funds in the Funds' best interest so as to maximize recoveries for them and their investors, Ms. Tilton blatantly abused her control over

the Zohar Funds to illegally siphon cash and other assets from the Zohar Funds for the ultimate benefit of herself and the Defendants that she owned and controlled.

6.    In furtherance of this scheme, Ms. Tilton has also sought to misrepresent, obscure, and conceal the full extent of the Zohar Funds' assets so that the Zohar Funds and their noteholders and other interested parties would not be able to detect her looting activities. For example, following the Patriarch Managers' resignations as collateral managers for the Zohar Funds in February 2016, the Patriarch Managers refused to turn over essential Zohar Fund records to the subsequent collateral manager. The concealed documents included the records of the Zohar Funds' full collateral portfolio, including records as to their equity positions (which records would have revealed illegal distributions to Ms. Tilton on equity interests belonging to the Zohar Funds, illegal attempted transfers of the Zohar Funds' equity rights to Ms. Tilton and her companies, and other wrongdoing). At the same time that she was concealing these documents, however, Ms. Tilton was also publicly proclaiming, including through multiple legal proceedings, that *she* and her entities were the rightful owners of Portfolio Company equity positions while the Zohar Funds held only limited, undefined, and undocumented "equity upside interests." When the Patriarch Managers were ultimately found at trial to be in breach of their duties to the Zohar Funds and ordered to turn over the concealed Zohar Funds' records, those records began to reveal the truth that Ms. Tilton's representations regarding her ownership of the equity positions were falsehoods intended as part of her overall scheme to abscond with the Zohar Funds' property. Beyond obscuring the Zohar Funds' holdings, Ms. Tilton's obfuscations have further necessitated multiple expensive litigations to protect the Zohar Funds' interests, including this Action, costing the Zohar Funds enormous sums in legal fees, and delaying their ability to fully manage and monetize their own assets.

7.     Through this toxic mix of fraud, theft, and mismanagement, Ms. Tilton has plundered the Zohar Funds, leaving them bereft of liquid assets sufficient to timely satisfy the billions of dollars in obligations they owe to their investors.  In November 2015, Zohar I defaulted on the obligations to repay its investors when their CLO notes matured.  Similarly, Zohar II will shortly default on obligations to repay its investors when their CLO notes mature in January 2017.  And, without a change to the status quo through this and related litigation, Zohar III will similarly face significant challenges to repay its investors when their CLO notes mature in 2019.  Thus, while Ms. Tilton has made herself famously wealthy, she has left nothing but losses in her wake for the Zohar Fund investors who trusted in her integrity and promises.

8.     The Zohar Funds therefore seek to remedy the injuries they have suffered at the hands of Ms. Tilton and her entities by bringing this action alleging a continuous, ongoing, and fraudulent scheme, carried out over the course of years by the Defendants, to abuse their positions of control over the Zohar Funds for the purpose of pilfering cash and other valuable assets worth more than a billion dollars, which the Zohar Funds should rightfully have been able to use to repay their investors.  This scheme was a flagrant violation of the Defendants' contractual and fiduciary obligations, and amounts to theft, conversion, and fraud that constitutes a pattern of racketeering activity prohibited by federal law.  The Zohar Funds therefore seek a declaration of their rights in the assets to which they are properly entitled, disgorgement of benefits that have been improperly conferred on Ms. Tilton and her controlled entities, damages for the Defendants' breaches of contract and fiduciary duties, and treble damages for Ms. Tilton's conduct in violation of the Racketeer Influenced and Corrupt Organizations Act.

## PARTIES

### A.  Plaintiffs

9.  Plaintiff Zohar I is a Cayman Islands exempted company.  Through an auction of of Zohar I's assets conducted in December 2016, non-party MBIA Insurance Corporation ("MBIA") became the beneficial and equitable owner of Zohar I's assets.

10.  Plaintiff Zohar II is a Cayman Islands exempted company.

11.  Plaintiff Zohar III is a Cayman Islands exempted company.

### B.  Defendants

12.  Defendant Patriarch Partners, LLC ("Patriarch Partners" and together with the Patriarch Managers, "Patriarch") is a Delaware limited liability company, with its principal place of business in New York, New York.  Upon information and belief, the only member of Patriarch Partners is Defendant Lynn Tilton.

13.  Defendant Patriarch Partners VIII, LLC ("Patriarch VIII") is a Delaware limited liability company with its principal place of business in New York, New York.  Until March 2, 2016, Patriarch VIII was the collateral manager for Plaintiff Zohar I.  Upon information and belief, the only member of Patriarch VIII is Defendant Lynn Tilton.

14.  Defendant Patriarch Partners XIV, LLC ("Patriarch XIV") is a Delaware limited liability company with its principal place of business in New York, New York.  Until March 2, 2016, Patriarch XIV was the collateral manager for Plaintiff Zohar II.  Upon information and belief, the only member of Patriarch XIV is Defendant Lynn Tilton.

15.  Defendant Patriarch Partners XV, LLC ("Patriarch XV") is a Delaware limited liability company with its principal place of business in New York, New York.  Until March 2, 2016, Patriarch XV was the collateral manager for Plaintiff Zohar III.  Upon information and belief, the only member of Patriarch XV is Defendant Lynn Tilton.

16.     Defendant Octaluna LLC ("Octaluna I") is a Delaware limited liability company with its principal place of business in New York, New York.  Ms. Tilton has represented that she owns and controls Octaluna I.

17.     Defendant Octaluna II LLC ("Octaluna II") is a Delaware limited liability company with its principal place of business in New York, New York.  Ms. Tilton has represented that she owns and controls Octaluna II.

18.     Defendant Octaluna III LLC ("Octaluna III") is a Delaware limited liability company with its principal place of business in New York, New York.  Ms. Tilton has represented that she owns and controls Octaluna III.

19.     Ark II CLO 2001-1, LLC ("Ark II") is a Delaware limited liability company with its principal place of business in New York, New York.  Upon information and belief, the only member of Ark II is Defendant Lynn Tilton.

20.     Ark Investment Partners II, L.P. ("AIP II") is a Delaware limited partnership with its principal place of business in New York, New York.  Upon information and belief, the only partner of AIP II is Defendant Lynn Tilton.

21.     Defendant Lynn Tilton is a resident of Florida.  She is the principal and, upon information and belief, sole member of Patriarch Partners, the Patriarch Managers, the Octaluna Defendants, and Ark II; she is the principal and, upon information and belief, sole partner of AIP II.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over the Zohar Funds' claims under 28 U.S.C. § 1331 and 18 U.S.C. §§ 1964, 1965.

23.     This Court has subject matter jurisdiction over the Zohar Funds' claims under 28 U.S.C. § 1332.

24.     This Court also has supplemental jurisdiction over the Zohar Funds' common law claims pursuant to 28 U.S.C. § 1367.

25.     This Court has personal jurisdiction over Patriarch Partners, the Patriarch Managers, the Octaluna Defendants, Ark II, and AIP II because their principal places of business are in New York County, New York and because it has personal jurisdiction over Lynn Tilton, the sole member or partner of these Defendants.  This Court has personal jurisdiction over Lynn Tilton because she has offices, and regularly transacts business, in New York County, New York.

26.     Venue in the Southern District of New York is appropriate under 28 U.S.C. § 1391(b) because it is the district in which a substantial part of the actions giving rise to the claims occurred, and it is the district in which property that is the subject of the action is situated. Zohar Fund Indentures, § 10.1(b).

## BACKGROUND

### A.     Patriarch Conceives, Structures, And Markets The Zohar Funds.

27.     Patriarch Partners is an investment firm, owned and directed by Ms. Tilton, that claims to, among other things, restructure and rebuild struggling and distressed companies into profitable businesses.  Since 2000, Patriarch Partners claims to have had ownership in and/or restructured more than 240 companies with combined revenues in excess of $100 billion.

28.     In addition to its private equity and turnaround business, Patriarch Partners has designed and sponsored CLO transactions.  At the center of a CLO transaction is a special purpose vehicle that issues notes of varying priority to investors and uses the proceeds of the sales of CLO notes to purchase or make loans and other investments that serve as the collateral for the repayment of principal and interest on the notes.  Because the special purpose vehicle

typically has no employees, a collateral manager, like the Patriarch Managers, selects the loans and other assets to be included in the collateral pool and manages them once they are in the pool.

29.     The Zohar Funds are CLO transactions that Ms. Tilton and Patriarch Partners created and marketed to investors for the ostensible purpose of investing in distressed debt.  The first Zohar fund, Zohar I, launched in November 2003, raising approximately $530 million from the sale of notes; Zohar II and Zohar III followed in January 2005 and April 2007, respectively, each raising approximately $1 billion from the sale of notes.

30.     Each Zohar Fund had a separate Patriarch collateral manager, each of which was provided with employees, office space, and other valuable operating services by Patriarch Partners: Patriarch VIII was Zohar I's collateral manager, Patriarch XIV was Zohar II's collateral manager, and Patriarch XV was Zohar III's collateral manager.

31.     As discussed further below, the Zohar Funds were each governed by a set of documents that include an Indenture (the "Indentures"), a CMA, and a Collateral Administration Agreement (the "CAAs") for each Fund.[1]  The roles and obligations of the collateral manager were set out in the CMAs, which granted the Patriarch Managers the power to act for and on behalf of the Zohar Funds in managing the loans and other assets of the Zohar Funds, subject to certain limitations set forth in the CMAs.[2]  The Patriarch Managers' powers were also limited by the terms of the Indenture for each of the Zohar Funds, which govern the rights and obligations of the Zohar Funds *vis-à-vis* the noteholders, Credit Enhancer, and Controlling Party; the

---

[1]     The Indentures, CMAs, and CAAs are substantially identical, and will be cited in the singular herein, except where there are relevant differences between the documents.

[2]     The CMAs are expressly made subject to the terms of the Indenture, with provisions of the Indenture controlling over conflicting provisions in the CMAs.  *See* Zohar I and Zohar II CMAs, §7.14; Zohar III CMA, § 7.13.

Patriarch Managers also assumed certain obligations under the Indentures. For example, the

Patriarch Managers were tasked with:

- "determin[ing] ... the specific Collateral to be acquired, originated, restructured, exchanged, held or disposed of by the [Zohar Funds]";

- "effectuat[ing] the acquisition, origination, restructuring, exchange or disposition of Collateral on behalf of the [Zohar Funds]";

- "monitor[ing] the Collateral on an ongoing basis";

- "mak[ing] determinations with respect to the exercise or enforcement of any and all rights by the [Zohar Funds] ... or rights or remedies in connection with the Collateral ...";  and

- "negotiat[ing] on behalf of the [Zohar Funds] with prospective purchasers of the Collateral [and] with any Person in connection with the possible workout, amendment or restructuring of the Collateral or any obligor ... thereon ... ."

Zohar II and Zohar III CMAs, § 2.2 (a), (b), (c), (d), and (f).[3]  The Zohar Funds authorized the

Patriarch Managers to "execute and deliver all necessary, desirable and appropriate documents

and/or instruments in the name and on behalf of the [Zohar Funds] as [their] attorney-in-fact with

respect thereto."  CMAs, § 2.5.  As a practical matter, the Patriarch Managers, under the

direction and control of Ms. Tilton, made every single investment decision on behalf of the

Zohar Funds, and exercised control over the Zohar Funds' investment and collateral management

activities.

---

[3]    The Zohar I CMA similarly provides that the Collateral Manager is tasked with "determin[ing] ... the specific Collateral to be purchased, restructured, exchanged, held, or disposed of by the [Zohar Funds]"; "effectuat[ing] the purchase, restructuring, exchange or disposition of Collateral on behalf of the [Zohar Funds]"; "monitor[ing] the Collateral on an ongoing basis"; "mak[ing] determinations with respect to the exercise or enforcement of any and all rights by the [Zohar Funds] ... or remedies in connection with the Collateral ..."; and "negotiat[ing] on behalf of the [Zohar Funds] with prospective purchasers of the Collateral [and] with any Person in connection with the possible workout, amendment or restructuring of the Collateral or any obligor ... thereon ... ."  Zohar I CMA, § 2.2 (a), (b), (c) (d), and (f).

32.     In light of the significant responsibility granted to the Patriarch Managers, their actions for and on behalf of the Zohar Funds were subjected to express fiduciary standards.  The Patriarch Managers agreed that, "in rendering [their] services as Collateral Manager," they would "use reasonable care and the same degree of skill and attention (a) that the Collateral Manager (i) exercises with respect to comparable assets that it manages for itself and its Affiliates and (ii) exercises with respect to comparable assets that it manages for others and (b) exercised by institutional investment managers of national standing generally in respect of assets of the nature and character of the Collateral and for clients having similar investment objectives and restrictions ... ."  *Id.* § 2.4.

33.     The Patriarch Managers further covenanted "not [to] take any action which [they] know[] or should be reasonably expected to know in accordance with prevailing market practices would ...  adversely affect the interests of the Holders of the Securities [*i.e.*, the Notes and Preference Shares issued by the Zohar Funds] in any material respect."  The Zohar I and Zohar II CMAs provided that "all purchases, exchanges and sales of Collateral by the Collateral Manager on behalf of the Company and/or the Zohar Subsidiary … will be effected on arm's-length terms."  Zohar I and Zohar II CMAs, § 2.9.  Zohar I and II CMAs, § 2.6.[4]  And while Patriarch XV was permitted to effectuate transactions between Zohar III and affiliates of the Patriarch Managers, such transactions were to be "at arms' length, for fair market value and in compliance with applicable law."  Zohar III CMA, §6.2 (d).

34.     Finally, like all investment advisers, the Patriarch Managers owed implied general fiduciary duties of care and loyalty to the Zohar Funds in providing advisory services and acting

---

[4]   The Zohar III CMA provides that it will not take any action that would "materially adversely affect" these interests.  Zohar III CMA, § 2.6.

as the Zohar Funds' agent and attorney-in-fact in administering the Zohar Funds' investment activities. These common law and statutory fiduciary duties are in addition to the specific duties of care set forth in the CMAs.

35.    The CMAs acknowledged that the assets to be acquired were often distressed, which would require some flexibility on the part of the Patriarch Managers to manage them. They also acknowledged the potential for conflicts of interest to arise from the "overall advisory, investment and other activities of the Collateral Manager" and all of its affiliates, and provided that the Patriarch Managers and their affiliates may hold several roles related to the Zohar Funds' investments, such as consultant or manager. CMA § 6.2. However, as described above, the CMAs also explicitly stated the Patriarch Managers' obligations to, among other things, ensure compliance with the Indentures and applicable laws, avoid actions that would adversely affect the Zohar Funds' noteholders, avoid intentional actions that they knew would cause an Event of Default, ensure that their actions were in accordance with customary and reasonable business practices, ensure that all purchases and sales be effected on arm's-length terms, and to act with skill, attention, and reasonable care. They also expressly acknowledged the Patriarch Managers' fiduciary duties and that they would be subject to liability for any conduct constituting fraud, bad faith, willful misconduct, gross negligence, or breach of fiduciary duty. Zohar I and II CMA, §§ 2.2(n), 2.4, 2.6, 2.9, 4.4, 4.5(a); Zohar III CMA, §§ 2.2(l), 2.4, 2.6, 2.9, 4.4, 4.5(a). Investors in the Zohar Funds therefore had every expectation that the Patriarch Managers would act in accordance with these requirements on their behalves.

36.    Information about the Zohar Funds—including current assets (defined in the Indenture as "Collateral"), their performance, and numerous other critical data points—was required to be communicated to noteholders, rating agencies, and others via Monthly Reports

and quarterly Note Valuation Reports, whose contents were prescribed by the Indentures. These reports were prepared by the Collateral Administrator—a role played by the same entity that provides Trustee services to the Zohar Funds—based on information provided by the Patriarch Managers. The Patriarch Managers were contractually obligated to "review and verify the contents of the [] reports" and, "[t]o the extent any of the information in such reports ... conflicts with data or calculations in the records of the [Portfolio] Manager, the [Portfolio] Manger shall promptly notify the Collateral Administrator of such discrepancy and use reasonable efforts to assist the Collateral Administrator in reconciling such discrepancy." *See, e.g.*, Zohar I and III CAAs, § 2(h).[5]

37.     Other entities owned and controlled by Ms. Tilton held additional, distinct, and inherently conflicted roles relating to the Zohar Funds' assets. For example, PPAS (which is in the business of providing agency services to lenders) acted as the Zohar Funds' agent under their loan agreements with the Portfolio Companies, responsible for invoicing, collecting, and disbursing payments, and receiving Portfolio Company financial information on behalf of the Zohar Funds.[6] PPMG, which is in the business of financial and management consulting, provided "management and consulting services" to the Portfolio Companies, which principally

---

[5]     The Zohar II CAA provides that "The [Portfolio] Manager shall review and verify the contents of the Monthly Collateral Report" and "[t]o the extent any of the information in the Monthly Collateral Report conflicts with data or calculations in the records of the [Portfolio] Manager, the [Portfolio] Manager shall promptly notify the Collateral Administrator of such discrepancy and use reasonable efforts to assist the Collateral Administrator in reconciling such discrepancy." Zohar II CAA, § 2(c).

[6]     PPAS was terminated as agent by the Zohar Funds on June 14, 2016, effective June 17, 2016, but has refused to cede that role to its replacement, and has refused to provide the Zohar Funds with access to the Portfolio Companies' financial information in the interim. PPAS's refusal to accept termination of its agency is the subject of another action currently pending in this district. *Patriarch Partners Agency Services v. Zohar CDO 2003-1 Ltd. et al.*, No. 16 Civ. 4488 (S.D.N.Y.) (VM) (KHP).

included Ms. Tilton serving as director or managing member, in exchange for management fees. Patriarch entities also retained ownership over preference shares issued by the Zohar Funds.

38.     Ms. Tilton also owned and managed the other Defendant entities, the Octaluna Defendants, Ark II, and AIP II.  These entities were formed for varying purposes, but ultimately came to be used as personal investment vehicles by Ms. Tilton.  In particular, Ms. Tilton from time to time used Ark II and AIP II to take or assert debt and equity positions in the Portfolio Companies alongside the Zohar Funds, while Ms. Tilton used the Octaluna Defendants as a vehicle to hold preference share rights or interests.  Ms. Tilton has recently asserted that the Octaluna Defendants are "owners" of valuable equity interests that in fact belong to the Zohar Funds.

39.     Zohar I and Zohar II also had a Credit Enhancer, MBIA, which was responsible for providing insurance to the senior noteholders in case of a default by these Funds.  Upon the occurrence of certain interruptions to the flow of payments to the senior noteholders, the Credit Enhancer would become responsible for paying off the senior notes in full.  The Credit Enhancer is also referred to in the Indentures as the Controlling Party for Zohar I and Zohar II, with the ability to direct certain limited actions on behalf of the Funds, particularly following an Event of Default under the Indentures.

40.     The Zohar Funds were formed to invest in or originate loans extended to distressed companies, and could also receive equity in connection with the acquisition of a company, the extension of a new loan, or the restructuring of an existing loan.  Under the terms of the Indentures, all such assets, regardless of how they were acquired by the Zohar Funds, are deemed "Collateral" of the Zohar Funds, which was defined under the Indentures in the broadest possible terms to effectively include "all [] property of any type or nature owned by [the Zohar

Funds]." The Collateral secured the repayment of principal and interest on the notes and, upon payment by MBIA under its policies, MBIA's guaranty of the Zohar Funds' note payment obligations.

**B.  The Zohar Funds Acquire Substantial Equity Positions In The Portfolio Companies, Which Defendants Exploit For Their Own Benefit.**

41.     One of the most valuable types of assets owned by the Zohar Funds are their equity holdings in the Portfolio Companies. These holdings are particularly important because the Portfolio Companies are distressed investments and many have failed to repay their loans— which were generally acquired at par—to the Zohar Funds. By holding equity in addition to loans, for those Portfolio Companies that do succeed, the Zohar Funds have the potential to obtain not only repayment on their loans, but also equity returns that could help offset the losses on loans to the Portfolio Companies that failed. In fact, however, the Defendants have repeatedly sought to deny the Zohar Funds the proper benefit of their equity investments, either by attempting to abscond with the equity investments themselves, by improperly diverting the benefit of those equity holdings for their own use, or by outright stealing the distributions on the equity.

42.     As background, the Zohar Funds' equity holdings were acquired by the Zohar Funds in a number of different contexts. The Zohar Funds' equity holdings were sometimes acquired when they provided funds that constituted at least part of the capital or financing that was used to acquire a Portfolio Company. For example, in December 2007, Ms. Tilton formed a company named RM Acquisition, LLC ("RM Acquisition"), for the purpose of acquiring Rand McNally & Company, a well-known purveyor of maps that was in financial distress at the time. She arranged for the Zohar Funds each to extend loans to RM Acquisition, which were expressly to be used to finance the purchase of Rand McNally and to provide operating capital. Within

days of the credit agreements being executed, the Zohar Funds also received equity interests in RM Acquisition pursuant to its Operating Agreement, in recognition that their loans had been used as funding to acquire ownership of the company. Similarly, in February 2005, a company called Snelling & Snelling was acquired using capital that was provided through loans provided by Zohar I and II under loan agreements executed on the same day as the Securities and Asset Purchase Agreement through which Snelling was acquired. Zohar I and II subsequently received equity interests in Snelling Holdings, LLC, in the form of common shares.

43. When extending loans to a Portfolio Company, even after it was acquired, the Zohar Funds were sometimes provided with equity interests in the company in recognition of the distressed nature of the loans. These equity interests provided additional value to the Zohar Funds, over and above expected repayments on the loans. For example, at the time Zohar II was formed, it purchased loans to 27 companies from another Tilton-controlled fund, Ark CLO 2000-1, Ltd., and simultaneously received equity interests in 23 of those companies as part of the transaction. The governing documents for the Zohar II transaction prepared by Patriarch described these equity interests as providing "additional value in realizing par recoveries" on the overall portfolio of purchased loans. In sworn testimony, Ms. Tilton later described these equity interests as "attached to the loan[s]" purchased by Zohar II and as equity interests that Zohar II had "paid for."

44. In yet other instances, the Zohar Funds obtained equity in connection with restructurings of existing loans to Portfolio Companies. For example, on June 15, 2007, Zohar II agreed to amend its credit agreement with another Portfolio Company, Fetco Home Décor, Inc. ("Fetco"), as part of a debt restructuring in which the outstanding balances on certain outstanding loans were increased to capitalize unpaid interest, a new term loan was extended, and interest

rates on all of the loans were decreased while maturity dates were extended by three years. Resolutions by the Fetco board of directors contemporaneously approved the issuance of 33,737 shares of common stock and 12,199 shares of preferred stock to Zohar II as express "consideration" for Zohar II agreeing to this restructuring of Fetco's debt. Corresponding stock certificates were issued that identified Zohar II as the "owner" of the issued shares. Similarly, an October 12, 2006, Stockholders Agreement for another Portfolio Company, Acme International Enterprises, Inc., stated that pursuant to a contemporaneous "Restructuring Agreement," Zohar II had "agreed to waive certain rights as a lender … in exchange for, among other things … the issuance by the Company to Zohar of 13,500 Series A Shares … and 150 Series C Shares … ." Ms. Tilton has provided sworn written testimony of another instance, concerning the parent company of IMG Fragrance Brands, LLC, where "[o]n October 17, 2008, Zohar I, Zohar II, and Zohar III obtained, collectively, 75% of the shares of IMG Holdings, Inc. … in exchange for agreement by the Zohar funds to withdraw a loan acceleration based on the borrowers' default." (Notably, in that same affidavit, Ms. Tilton testified that "Patriarch does not own (nor has it ever owned) any such equity"; Ms. Tilton now claims precisely the opposite.)

45. These are just examples of numerous such transactions over the years in which the Zohar Funds received equity interests either in connection with loans used to finance the acquisition of a Portfolio Company, the extension of a loan to a Portfolio Company, or in exchange for restructuring outstanding loans to Portfolio Companies. Through these and other instances, each of the Zohar Funds has obtained substantial equity interests titled their names in many of the Portfolio Companies—some in form of preferred or common stock and others in the form of LLC membership interests—in exchange for valuable consideration.

46.     At various times, in largely confidential contexts or recent court filings,

Defendants have conceded the significant breadth and substantial value of these equity

investments owned by the Zohar Funds.  For example, Ms. Tilton stated in court filings that, as

of 2007, the Zohar Funds together held a majority interest in 23 Portfolio Companies, including

100% stakes in seven of those companies.  She further claimed that the "vast majority" of returns

from the Zohar Funds were projected to come from equity returns.  Similarly, in February 2007,

a Patriarch rating agency presentation projected equity returns of over *1.5 billion* for Zohar II

alone from approximately 40 different Portfolio Companies, and approximately *500 million* for

Zohar III from more than a dozen Portfolio Companies.  In another presentation from 2009,

under the heading "The Zohar CDOs Benefit from Valuable Equity," Patriarch touted equity

ownership percentages by the Zohar Funds in 43 separate Portfolio Companies, including 14

companies in which the Zohar Funds owned 100% of the equity.  Indeed, Ms. Tilton has testified

that the "portfolio strategy" for the Zohar Funds was to "loan-to-own or [] own-to-loan"

(apparently unable to recall which of these was actually the strategy) because "the only way to

get beyond the face value of the loan is to have that equity upside."

47.     Notwithstanding these admissions as to the Zohar Funds' extensive equity

holdings, Defendants have sought to obscure and conceal the extent of the Zohar Funds' equity

holdings from noteholders and the Credit Enhancer.  For example, the Zohar Funds' Monthly

Reports, which were noteholders' primary source of information about the deals, and which the

Patriarch Managers were required to review and verify, contained sections that were intended for

the reporting of equity interests.  However, the Zohar I Monthly Reports routinely misreported

and substantially underreported that Fund's true equity holdings, while the Zohar II and III

Monthly Reports rarely, if ever, reported any equity interests for the Funds at all.  Likewise, the

Zohar Funds were required to produce quarterly financial statements, in compliance with generally accepted accounting principles, which are attached to an Officer's Certificate and provided to noteholders among others. None of these financial statements ever reported the Zohar Funds' equity interests, even though the Indentures required that they "present[] fairly, in all material respects, the [Zohar Funds'] financial position." Indentures, § 7.9.

48.     These steps by the Defendants to obscure the details of the Zohar Funds' equity holdings appear designed to conceal from the Zohar Funds' noteholders and Credit Enhancer that Defendants have been engaged in a longstanding scheme to convert most of the value of the Zohar Funds' equity holdings for Ms. Tilton's own benefit. The Defendants were uniquely situated to engage in such a scheme because of their multiple roles that allowed them to control both the Portfolio Companies and the Zohar Funds. This meant that they were often the *only parties* determining and documenting what equity interests were received by the Zohar Funds and how those interests were protected and enforced. Indeed, in many cases, the governing agreements memorializing the Zohar Funds' equity holdings and rights were signed by Ms. Tilton on behalf of all of the respective parties. This placed Defendants in a position where they could abuse their control over the Zohar Funds and the Portfolio Companies to deprive the Zohar Funds of their rightful equity interests in order to line Ms. Tilton's own pockets. This scheme has been implemented through numerous means.

49.     First, upon information and belief, while the Zohar Funds' funds were used as part of the capital or financing to acquire Portfolio Companies, equity received in exchange for those Funds was allocated not just to the Zohar Funds, but also to certain Defendants, granting those Defendants a concrete benefit that was paid for by the Zohar Funds, for nothing in exchange. In light of Ms. Tilton's role managing and directing these companies, this also created

rampant opportunities for the Defendants to obtain their ownership shares in the Companies without making any contributions, or with only disproportionate or minimal contributions.

50. Second, as to the equity interests that were allocated to the Zohar Funds, the Defendants have repeatedly stolen the ongoing financial benefit of those equity holdings. Specifically, where the Portfolio Companies in which the Zohar Funds hold equity interests have paid dividends or otherwise made distributions to their equity owners, Ms. Tilton has absconded with those payments rather than allowing them to properly be paid to the Zohar Funds' trustee for ultimate distribution to the Zohar Funds' noteholders. Indeed, tax filings recently obtained by the Zohar Funds going back to at least 2006 show that dividend and equity distributions made by Portfolio Companies, which are located in a variety of different states, to the Zohar Funds in New York, were intercepted by Ms. Tilton who wrongfully claimed these distributions as her personal property. These stolen amounts are substantial. In fact, based upon court filings by Ms. Tilton, they are believed to have been in the tens of millions of dollars or more.

51. Third, in other instances, the Defendants appear to have taken equity interests originally allocated to the Zohar Funds and simply transferred them back to themselves. For example, in multiple presentations to Moody's, including one in 2009, Patriarch disclosed that Zohar II owned 100% of HVEASI Holding BV ("HVEASI") and had expected returns on its equity ownership in that company of $199 million. However, when HVEASI was sold in 2012 for more than $300 million, Zohar II did not receive a penny from the sale. When confronted with this fact at a recent trial in Delaware that is discussed below, Ms. Tilton claimed that *she* had been the true owner of HVEASI and denied that Zohar II had *ever* owned any interest in the company. She claimed the contrary representation to Moody's had simply been a mistake—notwithstanding that the representation was made in multiple presentations and HVEASI was

identified as the most valuable of the 40 equity positions owned by Zohar II at the time of the 2009 Moody's presentation. Patriarch has failed to provide any evidence to substantiate Ms. Tilton's claim of a mistake, raising the specter that HVEASI represents yet another instance of Ms. Tilton pilfering the Zohar Funds' equity interests for her own.

52.     Fourth, even when not attempting to steal the Zohar Funds' equity interests outright, the Defendants have engaged in efforts to steal the voting and other rights associated with those equity interests. Specific efforts to do so in late 2015 on the eve of Defendants relinquishing control of the Zohar Funds are discussed in Section D below. These efforts were intended to deprive the Zohar Funds of the ability to exercise ownership control over the Portfolio Companies—including through a sale of the companies—or to remove Ms. Tilton from the lucrative management positions she holds.

53.     In particular, Ms. Tilton often installed herself as chief executive and always installed herself as a—and often the sole—managing member or director of the Portfolio Companies. In connection with those appointments, Ms. Tilton caused the Portfolio Companies to enter into Management Services Agreements with PPMG to provide "general executive, professional, and management consulting services," "finance functions," and "human resource functions," among others. These agreements, in turn, require the Portfolio Companies to pay onerous corporate management fees to PPMG for, in effect, having Ms. Tilton and her entities provide management services. Based upon review of one of these agreements, which is believed to be representative of others, they were structured to terminate when Patriarch no longer owned or controlled at least 30% of the company's outstanding equity. Nonetheless, in breach of this term, PPMG purports to continue to manage the Portfolio Companies and collect management fees, despite Patriarch's resignation as collateral manager of the Zohar Funds, which terminated

Patriarch's control over the equity positions held by the Zohar Funds, leaving Patriarch controlling less than 30% in most or all of the Portfolio Companies. Moreover, because of Defendants' efforts to abscond with the voting rights associated with the Zohar Funds' equity holdings, they have deprived the Zohar Funds of the ability to exercise their rights as equity owners to remove Ms. Tilton from her management roles and terminate the PPMG agreements (or enforce their existing termination provisions).

54. Finally, and more recently, Defendants have engaged in a campaign to place a cloud over *all* of the Zohar Funds' equity holdings by making specious contentions, discussed in Section E below, that *none* of those equity holdings are actually owned by the Zohar Funds but are rather all owned by Ms. Tilton, either directly or indirectly through other Defendants. Defendants have made these claims notwithstanding that the equity holdings are reflected in agreements and instruments—such as stock certificates titled in the Zohar Funds names—that unambiguously reflect the Zohar Funds' ownership of these equity interests. These recent efforts appear intended to further the Defendants' longstanding scheme to misappropriate the benefits of the Zohar Funds' equity holdings by both providing a fig leaf justification for their prior illegal conduct—such as stealing equity distributions—as well as to resist the Zohar Funds' efforts to enforce their true ownership rights over the Portfolio Companies.

## C. Patriarch Manipulates The Zohar Funds To Fraudulently Inflate Management Fees And Retain Control.

55. While the Patriarch Managers were given the authority, in the Indentures and the CMAs, to manage the Zohar Funds' Collateral with the goal of maximizing recovery *for the Funds*, there were several important checks on that authority. Certain of these checks looked to the performance of the assets in the Zohar Funds' portfolios, and created consequences when their performance sunk below acceptable levels.

56. For example, as part of the protections for noteholders built into the Zohar Funds' Indentures, each quarter the Zohar Funds are required to calculate the results for an Overcollateralization Test ("OC Test") which gets reported in the Monthly Report and Note Valuation Report. The OC Test is calculated as a ratio between the outstanding amounts due on the loans held in the particular Zohar Fund portfolio, adjusted to take into account certain credit risks on those loans, against the outstanding principal balances on the outstanding senior notes. The general purpose of the OC Test is to confirm that the Zohar Funds are likely to be able to collect sufficient amounts on their outstanding loans to meet their obligations to senior noteholders. To pass, the OC Test result must be above specified amounts under the Indentures in excess of 100%, reflecting that there is more collateral than needed to meet noteholder obligations (*i.e.,* there is "overcollateralization"). Failure of the OC Test triggers a number of consequences under the Indentures intended to conserve funds, including diverting or suspending a number of payments.

57. Collateral management fees are one of the types of payments that are impacted by an OC Test failure. Under the Zohar Funds' Indentures, the collateral manager is potentially entitled to both a senior management fee and a subordinated management fee, each calculated as 1% of the outstanding principal amount of assets held by the Zohar Fund (including unfunded loan amounts and excluding principal that represents previously deferred or capitalized interest except in limited circumstances), excluding any equity securities, for a maximum of a 2% total management fee. However, when the OC Test fails, pursuant to the Indentures' priority of payments, the subordinated management fee is cut off during the pendency of the failure, cutting the fees paid to the collateral manager in half. The priority of payments also cuts off payments made to preference share holders—the Octaluna Defendants—when the OC Test fails.

Additionally, under the Zohar I and Zohar II Indentures, if the OC Test is failed, the Controlling Party gains control of the Fund's Collateral.

58.    Since 2009 at the very latest, properly calculated, the OC Test under the Zohar Funds' Indentures should have been failing due to significant deterioration in the Funds' loan portfolios.  However, rather than reporting failing OC Test results, the Monthly Reports and Note Valuation Reports consistently reported passing test results due to fraudulent manipulations of those results by Patriarch, under Ms. Tilton's direction.  These manipulations took multiple forms.

59.    First, Patriarch routinely misreported the credit risk classification for Portfolio Companies.  One of the critical components of the OC Test calculation are metrics used to determine the likelihood of a Portfolio Company repaying its loan.  Under the Zohar I and II Indentures, to make those determinations, each asset is assigned to a numerical category between 1, reflecting non-performing high-credit-risk companies, and 4, reflecting performing low-credit-risk companies.  These numerical categories, which are also reported in the Monthly Reports, in turn, determine the amount of that Portfolio Company's outstanding loan balance that is included in the numerator of the OC Test calculation.  Under the Zohar I and II Indentures, an asset cannot qualify as a Category 4 if there are "negotiations, at the time of measurement, to restructure (either in or outside of a bankruptcy or reorganization proceeding) the financial obligations" of the relevant Portfolio Company, or if the Portfolio Company has defaulted on a principal or interest payment, "without regard to any applicable grace period or any waiver of such default … but only so long as such default has not been cured."  Zohar I and II Indentures, § 1.1.  Under the Zohar III Indenture, assets are categorized as either "Collateral Investments" (*i.e.*, a Category 4) or "Defaulted Investments" (*i.e.*, a Category 1).  Under these definitions, an asset is a Defaulted

Investment if, among other things, "a default as to the payment of principal and/or interest has occurred, but only so long as such default has not been cured." Zohar III Indenture, § 1.1.

60.     The Portfolio Company classifications are determined by the collateral manager, applying certain standards set forth in the Indentures. While the Indentures and CMAs at certain points gave the Patriarch Managers limited abilities to waive or otherwise forbear payments that were owed by Portfolio Companies to the Zohar Funds, they did *not* make the categorizations discretionary, and indeed required that Portfolio Companies be downgraded in the event that they defaulted on a payment of principal or interest, *regardless* of whether it had been waived. However, Patriarch routinely ignored the mandated objective standards that were supposed to determine these classifications under the Indentures, instead regularly classifying non-performing loans as a "Category 4" or "Collateral Investment" solely on the basis of Ms. Tilton's supposed subjective intention to support the company, without regard to how likely (or inevitable) that company's default was, and even after that company had defaulted on numerous interest payments due to the Zohar Funds, without cure. By applying this amorphous and subjective classification, in breach of the Indentures and CMAs, Patriarch inflated the Zohar Funds' OC Test results, and by extension the collateral management fees that were paid to the Patriarch Managers.

61.     As just one example, Zohar III extended loans under a revolving credit line to a Portfolio Company named Gorham Mill Acquisition ("Gorham"). From 2013 to 2015, Gorham paid Zohar III less than 10% of the interest that was properly due under the revolving credit agreement, falling more than $4 million in arrears. Notwithstanding the fact that Gorham was plainly failing to perform on its loan obligations, Patriarch classified Gorham as a "Collateral Investment" during the entire period, thereby allowing the entirety of Gorham's loan to be

included in the numerator of the OC Test calculation.   Ultimately, as part of a massive effort to steal value from the Zohar Funds (which will be discussed further below), Patriarch reduced the interest rate on Gorham's loans from 10% to just 0.5%.  Any such changes to loan terms should themselves have independently required changes to a Portfolio Company's classification under the Indentures, which require a re-categorization for *any* asset that has been restructured.

62.     Likewise, notwithstanding that multiple Portfolio Companies, such as American LaFrance and RapidRack, appeared to be in severe financial distress, and may even have ceased operations before being restructured into new, ostensibly performing companies, both the original and the restructured companies were rated as Category 4 by Patriarch.

63.     Second, Patriarch frequently took debt that had been purchased at a significant discount and wrote it up to par for purposes of calculating the OC Test under the Indentures. While the Indentures permit the collateral manager some flexibility in determining whether purchased debt should be valued at par, the fact that debt had just been acquired at a substantial discount to par was objective evidence that the value of these assets was impaired.  Moreover, upon information and belief, these assets did not meet the other requirements set forth in the Indentures as conditions for assigning a par valuation to an asset purchased at a discount. Nonetheless, Patriarch consistently reported the value of those assets at par, with the result once again that the Patriarch Managers' fees were fraudulently inflated.

64.     For example, in 2005, Zohar II purchased at least $29.6 million of debt issued by Intera Group for approximately $5.3 million—reflecting an *82% discount* to par.  Yet, notwithstanding the highly distressed nature of Intera's debt as reflected in this massive discount, Patriarch used the full face amount of $29.6 million for reporting its outstanding principal balance and treated it as a Category 3 loan, meaning that it was being restructured and this full

amount could be used for purposes of calculating the OC Test and its fees. After restructuring the Intera debt, Patriarch upgraded its categorization to Category 4 notwithstanding that it was failing to make the required interest payments. Seven months after being restructured, it defaulted.

65.     By manipulating the OC Test results in this manner, Ms. Tilton and Patriarch facilitated the Patriarch Managers and the Octaluna Defendants receiving hundreds of millions of dollars in management fees and preference share distributions to which they were not entitled and would not have otherwise received, and prevented the Controlling Party from gaining control over the Zohar Funds' Collateral. This included a substantial part of the more than *$700 million* in collateral management fees and other distributions Defendants received over the life of the Zohar Funds.

66.     Moreover, under the Zohar Indentures, a severe failure of the OC Test (below the "Adjusted Event of Default Overcollateralization Ratio") is an Event of Default, which gives the Controlling Party (with respect to Zohar I and II) or Controlling Class (with respect to Zohar III) cause to terminate the collateral manager (thereby, of course, also terminating senior and subordinated management fees). Accordingly, by fraudulently inflating the OC Test, Patriarch also extended the period of time during which it was able to engage in its fraudulent scheme by preventing investors from having the opportunity to terminate the Patriarch Managers when they should rightfully have had that choice.

67.     On March 30, 2015, following an extensive investigation into the OC Test manipulations, the SEC issued an Order Instituting Administrative and Cease-and-Desist Proceedings against Ms. Tilton, Patriarch Partners, and the Patriarch Managers, alleging that they had "defrauded" the Zohar Funds and their investors "by providing false and misleading

29

information, and engaging in a deceptive scheme, practice and course of business, relating to the values they reported for these funds' assets" by inflating the Zohar Funds' assets' classifications, as set out in this section. The SEC alleged that the Defendants had made "false and misleading" statements about the fair value of the loans in the Funds. Trial on the SEC's charges was held in October and November 2016 in front of an SEC administrative law judge, who has not yet rendered judgment.

68.     The SEC's case was premised in large part on violations of the Investment Advisers Act that are not precisely aligned with the claims made here and did not include the breach of contract or other claims specific to the Zohar Funds that are made here. Despite these differences, the evidence adduced at trial supports and supplements the Zohar Funds' allegations. For example, Ms. Tilton testified at trial that the Patriarch Managers had a fiduciary duty to the Zohar Funds and an obligation to manage their investments according to the Indentures. And, she acknowledged that Patriarch had not reduced the categorization of investments (from a "Category 4" to a "Category 1" or from a "Collateral Investment" to a "Defaulted Investment") to reflect their declining credit quality—as required by the Indentures—and instead had only reduced their categorization when the likelihood of any recovery on the investment had dropped to nearly zero. As a result, the OC Test was shown as passing—and the Patriarch Managers were paid their subordinated management fees, the Octaluna Defendants received preference share distributions, and Ms. Tilton avoided an Event of Default—when, under the plain terms of the Indentures, the OC Test was failing and the Patriarch Managers and Octaluna Defendants should have received none of those benefits.

**D.** **Defendants Transfer Assets And Rights To Themselves Out Of The Zohar Funds.**

69.     Notwithstanding the Patriarch Managers' fiduciary and contractual duties to the Zohar Funds, they have repeatedly consented to modifications of their loans to Portfolio Companies that reduced the value of those loans to the Zohar Funds and increased the likelihood that the Zohar Funds would default on payments to their noteholders.  For example, in numerous instances, the Patriarch Managers consented to extensions of maturity dates for loans from the Zohar Funds past the scheduled maturities of the Zohar Funds' obligations to their own noteholders.  Extending repayment on the loans past the Zohar Funds' own maturity dates was both a violation of the Indentures and rendered it a virtual certainty that the Zohar Funds would be forced to default on their obligations to their investors because the principal repayment of the loans was the primary source of funds that would be available to the Zohar Funds to repay the notes.  This is precisely what happened with respect to Zohar I and II.

70.     Likewise, the Patriarch Managers repeatedly agreed to provisions in the Zohar Funds' contracts that would give Defendants and other Patriarch entities control over the Zohar Funds' assets without any apparent benefit provided to the Zohar Funds.  For example, the Patriarch Managers agreed to transfer restrictions in credit agreements, requiring PPAS's consent to any loan assignments, without any apparent consideration provided to the Zohar Funds for relinquishing their right to unilaterally sell their loans.  In effect, these transfer restrictions purport to shift key rights of ownership held by the Zohar Funds to an entity owned and controlled by Ms. Tilton that has no ownership interest whatsoever in the underlying loans to which they relate, all for nothing in return.

71.     As the note maturity dates of the Zohar I and II notes neared and the likelihood that the Zohar Funds would repay their noteholders became increasingly remote, disputes

between Patriarch and the Controlling Parties that had begun early in the Zohar Funds' history were exacerbated. By mid-2015, Ms. Tilton concluded that MBIA, which was the Controlling Party for Zohar I and Zohar II, and the investors that constituted the Controlling Class for Zohar III, were looking to replace the Patriarch Managers as collateral manager for the Zohar Funds.

72. Facing fraud charges from the SEC and recognizing that, upon the removal of the Patriarch Managers, Defendants would no longer be able to exercise control over the Zohar Funds, Defendants accelerated their campaign to secretly grant themselves valuable assets and rights at the Zohar Funds' expense while they still could.

73. In particular, beginning in mid-2015, Ms. Tilton executed dozens of amendments to the loan agreements between the Zohar Funds and the Portfolio Companies, which (if they were effective) substantially reduced the value of the Zohar Funds' debt holdings, for the benefit of Ms. Tilton's own personal funds. For example, numerous amendments purported to subordinate the Zohar Funds' loans to loans made by Ark II and/or AIP II[7] and to reduce or eliminate the interest to be paid on the Zohar Funds' loans.[8] Other amendments increased the Zohar Funds' loan commitments to Portfolio Companies, extended maturity dates, and removed financial covenants that the Portfolio Companies had been required to meet.[9] Through these

---

[7]  These include amendments to the credit agreements for Duro Textiles LLC (dated July __, 2015), Gorham Paper and Tissue, LLC (dated June 24, 2015), Silverack, LLC (dated May 8, 2015), Spiegel, LLC (dated October 2, 2015), and Galey & Lord Industries, LLC (dated January 23, 2016).

[8]  These include amendments to the credit agreements for Red Shield Acquisition LLC (dated May 21, 2015), Petry Television Inc. (dated November 4, 2015), and Iconic American Trucks, LLC (dated February 25, 2016).

[9]  These include amendments to the credit agreements for 180s Inc. (dated September 1, 2015 and October 29, 2015), ACME International Enterprises,Inc. (dated September 1, 2015 and October __, 2015), Best Textiles Acquisition, LLC (dated August 7, 2015 and September 1, 2015), Croscill Home LLC (dated September 1, 2015), Denali Incorporated (dated November

amendments, Defendants gave away enormous value owned by or owed to the Zohar Funds,
transferring that value either to the Portfolio Companies over which they exercised control, or to
investment funds that Ms. Tilton owned directly.

74.     In September 2015, Ms. Tilton executed a series of legal documents purportedly
transferring the Zohar Funds' voting and other rights in its equity holdings to entities owned
directly by Ms. Tilton.  These documents, which took the form of irrevocable proxies or
amendments to LLC or stockholder agreements, purported to transfer equity voting rights,
including the rights to change directors or managing members or to effect a sale of the company,
from the Zohar Funds to Defendants, often the Patriarch Managers, or to provide the Defendants
with veto rights over any attempt to exercise such rights.  At least 35 such proxies or

---

19, 2015), Dura Operating LLC and Dura Automotive Systems (dated November 19, 2015),
Duro Textiles LLC (dated July __, 2015), East Alliance Limited (dated September 1, 2015),
eMag Solutions, LLC (dated September 1, 2015 and October __, 2015), Galey & Lord
Industries, LLC (dated July 8, 2015, September 1, 2015, October 29, 2015, and November 3,
2015), Global Automotive Systems, LLC (dated May 31, 2015 and September 1, 2015),
Gorham Paper and Tissue, LLC (dated June 24, 2015 and September 1, 2015), Hartwell
Industries, Inc. (dated September 1, 2015), Heritage Aviation, Ltd. (dated September 1,
2015), Iconic American Trucks, LLC (dated November 19, 2015), Inter-Marketing Group,
Inc. and Dana Classic Fragrances, Inc. (dated June 24, 2015 and September 1, 2015), Intrepid
U.S.A., Inc. (dated November 19, 2015), Jewel of Jane LLC (dated July 30, 2015, September
1, 2015, and November 19, 2015), LVD Acquisition, LLC (dated September 1, 2015 and
November __, 2015), MD Helicopters, Inc. (dated September 1, 2015), Mobile Armored
Vehicles, LLC (dated September 1, 2015), Natura Water, LLC (dated September 1, 2015 and
October __, 2015), NetVersant Solutions, LLC (dated September 1, 2015 and November 19,
2015), RM Acquisition, LLC (dated November 19, 2015), Remco Maintenance, LLC (dated
June 8, 2015, October 28, 2015, and November 19, 2015), Scan-Optics, LLC (dated
September 1, 2015 and October 28, 2015), Silverack, LLC (dated May 8, 2015, September 1,
2015, and September __, 2015), Snelling Staffing, LLC (dated September 1, 2015, October 2,
2015, October 8, 2015, October 22, 2015, November 5, 2015, November 18, 2015, and
November 19, 2015), Spiegel, LLC (dated September 1, 2015 and November 19, 2015), Stila
Styles, LLC (dated August 14, 2015), Transcare Corporation (dated September 1, 2015),
Vulcan Engineering Co. (dated November 19, 2015), and White Mountain Tissue, LLC
(dated September 1, 2015).  In many cases, these amendments were not signed by the
borrowers, but were signed only by Ms. Tilton.

amendments were executed by Ms. Tilton over a two-day period.[10]  The Zohar Funds received

no consideration in return for their purported forfeiture of critical ownership rights in the

Portfolio Companies' equity to entities owned and controlled by Ms. Tilton.

75.     In November 2015, when the notes issued by Zohar I matured and it defaulted on

its payment obligations to its investors, Ms. Tilton executed another series of amendments to the

credit agreements on behalf of the Zohar Funds that purported to restructure outstanding loans to

waive or restructure unpaid interest or commitment fees; waive the Zohar Funds' ability to

declare an Event of Default based on prior missed payments; waive other existing Events of

Default; grant sole discretion to waive any Event of Default under the credit agreements to

PPAS; and require consent from PPAS for any amendment, modification, termination or waiver

---

[10]  These include irrevocable proxies relating to 180s Inc. (dated September 21, 2015), Fetco
Home Décor, Inc. (dated September 21, 2015), Glenoit LLC (dated September 21, 2015),
Hartwell Industries, Inc. (dated September 21, 2015), Inter-Marketing Group, Inc. (dated
September 21, 2015), MD Helicopters, Inc. (dated September 21, 2015), Performance
Designed Products LLC (dated September 21, 2015), and UI Holdings (dated September 21,
2015), and voting rights amendments to LLC Agreements of ACME International
Enterprises, Inc. (dated September 21, 2015), American LaFrance, LLC (dated September
22, 2015), Best Textiles Acquisition, LLC (dated September 22, 2015), Black Mountain
Door, LLC (dated September 22, 2015), Croscill Home LLC (dated September 22, 2015),
Denali Incorporated (dated September 22, 2015), Dura Automotive Systems (dated
September 22, 2015), Duro Textiles LLC (dated September 22, 2015), eMag Solutions, LLC
(dated September 22, 2015), Galey & Lord Industries, LLC (dated September 22, 2015),
Global Automotive Systems, LLC (dated September 22, 2015), Gorham Paper and Tissue,
LLC (dated September 22, 2015), Iconic American Trucks, LLC (dated September 22, 2015),
Jewel of Jane LLC (dated September 22, 2015), Libertas Copper, LLC (dated September 22,
2015), LVD Acquisition, LLC (dated September 22, 2015), Mobile Armored Vehicles, LLC
(dated September 22, 2015), Netversant Solutions, LLC (dated September 22, 2015), Remco
Maintenance, LLC (dated September 22, 2015), RM Acquisition, LLC (dated September 22,
2015), Scan-Optics, LLC (dated September 22, 2015), Silverack, LLC (dated September 22,
2015), Snelling Staffing, LLC (dated September 22, 2015), Spiegel, LLC (dated September
22, 2015), Stila Styles, LLC (dated September 22, 2015), White Mountain Tissue, LLC
(dated September 22, 2015), and Xinhua (dated September 22, 2015).  Patriarch has
previously attempted to make voting rights amendments to the LLC Agreements of certain
portfolio companies, like Amweld International, in May 2011.

of any provision of the credit agreement, among other changes.[11]  On November 19, 2015 alone, Patriarch entered into at least thirty different credit agreement amendments giving PPAS sole discretion to waive Events of Default by the Portfolio Companies, requiring PPAS consent to any amendment, modification, termination or waiver of the credit agreement, and waiving any Events of Default then existing under the credit agreements.[12]

76.     In February 2016, Ms. Tilton executed an additional round of amendments, making some of the amendments stated above for additional Portfolio Companies,[13] and making additional amendments that gave Ark II "sole and absolute discretion" to make revolving credit

---

[11]   These include amendments to the credit agreements for 180s Inc. (dated November 3, 2015), Duro Textiles LLC (dated November 3, 2015), Global Automotive Systems, LLC (dated October 31, 2015), Heritage Aviation, Ltd. (dated November 3, 2015), Inter-Marketing Group, Inc. and Dana Classic Fragrances, Inc. (dated November 3, 2015), Jewel of Jane LLC (dated November 3, 2015), LVD Acquisition, LLC (dated November __, 2015), MD Helicopters, Inc. (dated November 3, 2015), Natura Water, LLC (dated November 3, 2015), Scan-Optics, LLC (dated November 3, 2015), Spiegel, LLC (dated November 3, 2015), and Transcare Corporation (dated November 3, 2015).

[12]   These include amendments to the credit agreements for 180s Inc., ACME International Enterprises, Inc., Best Textiles Acquisition, LLC, Croscill Home LLC, Denali Incorporated, Dura Operating LLC and Dura Automotive Systems, Duro Textiles LLC, East Alliance Limited, eMag Solutions, LLC, Fetco Home Décor, Inc., Galey & Lord Industries, LLC, Global Automotive Systems, LLC, Hartwell Industries, Inc., Heritage Aviation, Ltd., Iconic American Truck, LLC, Inter-Marketing Group, Inc. and Dana Classic Fragrances, Inc., Intrepid U.S.A., Inc., Jewel of Jane LLC, Libertas Copper, LLC, LVD Acquisition, LLC, MD Helicopters, Inc., Mobile Armored Vehicles, LLC, Natura Water, LLC, NetVersant Solutions, LLC, RM Acquisition, LLC, Remco Maintenance, LLC, Scan-Optics, LLC, Silverack, LLC, Snelling Staffing, LLC, Spiegel, LLC, Transcare Corporation, and Vulcan Engineering Co.

[13]   These included amendments to the credit agreements for ACME International Enterprises, Inc. (dated February 5, 2016), Best Textiles Acquisition, LLC (dated February 5, 2016), Gorham Paper and Tissue, LLC (dated February 5, 2016), Inter-Marketing Group, Inc. and Dana Classic Fragrances, Inc. (dated February 5, 2016), Jewel of Jane LLC (dated February 5, 2016), Silverack, LLC (dated February 5, 2016), and Snelling Staffing, LLC (dated February 5, 2016).

loans[14] and reducing the commitment fees being paid by many Portfolio Companies to the Zohar Funds.[15]

77.     Thus, over the life of the Zohar Funds but accelerating in 2015 and 2016, Defendants absconded with valuable interests of the Zohar Funds by amending loan agreements to reduce the value of the Zohar Funds' debt holdings through various changes in terms, and amending equity agreements to transfer any conceivable control right that the Zohar Funds might have had through their equity holdings to the Patriarch Managers or another one of the Defendants. In doing so, as discussed above, Ms. Tilton sought to ensure that she would maintain control of the Portfolio Companies, that PPMG's lucrative contracts with the Portfolio Companies would remain in force, and that she would retain maximal control over Portfolio Company funds regardless of what happened to the Zohar Funds.

**E.      Defendants Fraudulently Conceal And Assert Ownership Over The Zohar Funds' Stolen Collateral.**

78.     As described above, for years Defendants worked to conceal the extent of the Zohar Funds' equity holdings from their investors and Credit Enhancer, secretly reaping the benefits of cash dividends and distributions on that equity while allowing the Trustee to issue

---

[14]   These included amendments to the credit agreements for ACME International Enterprises, Inc. (dated February 5, 2016), Best Textiles Acquisition, LLC (dated February 5, 2016), Galey & Lord (dated February 5, 2016), Gorham Paper and Tissue, LLC (dated February 5, 2016), Inter-Marketing Group, Inc. and Dana Classic Fragrances, Inc. (dated February 5, 2016), Jewel of Jane LLC (dated February 5, 2016), Silverack, LLC (dated February 5, 2016), and Spiegel, LLC (dated February 5, 2016).

[15]   These included amendments to the credit agreements for ACME International Enterprises, Inc. (dated February 5, 2016), Best Textiles Acquisition, LLC (dated February 5, 2016), Gorham Paper and Tissue, LLC (dated February 5, 2016), Inter-Marketing Group, Inc. and Dana Classic Fragrances, Inc. (dated February 5, 2016), Jewel of Jane LLC (dated February 5, 2016), Silverack, LLC (dated February 5, 2016), and Spiegel, LLC (dated February 5, 2016).

reports month after month that failed to report (or accurately report) the equity owned by the Zohar Funds, even as Defendants touted the value of those very interests to rating agencies. Once they had sought to transfer the equity and/or equity rights from the Zohar Funds, Defendants doubled down on their efforts to hide what they had done.

79.    Following the default of Zohar I, knowing that through the Fall 2015 amendments they had plundered the Zohar Funds' valuable interests in favor of various Patriarch entities, the Patriarch Managers agreed in February 2016 to resign as collateral manager for the Zohar Funds. After managing the Zohar Funds since Zohar I's inception in 2003, the Patriarch Managers ceased to be the collateral managers as of March 2, 2016.  Alvarez & Marsal Zohar Management ("AMZM") was appointed to replace them as collateral manager for the Zohar Funds.

80.    Upon its appointment as collateral manager of the Zohar Funds, AMZM requested that Patriarch provide AMZM with the Zohar Funds' books and records that the Patriarch Managers had used to fulfill their duties as collateral managers, including, among several other categories of documents, (1) a full listing of the Zohar Funds' collateral; (2) documentation relating to the Zohar Funds' loans; (3) documentation related to the Zohar Funds' equity interests; and (4) up-to-date financial reports for each of the Portfolio Companies.

81.    While the Patriarch Managers were required to provide this information under the CMAs, Patriarch instead embarked on a course of conduct that was intended to give nothing more than the appearance of cooperation.  For example, after providing AMZM with an initial production that was comprised largely of loan agreements and amendments, Patriarch declared its production complete, and represented to AMZM and the Zohar Funds that it had provided all of the documents related to the Zohar Funds' collateral.

82.     Yet, contrary to these representations, the materials that Patriarch provided lacked the most critical information that AMZM had requested and needed in order to fulfill its duties as the Zohar Funds' collateral manager, such as a complete list of collateral owned by the Zohar Funds, or *any* documentation related to the Zohar Funds' equity ownership, such as stock certificates, LLC agreements, or stockholder agreements.

83.     As a result of Patriarch's deficient responses, AMZM was forced to initiate a lawsuit in the Delaware Court of Chancery (the "Delaware Action"), seeking the documents from the Patriarch Managers that would allow AMZM to, among other things, determine what assets the Zohar Funds own—and what rights it has in respect of those assets—so that it could attempt to recover value from these holdings.  In the course of that lawsuit, Patriarch made a series of convoluted assertions that the Zohar Funds' equity interests—which were memorialized in stock certificates and LLC Agreements naming the Zohar Funds as the holders of equity— were not actually the Zohar Funds' equity interests.  Rather, Patriarch asserted, they belonged to Ms. Tilton and entities under her control, who had simply *gifted* the upside of those equity interests to the Zohar Funds while leaving the actual ownership of them vested with Ms. Tilton.

84.     Ms. Tilton asserted in her testimony that she had created this structure because the Zohar Funds' Indentures prohibited the ownership of equity interests, and that such interests were therefore not "Collateral" of the Zohar Funds.  But, in fact, equity falls squarely within the definition of Collateral under the Indentures and the equity interests here appear to have been acquired in ways that were permitted under the Indentures.  In any event, whether or not the Indentures permitted the collateral manager to acquire certain equity interests on behalf of the Zohar Funds, there was no prohibition on owning it.  Once that equity was owned in the Zohar

Funds' name, regardless of how it was obtained, it was their property, and constituted "Collateral" under the Indentures.

85.     Patriarch also fought production of presentations it had made to rating agencies on behalf of the Zohar Funds, aware that those presentations revealed the Zohar Funds' ownership of the very valuable equity interests that Ms. Tilton was seeking to claim as hers.  The presentations that Patriarch sought to conceal included the presentations discussed above in which Patriarch had represented to the ratings agencies that Zohar II owned 100% of the equity in HVEASI, even though it would receive none of the more than $300 million received when it was sold by Defendants in 2012.

86.     After a full trial on the merits, on October 26, 2016, the Delaware Court of Chancery ruled that Patriarch had breached the CMAs by failing to turn over books and records to the Zohar Funds and ordered immediate production of those documents.  Patriarch responded by appealing and seeking an emergency stay to prevent the Zohar Funds from receiving *their own documents*.  Patriarch's requested emergency stay was denied, and an appeal is now pending before the Delaware Supreme Court.  In the interim, however, the Zohar Funds have begun to receive documents from Patriarch that have permitted them to begin to piece together the puzzle, set out here, of the Defendants' fraudulent misconduct and outright theft, although the production is far from complete.

87.     The brazen fraudulent scheme described above was, by its very nature, impossible for the Zohar Funds to discover prior to March 3, 2016, because until that time they were fully controlled by Patriarch (which was controlled by Ms. Tilton), which actively sought to conceal its wrongdoing from noteholders, the Controlling Parties, and any other interested parties. Indeed, even after appointment of a new collateral manager for the Zohar Funds, that collateral

manager could not have discovered the extent of this wrongdoing until Patriarch was finally ordered by the court in Delaware to produce the evidence of the fraudulent scheme, some of which was produced as late as December 2016, and much of which Patriarch is still withholding. As just a few examples, no documents have been turned over that relate to ownership of HVEASI, tax documents turned over have been redacted to conceal the full extent of the equity distributions and dividends stolen by Defendants, and Patriarch has refused to turn over the transaction documents for loans and equity acquisitions made by the Zohar Funds themselves, which would fully reveal the terms on which the Zohar Funds acquired those interests.

88. Moreover, notwithstanding the Delaware Action, Defendants have adopted a litigation strategy through which they continue to affirmatively misrepresent and assert their ownership over the Zohar Funds' equity interests. In particular, on September 12, 2016, Octaluna I and Patriarch XV brought a lawsuit challenging the procedures being used by the Zohar Funds' Trustee to auction collateral belonging to Zohar I (although the auction was being conducted pursuant to specific provisions of the Indenture). In their briefing, Octaluna I and Patriarch XV accused MBIA of trying to "steal equity" that Octaluna I and Patriarch XV claimed belongs to Octaluna I. Octaluna I and Patriarch XV asserted that including the equity in the auction would "put a cloud over Octaluna and its affiliates' equity holdings in the Portfolio Companies at a critical time," and contended that Defendants were the only parties entitled to sell those equity interests, or to sell the Portfolio Companies themselves by virtue of those interests.

89. On November 14, 2016, in a filing in connection with an involuntary bankruptcy proceeding that Patriarch XV filed and later withdrew with respect to Zohar I, Patriarch XV (at Ms. Tilton's direction) objected to efforts by a Zohar III investor to obtain documents from the

proceeding related to the Zohar Funds' equity holdings, contending in support that "[c]ertain Patriarch affiliates," and not the Zohar Funds, were the "ultimate equity owner" of the Portfolio Companies.

90.     On November 23, 2016, in response to an effort by the Zohar Funds to appoint new directors for three Portfolio Companies as to which they own a majority stake, Defendants refused to recognize their slate of appointed directors, asserting in a letter and then in subsequent court filings that the Octaluna Defendants "are the owners of the equity in the Companies."

91.     Thus, years of Defendants improperly manipulating the Zohar Funds, breaching contractual and fiduciary duties to the Zohar Funds, breaching Indenture and CMA provisions to inflate payments from the Zohar Funds, and engaging in fraud and outright theft of valuable Zohar Fund assets, gives rise to a number of causes of action, as set forth below.

## CAUSES OF ACTION

### COUNT I – DECLARATORY JUDGMENT
### (Against All Defendants)

92.     Plaintiffs incorporate the foregoing allegations as if fully set forth here.

93.     The Zohar Funds are record holders and owners of equity interests that are memorialized in the form of, among other documents, stock certificates and LLC agreements. The Zohar Funds received these interests for good and valuable consideration, generally in connection with providing financing for the acquisition of Portfolio Companies, extending loans to Portfolio Companies, or in exchange for agreeing to restructure loans to Portfolio Companies.

94.     The stock certificates are valid securities issued in the names of the Zohar Funds and declare the Zohar Funds "owners" of shares of stock.

95.     The LLC agreements list the Zohar Funds as parties, include the Zohar Funds as signatories, and list the Zohar Funds as members entitled to membership interests.

96.     Nonetheless, the Defendants have repeatedly asserted, including in several court proceedings, that the Zohar Funds do not own this equity, but rather have been gifted "upside" in the equity, which, Defendants assert, is actually owned by Ms. Tilton and the Octaluna Defendants.  Indeed, Defendants have even accused the Zohar Funds of "stealing" by lawfully attempting to assert their equity ownership rights.

97.     Accordingly, a justiciable controversy exists among the parties with regard to the ownership over and rights in equity interests in Portfolio Companies.

98.     The Zohar Funds therefore seek a declaration that they are the legal owners of the equity interests issued or otherwise created in their names, with the relevant equity rights and interests to be established at trial.

### COUNT II – DECLARATORY JUDGMENT
### (Against All Defendants)

99.     Plaintiffs incorporate the foregoing allegations as if fully set forth here.

100.     As set forth above, each of the Zohar Funds is party to an Indenture, which is explicitly referenced and incorporated into the relevant CMAs for each Zohar Fund.  The Indentures are valid and enforceable contracts under which the Zohar Funds have fully performed.

101.     Section 1.1 of the Indentures ("Definitions") defines "Collateral" as "All Money, instruments, accounts, payment intangibles, general intangibles, letter-of-credit rights, chattel paper, electronic chattel paper, deposit accounts, investment property and other property and rights subject or intended to be subject to the lien of this Indenture for the benefit of the Secured Parties as of any particular time."  The Granting Clause of the Indentures states, in turn, that "The Issuer hereby Grants to the Trustee, for the benefit and security of the Secured Parties, a continuing security interest in, and lien on, all of its right, title and interest in, to and under, in

each case, whether now owned or existing, or hereafter acquired or arising, all accounts, payment intangibles, general intangibles, letter-of-credit rights, chattel paper, electronic chattel paper, instruments, deposit accounts, investment property (each, as defined by the UCC), and **any and all other property of any type or nature owned by it** ... ." Indentures, p. 1 (emphasis added).

102.    The Zohar Funds are record holders and owners of equity interests that are memorialized in the form of, among other documents, stock certificates and LLC agreements. The stock certificates are valid securities issued in the names of the Zohar Funds and declare the Zohar Funds "owners" of shares of stock. The LLC agreements are valid and enforceable contracts that list the Zohar Funds as parties, include the Zohar Funds as signatories, and list the Zohar Funds as members entitled to membership interests. Accordingly, all of these equity interests are Collateral as that term is defined under the Indentures.

103.    Nonetheless, the Defendants have asserted in several court proceedings, including in this Court, that the Zohar Funds' equity interests do not constitute Collateral under the Indentures, and for that reason cannot be owned by the Zohar Funds.

104.    Accordingly, a justiciable controversy exists among the parties regarding whether the Zohar Funds' equity interests constitute Collateral.

105.    The Zohar Funds seek a declaration that the equity interests issued or otherwise created in their names (with the relevant equity interests to be established at trial) are Collateral, as that term is defined under the Indentures.

## COUNT III – DECLARATORY JUDGMENT
### (Against All Defendants)

106.    Plaintiffs incorporate the foregoing allegations as if fully set forth here.

107.    The Zohar Funds are record holders and owners of valuable equity and loan interests that are memorialized in the form of, among other documents, stock certificates, LLC

agreements, and loan agreements.  The Zohar Funds received these interests for good and valuable consideration.

108.    The relevant agreements are valid and enforceable.

109.    Nonetheless, the Defendants have purported to execute proxies, other documents, or amendments to existing documents, in order to transfer value from the Zohar Funds to one or more of the Defendants, including by granting voting rights, transfer restriction rights, priority of payments, or the right to veto an Event of Default, as set out in more detail above.

110.    These amendments, proxies, and other documents or provisions were executed outside of the scope and authority of the Patriarch Managers' entitlement to act on behalf of the Zohar Funds, because their actions were required to be taken in good faith, at arm's length, done according to a standard of care, and comport with applicable laws and prevailing market standards.

111.    Moreover, execution of many of these amendments, proxies, and other documents or provisions breached the Indentures by purporting to transfer Collateral subject to the Indentures' lien, which secures the interests of noteholders and the Credit Enhancer.

112.    The Defendants, on information and belief, contend that each of the documents was validly enacted within the proper scope and authority of the Patriarch Managers.  Ms. Tilton purported to sign each such document on behalf of every party thereto, and has asserted in a declaration to a court of law that certain of these documents had successfully transferred the Zohar Funds' right to vote shares in certain companies and to consent to the election or removal of the directors of those companies.

113.    Accordingly, a justiciable controversy exists as to the enforceability of the amendments, proxies, and other documents or provisions.

114.    The Zohar Funds therefore seek at a minimum a declaration that these amendments, proxies, and other documents or provisions were *void ab initio* and are deemed unenforceable.

## COUNT IV – ACCOUNTING
### (Against The Patriarch Managers)

115.    Plaintiffs incorporate the foregoing allegations as if fully set forth here.

116.    Under the CMAs, the Patriarch Managers contracted to provide investment and advisory services to the Zohar Funds, were tasked with managing the Zohar Funds' investments, and were designated power to act on behalf of the Zohar Funds, including to execute all "necessary, desirable and appropriate documents and/or instruments in the name and on behalf of" the Zohar Funds.  CMAs, § 2.5.

117.    As collateral managers, the Patriarch Managers held a position of confidence and trust with respect to the Zohar Funds, which the Patriarch Managers knew of and accepted, and were obligated to act as agents on behalf of the Zohar Funds in good faith and with due regard to the Zohar Funds' interests.

118.    The Patriarch Managers owed fiduciary duties of loyalty, which obligated them to put the interests of the Zohar Funds ahead of their own self-interest, and to refrain from exploiting the relationship for their own personal benefit.  The Patriarch Managers also owed fiduciary duties prohibiting them from self-dealing and conflicts of interest, and to disclose material facts.

119.    The Patriarch Managers were obligated by the Indentures and the CMAs to supervise and account for the Zohar Funds' collateral, including money or property, but have failed and refused to account to the Zohar Funds or to the Trustee under the Indentures, despite demand for same, for equity interests owned by the Zohar Funds and equity distributions

thereon.  The Patriarch Managers have obscured these equity interests from the Zohar Funds'
investors and other interested parties and have provided incorrect and incomplete information to
the Trustee for inclusion in monthly reports.  This failure and refusal is without excuse.

120.    Accordingly, the Zohar Funds are entitled to a prompt accounting of the equity
interests owned by the Zohar Funds and the cash distributions that have been paid on that equity.
The Zohar Funds demand that the Patriarch Managers be directed to account to the Zohar Funds
for the equity interests owned by the Zohar Funds and the dividends and distributions paid
thereon.

121.    The Zohar Funds have no adequate remedy at law for the relief sought hereby.

## COUNT V – BREACH OF CONTRACT
### (Against The Patriarch Managers)

122.    Plaintiffs incorporate the foregoing allegations as if fully set forth here.

123.    As set forth above, each of the Patriarch Managers entered into a CMA by which
it agreed to act as collateral manager for the Zohar Funds.  Patriarch Partners VIII entered into a
CMA with Zohar I, Patriarch Partners XIV entered into a CMA with Zohar II, and Patriarch
Partners XV entered into a CMA with Zohar III.

124.    The CMAs provide that the Patriarch Managers:

- "shall not … direct or effect the acquisition or disposition of the Collateral
  Investments [or Collateral Debt Obligations] or any other item included in the
  Collateral except in accordance with the requirements of the Indenture …";

- "shall not take any action which it knows or should be reasonably expected to
  know in accordance with prevailing market practices would … adversely
  affect the interests of the Holders of the Securities … in any material respect
  …";

- Ensure that "all purchases, exchanges and sales of Collateral by the Collateral Manager on behalf of the Company … shall be in accordance with reasonable and customary business practices of the relevant market and in compliance with applicable laws and all purchases and sales of the Collateral will be effected on arm's-length terms …";

- "covenant[] that [they] shall comply in all material respects with all laws and regulations applicable to it in connection with the performance of its duties under this Agreement and the Indenture"; and

- "shall, in rendering its services as Collateral Manager, use reasonable care and the same degree of skill and attention (a) that the Collateral Manager (i) exercises with respect to comparable assets that it manages for itself and its Affiliates and (ii) exercises with respect to comparable assets that it manages for others and (b) exercised by institutional investment managers of national standing generally in respect of assets of the nature and character of the Collateral and for clients having similar investment objectives and restrictions, in each case except as otherwise expressly provided in the Indenture."

Zohar I and II CMA, §§ 2.2(n), 2.4, 2.6, 2.9; Zohar III CMA, §§ 2.2(l), 2.4, 2.6, 2.9.

125. The CMAs contain an exculpation provision, but it provides that the Patriarch Managers will be liable "by reason of acts or omissions constituting fraud, bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of the obligations of the Collateral Manager hereunder and under the terms of the other Transaction Documents to which it is a party." CMAs, § 4.4.

126.  The CMAs are valid and enforceable contracts.  The Zohar Funds have complied with all material terms of the CMAs.

127.  The Patriarch Managers have knowingly and intentionally breached the CMAs by failing to obtain for the Zohar Funds all equity interests to which they were entitled and which interests are held by other Defendants, consenting on behalf of the Zohar Funds to the transfer of debt and equity rights and holdings from the Zohar Funds to other Defendants, and reducing the Zohar Funds' priority as creditors, reducing the amount of interest owed to the Zohar Funds, and making other changes detrimental to the Zohar Funds' interests.  These self-dealing transactions adversely affected the Zohar Funds and their noteholders, violated customary business practices and applicable law, and violated the Patriarch Managers' standard of care under the CMAs.

128.  As a result of the Patriarch Managers' breaches of the CMAs, the Zohar Funds have suffered economic loss and damages in an amount to be proven at trial, and are entitled to be placed in the same situation as if the CMAs had not been violated.  The Zohar Funds seek rescission of the transactions executed by the Patriarch Managers in breach of the CMAs or, in the alternative, damages in the amount of losses caused by the Patriarch Managers' breaches of the CMAs.

## COUNT VI – BREACH OF CONTRACT
### (Against The Patriarch Managers)

129.  Plaintiffs incorporate the foregoing allegations as if fully set forth here.

130.  As set forth above, each of the Zohar Funds is party to an Indenture, which is explicitly referenced and incorporated into the relevant CMA for each Zohar Fund.  The Indentures are valid and enforceable contracts under which the Zohar Funds have fully performed.

131.  The Zohar I and II Indentures provide that:

> [u]pon the acquisition of each Collateral Debt Obligation by the Issuer, the
> Collateral Manager shall designate (in a writing delivered to the Trustee and the
> Credit Enhancer) each such Collateral Debt Obligation as falling within Category
> 1, Category 2, Category 3 or Category 4. After the acquisition of each Collateral
> Debt Obligation by the Issuer and/or the Zohar Subsidiary, to the extent that the
> characterization of such Collateral Debt Obligation shall change, the Collateral
> Manager shall redesignate (in a writing delivered to the Trustee and the Credit
> Enhancer) each such Collateral Debt Obligation as falling within Category 1,
> Category 2, Category 3 or Category 4 or as a Workout Obligation.

Zohar I and II Indentures, § 12.1(b).

132.    Section 1.1 of the Zohar I and II Indentures sets out definitions for each of these

categories, which include objective criteria for determining a particular asset's classification,

most of which are tied to the likelihood of repayment on that asset.  An asset is a Category 4

asset only if it meets the definition of "Current," meaning that it is not a "Defaulted Obligation,"

or an obligation that has "previously deferred and/or capitalized as principal any interest due."  A

Category 1 asset is a "Defaulted Obligation," "with respect to which a default as to the payment

of principal and/or interest has occurred (without regard to any applicable grace period or any

waiver of such default) but only so long as such default has not been cured."

133.    Likewise, the Zohar III Indenture provides that a "Defaulted Investment" is an

investment

> as to which the Collateral Manager believes, that (A) a default has occurred and is
> continuing with respect to such Collateral Investment that in the sole judgment of the
> Collateral manager will likely result in a default as to the payment of principal and/or
> interest on such Collateral Investment or (B) a default as to the payment of principal
> and/or interest (beyond any applicable grace period) has occurred and is continuing on
> another obligation of the same issuer that is senior or pari passu in right of payment … .

Zohar III Indenture, § 1.1.  By contrast, a Collateral Investment is an "outstanding loan or

obligation" that is not a Defaulted Investment.  *Id.*

134.    Under the Indentures, in order to calculate the Class A Overcollateralization Ratio

Test, Category 4 or Collateral Investment assets are typically valued at their principal amounts,

while Category 1 or Defaulted Investment assets are valued at a lower amount, generally either the market value of that asset, or a substantially impaired value dictated by the asset's Moody's rating.

135.    The Zohar II Indenture further provides that the Principal Balance of any Collateral Debt Obligation that was acquired at a discount, for "less than 95% of the outstanding principal amount of such obligation on such origination date," must be equal to the "outstanding principal amount thereof (*including*, for the avoidance of doubt, the discounted portion thereof) plus any unfunded commitment," (emphasis added) as long as the Discounted Loan met certain requirements.  But, in the event that Discounted Loans were more than 10% of the Maximum Investment Amount or did not meet other requirements, "the Principal Balance of such Discounted Loan shall be deemed to equal the outstanding principal amount thereof (*excluding* the discounted portion thereof) plus any unfunded commitment …" (emphasis added).  Zohar II Indenture, § 1.1.

136.    Under the Indentures, "the Collateral Manager … agrees to perform any provisions of this Indenture applicable to the Collateral Manager."  Indentures, § 14.4.

137.    The CMAs contain an exculpation provision, but it provides that the Patriarch Managers will be liable "by reason of acts or omissions constituting fraud, bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of the obligations of the Collateral Manager hereunder and under the terms of the other Transaction Documents to which it is a party."  CMAs, § 4.4.

138.    The Patriarch Managers have knowingly and intentionally breached the Indentures by incorrectly categorizing the Zohar Funds' assets, and falsely inflating their assets' Principal Balances in violation of the Indentures.  By virtue of the Zohar Funds' OC Tests being

reported as passed when they were actually failing and by being calculated based on an inflated valuation of the Zohar Funds' assets, the Patriarch Managers obtained collateral management fees and the Octaluna Defendants obtained preference share payments to which neither were entitled and Patriarch retained control over the Zohar Funds for longer than they would have otherwise.

139.    As a result of the Patriarch Managers' breaches of the Indentures, the Zohar Funds have suffered economic loss and damages in an amount to be proven at trial. The Zohar Funds have also incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect their rights under the Indentures.

## COUNT VII – CONVERSION
### (Against All Defendants)

140.    Plaintiffs incorporate the foregoing allegations as if fully set forth here.

141.    As set forth more fully above, the Zohar Funds are the owners of equity interests issued or otherwise created in their names (with the relevant equity interests to be established at trial), and of debt memorialized by a series of loan agreements between the Zohar Funds and Portfolio Companies.

142.    Ms. Tilton has intentionally interfered with the property rights of the Zohar Funds by diverting and exercising dominion and control over the dividends and distributions on these equity interests into her own personal accounts, thereby depriving the Zohar Funds of the use of that property.

143.    Additionally, Defendants have intentionally interfered with the Zohar Funds' equity rights and interests by selling the companies in which the Zohar Funds owned equity without paying the Zohar Funds any compensation. For example, in the case of HVEASI,

Defendants represented that Zohar II owned 100% of the company, but then sold the company for more than $300 million without giving Zohar II a penny of those proceeds.

144.     Additionally, in 2015, the Defendants intentionally interfered with the property rights of the Zohar Funds by executing a series of loan agreement amendments and irrevocable proxies that were designed to strip the Zohar Funds of their valuable rights in that property and transfer them to Defendants, thereby unlawfully exercising dominion and control over the Zohar Funds' property and depriving the Zohar Funds of the use of that property.

145.     The Defendants subsequently exacerbated this interference by actively concealing the agreement amendments and irrevocable proxies from the Zohar Funds and their replacement collateral manager, AMZM, by refusing to turn over documents that would evidence these transactions.

146.     As a direct and proximate result of the conduct of the Defendants, the Zohar Funds have suffered substantial damages in an amount to be proven at trial.

## COUNT VIII – BREACH OF FIDUCIARY DUTY
### (Against The Patriarch Managers)

147.     Plaintiffs incorporate the foregoing allegations as if fully set forth here.

148.     Under the CMAs, the Patriarch Managers contracted to provide investment and advisory services to the Zohar Funds, were tasked with managing the Zohar Funds' investments, and were designated power to act on behalf of the Zohar Funds, including to execute all "necessary, desirable and appropriate documents and/or instruments in the name and on behalf of" the Zohar Funds.  CMAs, § 2.5.

149.     As collateral managers, the Patriarch Managers held a position of confidence and trust with respect to the Zohar Funds, which the Patriarch Managers knew of and accepted, and

were obligated to act as agents on behalf of the Zohar Funds in good faith and with due regard to the Zohar Funds' interests.

150.     The Patriarch Managers owed fiduciary duties of loyalty, which obligated them to put the interests of the Zohar Funds ahead of their own self-interest, and to refrain from exploiting the relationship for the benefit of themselves and other entities owned by Ms. Tilton. The Patriarch Managers also owed fiduciary duties prohibiting them from self-dealing and conflicts of interest, and to disclose material facts.

151.     The Patriarch Managers violated their fiduciary duties continually since the inception of the Zohar Funds by, among other things, failing to obtain equity interests for the Zohar Funds to which they were properly entitled and wrongfully consenting on behalf of the Zohar Funds to the purported transfer of valuable interests, including debt and equity interests owned by the Zohar Funds, to themselves or other Defendants, in acts of self-dealing and exploitation of their position of power and control with respect to the Zohar Funds.  Through this conduct, the Patriarch Managers placed the Defendants' own interests above those of the Zohar Funds, and caused economic damages to the Zohar Funds and their noteholders.

152.     As a direct and proximate result of the conduct of the Patriarch Managers, the Zohar Funds have suffered damages in an amount to be proven at trial.

### COUNT IX – FAITHLESS SERVANT
### (Against The Patriarch Managers)

153.     Plaintiffs incorporate the foregoing allegations as if fully set forth here.

154.     Since the inception of the Zohar Funds, they have paid the Patriarch Managers hundreds of millions of dollars in collateral management fees in exchange for the Patriarch Managers' services as the Zohar Funds' fiduciaries and agents.

155.    By reason of their breaches of their fiduciary duties owed to the Zohar Funds, the Patriarch Managers are faithless servants, and are required to forfeit all money that they received from the Zohar Funds as of the first day that they breached their duties.

### COUNT X – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against Patriarch Partners And Tilton)

156.    Plaintiffs incorporate the foregoing allegations as if fully set forth here.

157.    At all relevant times, Patriarch Partners and Ms. Tilton owned and/or controlled the Patriarch Managers, directed their actions, and/or acted on their behalves.

158.    Under the CMAs, the Patriarch Managers contracted to provide investment and advisory services to the Zohar Funds, were tasked with managing the Zohar Funds' investments, and were designated power to execute all "necessary, desirable and appropriate documents and/or instruments in the name and on behalf of" the Zohar Funds.  CMAs, § 2.5.  As collateral managers, the Patriarch Managers held positions of confidence and trust with respect to the Zohar Funds, which the Patriarch Managers knew of and accepted, and were obligated to act in good faith and with due regard to the Zohar Funds' interests.

159.    The Patriarch Managers owed fiduciary duties of loyalty, which obligated them to put the interests of the Zohar Funds ahead of their own self-interest, and to refrain from exploiting the relationship for their own personal benefit.  The Patriarch Managers also owed fiduciary duties prohibiting them from self-dealing and conflicts of interest, and to disclose material facts.

160.    Ms. Tilton and Patriarch Partners were aware of the Patriarch Managers' fiduciary duties.

161.    The Patriarch Managers violated their fiduciary duties continually since the inception of the Zohar Funds by, among other things, failing to obtain equity interests for the

Zohar Funds to which they were properly entitled and wrongfully consenting on behalf of the Zohar Funds to the purported transfer of valuable interests including debt and equity interests owned by the Zohar Funds to themselves or other Defendants, in acts of self-dealing and exploitation of their position of power and control with respect to the Zohar Funds. Through this conduct, the Patriarch Managers placed the Defendants' own interests above those of the Zohar Funds, and caused economic damages to the Zohar Funds and their noteholders.

162.  Patriarch Partners and Ms. Tilton induced this violation by exerting control over the Patriarch Managers and causing them to take all of the actions that violated these duties, and provided the personnel and resources that were required to violate these duties.

163.  As a direct and proximate result of the conduct of Tilton and Patriarch Partners, the Zohar Funds have suffered damages in an amount to be proven at trial.

### COUNT XI – UNJUST ENRICHMENT
### (Against ARK II, AIP II, The Octaluna Defendants, And Tilton)

164.  Plaintiffs incorporate the foregoing allegations as if fully set forth here.

165.  As a result of Defendants' misconduct, ARK II, AIP II, the Octaluna Defendants, and Ms. Tilton have been enriched at the Zohar Funds' expense.

166.  ARK II and AIP II have been enriched directly by, among other things, the granting to ARK II and AIP II of a priority over the Zohar Funds' liens on the Portfolio Companies and the transfer of valuable interests from the Zohar Funds to ARK II and AIP II.

167.  The Octaluna Defendants and Ms. Tilton have been enriched directly by, among other things, misappropriating dividends and distributions on equity interests owned by the Zohar Funds, asserting ownership over equity interests owned by the Zohar Funds, and otherwise taking valuable rights in the Portfolio Companies belonging to the Zohar Funds for themselves or companies Ms. Tilton owns and controls.

168. Ms. Tilton, and ARK II, AIP II, and the Octaluna Defendants, through their owner, Ms. Tilton, knew of and played an active role in the Defendants' scheme to transfer valuable rights in the Portfolio Companies and valuable equity distributions away from the Zohar Funds.

169. The circumstances are such that it would be against equity and good conscience to permit ARK II, AIP II, the Octaluna Defendants, and Ms. Tilton to retain their ill-gotten gains from the Zohar Funds. ARK II, AIP II, the Octaluna Defendants, and Ms. Tilton have an obligation to the Zohar Funds to make restitution for their ill-gotten gains. ARK II, AIP II, the Octaluna Defendants, and Ms. Tilton have failed to make restitution to the Zohar Funds for their ill-gotten gains.

170. Restitution should therefore be made by ARK II, AIP II, the Octaluna Defendants, and Ms. Tilton to the Zohar Funds in an amount to be proven at trial.

## COUNT XII – VIOLATION OF RICO, 18 U.S.C. § 1962(c)
### (Against Lynn Tilton)

171. Plaintiffs incorporate the foregoing allegations as if fully set forth here.

172. At all relevant times, the Zohar Funds were and are "persons" within the meaning of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(3).

173. At all relevant times, Ms. Tilton was and is a "person" within the meaning of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(3).

174. At all relevant times, Ms. Tilton was, and is, a person that exists separate and distinct from the RICO enterprise, described below. Ms. Tilton is the sole owner of the other members of the enterprise, but each member is a legally different entity from Ms. Tilton, with different legal rights, obligations, powers, and privileges from Ms. Tilton. Ms. Tilton incorporated each of the other Defendants to fulfill a particular purpose, and each of the

Defendants is in a distinct line of business and plays a different role as part of the enterprise: the Patriarch Managers act as collateral managers; Patriarch Partners provides employees and services to entities within the enterprise; the Octaluna Defendants are investment vehicles that hold preference shares in the Zohar Funds; Ark II and AIP II are Ms. Tilton's personal investment funds; PPAS provides Administrative Agent services under credit agreements; and PPMG provides corporate management services to the Portfolio Companies.

175.    Ms. Tilton violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

### *The Patriarch Enterprise*

176.    Taken together, Patriarch, the Octaluna Defendants, Ark II, AIP II, PPAS, and PPMG (hereinafter, the "Patriarch Enterprise") constitute an ongoing criminal enterprise that is owned and directed by Ms. Tilton, the RICO person.  Through a pattern of fraud, theft, conversion, and breach of contractual and fiduciary duties, the members of the enterprise associated together to engage in a common scheme of fraudulent misrepresentations, self-dealing, breaches of trust and fiduciary duty, and outright theft or attempted theft for the common purpose of misusing and misappropriating hundreds of millions of dollars of the Zohar Funds' assets, seeking to benefit from and potentially transfer those assets and making it difficult or impossible for the Zohar Funds or their noteholders or other interested parties to identify and trace those assets.

177.    The Patriarch Enterprise was set up for the purpose of providing a variety of different asset management, investment, and administrative financial and investment services, and thus has an ascertainable structure separate and apart from the pattern of racketeering

activity in which the Defendants engaged.  Each of the Defendants has a distinct corporate identity and engages in a specific and distinct line of business.

178.    This association-in-fact constitutes an "enterprise" within the meaning of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(4), and it was or is engaged in, and/or its activities affected, interstate and/or foreign commerce.

179.    Ms. Tilton directly or indirectly benefited from the Zohar Funds' assets by, among other things: (1) exercising or asserting ownership over equity belonging to the Zohar Funds, including the ability to manage, control, or sell the Portfolio Companies in which the Zohar Funds hold equity interests; (2) misappropriating dividends or distributions on equity holdings of the Zohar Funds from those Portfolio Companies; (3) earning management fees from Portfolio Companies that are contingent upon ongoing ownership and control of Portfolio Company equity; (4) benefitting from priority as against the Zohar Funds' debt holdings in the Portfolio Companies, and as managers of the Portfolio Companies, from forgiveness or restructuring of that debt; and (5) earning inflated collateral management fees from providing hopelessly conflicted and ultimately fraudulent collateral management services.

180.    The Patriarch Enterprise's repeated, continuous, and flagrant violations of law constitute a "pattern of racketeering activity" in violation of RICO, 18 U.S.C. § 1961, *et seq.* Their racketeering activities, both individually and collectively, have been ongoing since at least 2006 and pose a serious threat of continuing criminal conduct into the foreseeable future.

181.    The Patriarch Enterprise's common purpose came into existence as early as 2006 or before, and no later than 2009, by which time the Patriarch Enterprise set up by Ms. Tilton had stolen significant equity distributions and had so thoroughly manipulated the categorizations of the Zohar Funds' assets that, absent those manipulations, control over at least Zohar I and II

would have passed to their Controlling Party. By virtue of this ongoing control, the participants in the Patriarch Enterprise were able to extract significant benefit from the Zohar Funds, as set out above, without detection by noteholders, the Controlling Party, or others.

182. The Patriarch Enterprise is a cohesive group with specific, distinct, and assigned responsibilities and a command structure operating in, and directed from, the United States. The Enterprise is structured as follows:

a) Defendant Ms. Tilton, the RICO person, is the central and controlling figure in the Patriarch Enterprise, and has been responsible for oversight of the scheme to defraud the Zohar Funds, and through her ownership of and positions of authority in the other Defendants, she has directed the other Defendants to take actions necessary to accomplish the overall aims of the Patriarch Enterprise. She is the central participant in the orchestration, planning, and execution of the Patriarch Enterprise's scheme to defraud the Zohar Funds. She also ultimately was a primary beneficiary of the scheme's extraction of fees and assets from the Zohar Funds.

b) Defendants the Patriarch Managers are distinct entities that are owned and directed by Ms. Tilton. Until March 2, 2016, the Patriarch Managers acted as collateral manager for one of the Zohar Funds. In that capacity, the Patriarch Managers were imbued with contractual and fiduciary duties to the Zohar Funds, which they breached and abandoned by fraudulently misclassifying the Zohar Funds' assets and engaging in a series of self-dealing transactions designed to strip value from the Zohar Funds and transfer that value to members of the Patriarch Enterprise. Directly and through their agent officers, directors, and employees, the Patriarch Managers have conducted and participated in the management and operation of the Patriarch Enterprise, including the

59

orchestration, planning, and execution of the scheme to defraud the Zohar Funds. The Patriarch Managers have benefited from the Patriarch Enterprise's scheme to extract fees and assets from the Zohar Funds by receiving valuable, fraudulently inflated collateral management fees and coordinating the transfer or purported transfer of valuable rights and interests away from the Zohar Funds.

        c)    Defendant Patriarch Partners is a distinct entity that is owned and directed by Ms. Tilton. Patriarch Partners provides employees, knowledge, facilities, and other resources to the other Defendants in order to facilitate the carrying out of the Patriarch Enterprise's scheme. Directly and through its agent officers, directors, and employees, Patriarch Partners has conducted and participated in the management and operation of the Patriarch Enterprise, including the orchestration, planning, and execution of the scheme to defraud the Zohar Funds. Patriarch Partners has benefited from the Patriarch Enterprise's scheme to extract fees and assets from the Zohar Funds.

        d)    The Octaluna Defendants are distinct entities that are owned and directed by Ms. Tilton. The Octaluna Defendants own certain interests in the Zohar Funds and purport to hold and receive distributions on valuable equity interests in the Portfolio Companies, notwithstanding that those interests are issued in the names of the Zohar Funds. Directly and through their agent officers, directors, and employees, the Octaluna Defendants have conducted and participated in the management and operation of the Patriarch Enterprise, including the orchestration, planning, and execution of the scheme to defraud the Zohar Funds. The Octaluna Defendants have benefited from the Patriarch Enterprise's scheme to extract fees and assets from the Zohar Funds by

receiving purported transfers of valuable equity rights and interests and distributions thereon.

e) Defendants ARK II and AIP II are distinct entities that are owned and directed by Ms. Tilton. ARK II and AIP II have purportedly made certain investments in the Portfolio Companies, and now hold preferential rights in those Companies at the expense of the Zohar Funds. Directly and through their agent officers, directors, and employees, ARK II and AIP II have conducted and participated in the management and operation of the Patriarch Enterprise, including the orchestration, planning, and execution of the scheme to defraud the Zohar Funds. ARK II and AIP II have benefited from the Patriarch Enterprise's scheme to extract fees and assets from the Zohar Funds by receiving purported transfers of valuable rights from the Zohar Funds.

f) PPAS is a distinct entity owned and directed by Ms. Tilton that played a role in the Patriarch Enterprise. PPAS acted as Administrative Agent to the Zohar Funds under their loan agreements with Portfolio Companies, and in so doing has consented to many of the Defendants' efforts to transfer valuable rights away from the Zohar Funds. Directly and through its agent officers, directors, and employees, PPAS has conducted and participated in the management and operation of the Patriarch Enterprise, including the orchestration, planning, and execution of the scheme to defraud the Zohar Funds. PPAS has benefited from the Patriarch Enterprise's scheme to extract fees and assets from the Zohar Funds by receiving valuable agency fees.

g) PPMG is a distinct entity owned and directed by Ms. Tilton that played a role in the Patriarch Enterprise. PPMG acted as a management consultant to the Portfolio Companies, and in so doing has siphoned valuable cash and assets away from the Zohar

61

Funds. Directly and through its agent officers, directors, and employees, PPMG has conducted and participated in the management and operation of the Patriarch Enterprise, including the orchestration, planning, and execution of the scheme to defraud the Zohar Funds. PPMG has benefited from the Patriarch Enterprise's scheme to extract fees and assets from the Zohar Funds by receiving valuable management fees.

183.     Ms. Tilton knew of the existence of, and conducted the operation and management of the Patriarch Enterprise and its affairs.

184.     Actions taken by Ms. Tilton, acting through the Patriarch Enterprise, in furtherance of the scheme include, but are not limited to (1) exercising or asserting ownership over the Zohar Funds' equity interests; (2) stealing cash dividends and distributions on those equity interests; (3) attempting to hide the existence of the Zohar Funds' equity interests from noteholders and the Zohar Funds themselves; (4) attempting to steal the Zohar Funds' equity and debt interests; (5) modifying loan payment obligations in order to benefit Defendants at the expense of the Zohar Funds; and (6) inflating the categorization of the Zohar Funds' assets and manipulating those assets in order to pass OC Tests, retain control, and obtain inflated management fees.

185.     The Patriarch Enterprise was predominately domestic in nature, as it was conceived of and orchestrated in the United States, and carried out predominately if not entirely in the United States.

186.     At all relevant times, the Patriarch Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c). The Enterprise participated in multi-billion dollar lending to distressed companies in a variety of industries and regions, caused those loans to be made and transferred payment and debt and equity ownership

stakes and distributions across state lines, and held and transferred funds and assets using national financial institutions.

### *The Pattern of Racketeering Activity*

187.    The Patriarch Enterprise is a continuing enterprise engaged in a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(1) and (5) and in violation of 18 U.S.C. § 1962(c), consisting of multiple acts of racketeering by members of the enterprise that are interrelated, not isolated, continued since at least 2006 and perpetrated for the same or similar purposes by the same persons on the same victims.

188.    The actions undertaken by Ms. Tilton from at least 2006 to the present were inherently unlawful, they were her regular way of operating, and the nature of her acts clearly implies a threat of continued wrongful activity.

189.    Ms. Tilton engaged in a pattern of racketeering, including, but not limited to mail, wire, and bank fraud, and receipt and transportation of stolen property across state lines, as set out below:

### *Predicate Acts: Mail, Wire, and Bank Fraud, Violations of 18 U.S.C. §§ 1341, 1343, 1344, In Obtaining Inflated Management Fees*

190.    The Patriarch Enterprise engaged in a massive, and egregious, scheme to defraud the Zohar Funds in order to ensure that Ms. Tilton extracted substantial management fees from the Zohar Funds through the Patriarch Managers, regardless of whether they had fulfilled their contractual and fiduciary duties to the Zohar Funds (which, as set out below, they had not).  The ultimate aim of the scheme was to defraud and deceive the Zohar Funds not only to extract substantial unearned fees, but also to retain virtually unchecked control over the Zohar Funds, when in reality the poor performance of the Zohar Funds' Collateral dictated that Ms. Tilton and the Patriarch Managers be removed from control of the Zohar Funds and the Portfolio

Companies. Ms. Tilton achieved this goal by causing the Defendants to regularly and systematically misrepresent the performance of the Zohar Funds' Collateral, and thereby fraudulently inflating calculations based on the performance of those assets. The Patriarch Enterprise's pattern of racketeering included mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and/or bank fraud in violation of 18 U.S.C § 1344.

191.    In furtherance of this scheme, and as described herein, Ms. Tilton transmitted, or caused to be transmitted, by means of (1) placing or causing matters and things to be placed in any post office or authorized depository, or depositing or causing to be deposited matters and things to be sent or delivered by a private or commercial interstate carrier and/or (2) wire communications in interstate or foreign commerce, emails, telephone calls, writings, signs, signals, pictures, and sounds, including, but not limited to, the following:

a)      Emails, telephone calls, and other communications by wire and mail to the Trustee of the Zohar Funds, conveying fraudulent classifications of the Zohar Funds' assets;

b)      Emails, telephone calls, and other communications by wire and mail to the Trustee of the Zohar Funds, conveying fraudulent and inflated principal balances of the Zohar Funds' assets;

c)      Emails, telephone calls, and other communications by wire and mail to the Trustee of the Zohar Funds, calculating OC Test levels based on fraudulent and inflated classifications and principal balances of the Zohar Funds' assets;

d)      Emails, telephone calls, and other communications by wire and mail to the Trustee of the Zohar Funds, calculating management fees due and owing on the basis of fraudulent and inflated classifications of the Zohar Funds' assets; and

e)    Publication in Monthly Reports and Note Valuation Reports, which were transmitted through the mail and wires to noteholders, of fraudulent and inflated classifications of the Zohar Funds' assets, and the OC Test and management fee levels based on those inflated numbers.

192.    The Zohar Funds incorporate by reference the attached Appendix A, Appendix B, and Appendix C, which set forth examples of Monthly Reports and Note Valuation Reports that report fraudulent and inflated classifications; miscalculated OC Test results; and miscalculated management fees, which were transmitted through the mail and wires to noteholders on or about the relevant publication date.  In order to produce each of the reports listed on Appendix A, Appendix B, and Appendix C, acting through the Patriarch Enterprise, Ms. Tilton communicated fraudulent classifications to the Trustee prior to publication, and at a minimum confirmed the miscalculated OC Test results and management fees, as her controlled entities were required to do by contract, if she did not provide those numbers to the Trustee directly.  These numbers were included in each respective Monthly Report or Note Valuation Report, as set out in Appendix A, Appendix B, and Appendix C.

193.    Each of the transmissions described above constitutes a separate fraudulent use of the mail or wires by Ms. Tilton.  The Zohar Funds relied on the information contained in these transmissions, and were induced thereby to permit the Patriarch Managers to continue exercising control over the Zohar Funds, and to pay copious management fees to the Patriarch Managers.

194.    The Trustee for the Zohar Funds, U.S. Bank N.A. is a financial institution as that term is defined by 18 U.S.C. § 20.

195.    Ms. Tilton also engaged in a scheme to obtain moneys, funds, credits, assets, securities or other property under the custody or control of a financial institution by means of

false or fraudulent pretenses, representations, or promises, including, but not limited to, the
following:

        a)      Communications to the Trustee of the Zohar Funds, conveying fraudulent
and inflated classifications of the Zohar Funds' assets;

        b)      Communications to the Trustee of the Zohar Funds, conveying fraudulent
and inflated principal balances of the Zohar Funds' assets;

        c)      Communications to the Trustee of the Zohar Funds, calculating OC Test
levels based on fraudulent and inflated classifications and principal balances of the Zohar
Funds' assets; and

        d)      Communications to the Trustee of the Zohar Funds, calculating
management fees due and owing on the basis of fraudulent and inflated classifications
and principal balances of the Zohar Funds' assets.

196.    Such communications were made in connection with each of the Monthly Reports
and Note Valuation Reports identified in Appendix A, Appendix B, and Appendix C.

197.    As a direct result of these efforts, Ms. Tilton, through the Patriarch Managers, was
paid management fees that were not earned, based on improperly inflated asset classifications, by
the Zohar Funds' Trustee, U.S. Bank, which otherwise maintained such funds under its custody
and control.

198.    Each of the transmissions set out herein constitutes a separate fraudulent use of
the mails and/or wires by Ms. Tilton.  The Zohar Funds reasonably relied on Ms. Tilton's false
and misleading statements in agreeing to pay Defendants fraudulently inflated management fees
and preference share disbursements on each pay period and in permitting U.S. Bank to pay these
amounts.

199.    Ms. Tilton, through her control of the Patriarch Enterprise, sent or caused to be sent wire and/or mail communications, or acted with knowledge that wire and/or mail communications would be made in the ordinary operation of the Patriarch Enterprise, or could reasonably have foreseen that the wires or mails would be used in the ordinary course of business as a result of the Patriarch Enterprise's acts, and would be used for the purpose of extracting funds under bank custody and control in the form of collateral management fees from the Zohar Funds.  Accordingly, Ms. Tilton, acting through the Patriarch Enterprise, committed numerous acts of mail, wire, and bank fraud in violation of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and 18 U.S.C. § 1344.  Ms. Tilton also engaged in additional and similar acts of mail, wire, and bank fraud in furtherance of the Patriarch Enterprise's scheme, which will be proven at trial.

200.    Ms. Tilton participated in the scheme or artifice knowingly, willfully, and with the specific intent to deceive and/or defraud the Zohar Funds into paying exorbitant management fees, to obtain those fees from a financial institution, and to retain control over the Zohar Funds. The scheme was successful because Ms. Tilton was able to extract hundreds of millions of dollars in unearned fees and retain the role of collateral manager for years, causing the Zohar Funds substantial damages.  These damages were contemplated and intended by Ms. Tilton.

201.    Due to Ms. Tilton's fraud and concealment of her wrongdoing, the Zohar Funds could not have discovered the acts alleged herein prior to, at the earliest, March 30, 2015, when the SEC filed its Order Instituting Administrative and Cease-and-Desist Proceedings.  Moreover, no action could be taken with respect to Ms. Tilton's wrongdoing by the Zohar Funds because, due to the ongoing fraudulent scheme, Defendants retained total control over the Zohar Funds until the Patriarch Managers finally resigned their position as collateral manager, effective March 3, 2016.

*Predicate Acts: Mail and Wire Fraud, Violations of 18 U.S.C. §§ 1341, 1343, In Attempting To Steal Equity And Equity Distributions*

202.     Ms. Tilton, through the Patriarch Enterprise, engaged in a separate, egregious criminal scheme to defraud the Zohar Funds in order to attempt to illegally obtain their valuable equity interests and outright steal the cash distributions on those interests.  The ultimate objective of Ms. Tilton's scheme or artifice was to defraud the Zohar Funds into acquiescing to Ms. Tilton's assertion of ownership over the Zohar Funds' equity interests and theft of the distributions thereon by clouding or outright hiding the fact of the Zohar Funds' equity ownership, and Ms. Tilton's theft thereof.  Ms. Tilton achieved this goal by misrepresenting, or causing the Defendants to regularly and systematically misrepresent, the ownership of the Zohar Funds' equity interests.  Ms. Tilton's pattern of racketeering included mail fraud in violation of 18 U.S.C. § 1341 and/or wire fraud in violation of 18 U.S.C. § 1343.

203.     In furtherance of the scheme, and as described herein, Ms. Tilton transmitted, or caused to be transmitted, by means of (1) placing or causing matters and things to be placed in any post office or authorized depository, or depositing or causing to be deposited matters and things to be sent or delivered by a private or commercial interstate carrier and/or (2) by means of wire communications in interstate or foreign commerce, emails, telephone calls, writings, signs, signals, pictures, and sounds, including, but not limited to, the following:

a)     Publication in Monthly Reports and financial statements, which were transmitted through the mail and wires to noteholders, of false and misleading information concerning the Zohar Funds' equity interests, wrongfully omitting many equity interests rightfully owned by the Zohar Funds, causing the Patriarch Managers to violate the requirement the requirements under the CMAs and CAAs that they monitor

68

and report the Zohar Funds' collateral, and ensure the accuracy and completeness of the Monthly Reports;

b)      Emails, telephone calls, and other communications by wire and mail, on April 1, 2016 and May 20, 2016 and in other instances, to the Zohar Funds, representing that Patriarch had provided the Zohar Funds with all documents relating to their Collateral, even though they had not yet produced a scrap of evidence of the Zohar Funds' equity holdings, or any related documents that the Zohar Funds were entitled to, that would have permitted them to ascertain their true ownership levels in the Portfolio Companies or the cash distributions received thereon;

c)      Court filings, transmitted by wire and mail, including:

1.      A September 12, 2016 complaint and motion for a temporary restraining order, removed to the Southern District of New York, in which Defendants asserted that the Zohar Funds were trying to "steal equity" rightfully owned by the Octaluna Defendants, and that they intended to sell those Portfolio Companies by virtue of those interests;

2.      A November 14, 2016 filing in the Bankruptcy Court for the Southern District of New York, asserting that the Octaluna Defendants are the "ultimate equity owners" of the Portfolio Companies; and

3.      A December 20, 2016 Answer and Counterclaims filed in the Delaware Court of Chancery, seeking declaratory relief and other

remedies asserting Ms. Tilton's and the Octaluna Defendants' ownership of equity in three portfolio companies.

d) Correspondence, transmitted by wire and mail, including:

1. A November 23, 2016 letter from Defendants to AMZM stating that the Octaluna Defendants are "the owner[] of the equity in the Companies"; and

2. Representations by Ms. Tilton, in or about late November 2016, to a prospective purchaser of Portfolio Company MD Helicopter, that she was full and sole owner of MD Helicopter.

204. The Zohar Funds incorporate by reference the attached Appendix A, Appendix B, and Appendix C, which set forth examples of Monthly Reports and Note Valuation Reports that report inaccurate, misleading, and fraudulent information about the Zohar Funds' equity holdings. In order to produce each of the reports listed on Appendix A, Appendix B, and Appendix C, Ms. Tilton communicated fraudulent information to the Trustee prior to publication, and at a minimum failed to provide the Trustee with information her controlled entities were obligated to provide. These misrepresentations were included in each respective Monthly Report or Note Valuation Report, as set out in Appendix A, Appendix B, and Appendix C.

205. Each of the transmissions described above constitutes a separate fraudulent use of the mail or wires by Ms. Tilton. The Zohar Funds relied on the information contained in these transmissions, and were induced thereby to permit Ms. Tilton to retain control over the Portfolio Companies and to otherwise acquiesce to her assertions of equity ownership.

206.     As a direct result of these efforts, Ms. Tilton has purported to retain valuable equity ownership interests that she does not own and is not entitled to, and to receive dividends and distributions on those interests, free from recovery efforts employed by the Zohar Funds since they had no idea of their true holdings or what was purported to have been transferred away.

207.     Each of the transmissions set out herein constitutes a separate fraudulent use of the mails and/or wires by Ms. Tilton.  The Zohar Funds reasonably relied on Ms. Tilton's false and misleading statements in delaying any recovery efforts since they had no idea of their true holdings or what was purported to have been transferred away.

208.     Ms. Tilton, through her control of the Patriarch Enterprise, sent or caused to be sent wire and/or mail communications, or acted with knowledge that wire and/or mail communications would be made in the ordinary operation of the Patriarch Enterprise, or could reasonably have foreseen that the wires or mails would be used in the ordinary course of business as a result of the Enterprise's acts.  Accordingly, Ms. Tilton, acting through the Patriarch Enterprise, committed numerous acts of mail and wire fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343.  These violations are ongoing.  Ms. Tilton also engaged in additional and similar acts of mail and wire fraud in furtherance of the Patriarch Enterprise scheme, which will be proven at trial.

209.     Ms. Tilton participated in the scheme or artifice knowingly, willfully, and with the specific intent to deceive and/or defraud the Zohar Funds into acquiescing to the theft of their equity interests, causing the Zohar Funds substantial damages.  These damages were contemplated and intended by Ms. Tilton.

210.    No action could be taken with respect to Ms. Tilton's wrongdoing by the Zohar Funds because, thanks to Ms. Tilton's ongoing fraudulent scheme, she retained total control over the Zohar Funds until the Patriarch Managers resigned their positions as collateral managers, effective March 3, 2016.  Moreover, thanks to Ms. Tilton's fraud and concealment of her wrongdoing, the Zohar Funds could not have discovered the acts alleged herein prior to July 2016, at the earliest, when an incomplete set of documents evidencing some of the Zohar Funds' equity holdings were first produced by Patriarch, in connection with the Delaware Action and under threat of a court order, or prior to December 2016, when an additional (but still incomplete) set of documents was produced under court order.  The Zohar Funds are still seeking additional documentation that Patriarch continues to withhold.

### *Predicate Acts: Transportation And Receipt Of Stolen Property, Violations of 18 U.S.C. §§ 2314, 2315*

211.    Ms. Tilton, through the Patriarch Enterprise, engaged in a separate, egregious criminal scheme to receive and transport across state lines stolen property, in the form of cash distributions belonging to the Zohar Funds.  An ultimate objective of Ms. Tilton's scheme or artifice was to steal cash belonging to the Zohar Funds.  Ms. Tilton's pattern of racketeering included receipt of stolen property in violation of 18 U.S.C. § 2315 and/or transportation of stolen property across state lines in violation of 18 U.S.C. § 2314.

212.    Ms. Tilton, acting through the Patriarch Enterprise, devised a fraudulent scheme (set out in more detail above), beginning at least in 2006, by which Ms. Tilton, acting as the manager, director, and/or CEO of the Portfolio Companies, caused equity distributions to be paid to the Zohar Funds, care of the Patriarch Managers, understanding that Ms. Tilton would be able to fraudulently take possession of and assert ownership over those funds, which in reality belonged to the Zohar Funds.  In so doing, Ms. Tilton caused these stolen equity distributions to

be transported across state lines, from the Portfolio Companies, which are located in a variety of different states across the United States, to Ms. Tilton and certain of her controlled entities, in New York. Upon information and belief, Ms. Tilton then caused these funds to be transferred to other accounts also located across state lines.

213. As a result of and through this fraudulent scheme, beginning at least in 2006, Ms. Tilton received the equity distributions on equity interests in the Portfolio Companies that were owned by, and titled in the names of, the Zohar Funds. Those equity distributions, which were paid in cash, were documented by K-1 tax forms issued to the Zohar Funds, for whom those distributions were intended.

214. At the time Ms. Tilton received these equity distributions, Ms. Tilton was well aware that they belonged to the Zohar Funds, and had been stolen, converted, and taken by fraud from the Zohar Funds, from whom Ms. Tilton and other entities within the Patriarch Enterprise had fraudulently hidden the Funds' own equity interests. Indeed, in her role as manager, director, and/or CEO of the Portfolio Companies she caused the distributions to be paid out, in the names of the Zohar Funds, care of the Patriarch Managers, entities that she owned and controlled, thereby facilitating their theft. Ms. Tilton received and took possession of these funds knowing that they were stolen property belonging to the Zohar Funds.

215. The stolen property belonging to the Zohar Funds that was transported and received by Ms. Tilton was worth tens of millions of dollars or more.

### *Continuity of Conduct*

216. Ms. Tilton's extensive violations of state and federal law through the Patriarch Enterprise and its members acting at her direction, each of which directly and proximately injured the Zohar Funds, constituted a continuous course of conduct in the United States beginning in at least 2006 and continuing today, which was intended to obtain money and

valuable equity and other interests through false representations, fraud, deceit, and other improper and unlawful means. Therefore, said violations were a part of pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5).

### *The Patriarch Enterprise Caused Injury to the Zohar Funds*

217.    The Zohar Funds, as the original and rightful owners of the relevant equity interests and contract rights and the parties responsible for paying collateral management fees to the Patriarch Managers, have been injured in their business or property as a direct and proximate result of Ms. Tilton's violations, described above, of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts constituting the pattern of racketeering activity.

218.    The Zohar Funds' injuries are clear and definite and include the loss of tens of millions of dollars or more in cash, as well as the loss of $700 million in collateral management fees and preference share payouts, and the loss of other valuable rights and interests.

### *The Zohar Funds' Entitlement to Treble Damages*

219.    As a result of the violations of 18 U.S.C. § 1962(c) by Ms. Tilton, the Zohar Funds have suffered substantial damages in an amount to be proven at trial.

220.    Pursuant to 18 U.S.C. § 1964(c), the Zohar Funds are entitled to recover treble their general and special compensatory damages, plus interest, costs, and attorneys' fees incurred by reason of Ms. Tilton's violations of 18 U.S.C. § 1962(c).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against Defendants and:

(a)     Issue declaratory judgment that the Zohar Funds are the legal owners of the equity interests issued or otherwise created in their names, with the relevant equity interests to be established at trial;

(b)     Issue declaratory judgment that the equity interests issued or otherwise created in the Zohar Funds' names (with the relevant equity rights and interests to be established at trial) are Collateral, as that term is defined under the Indentures;

(c)     Issue declaratory judgment that amendments, proxies, and other documents concerning the assets and interests of the Zohar Funds entered into by Defendants outside the scope of their authority were *void ab initio* and are deemed unenforceable;

(d)     Direct a prompt accounting of the equity interests owned by the Zohar Funds and cash distributions paid thereon and issue Declaratory Judgment as to the ownership of those amounts in favor of the Zohar Funds;

(e)     Award damages to the Zohar Funds in an amount to be determined at trial;

(f)     Award restitution to the Zohar Funds in an amount to be determined at trial;

(g)     Order forfeiture of all collateral management fees paid to Defendants since inception of the Zohar Funds;

(h)     Award treble damages pursuant to 18 U.S.C. § 1964(c);

(i)     Award the costs of this action, including the Zohar Funds' attorneys' fees; and

(j)     Grant to the Zohar Funds whatever further relief is just and proper.


Dated:          January 16, 2017                    Respectfully submitted,

                                                    QUINN EMANUEL URQUHART
                                                    & SULLIVAN, LLP


                                                    By: _____
                                                    Michael Carlinsky
                                                    Jonathan Pickhardt
                                                    Ellison Ward Merkel
                                                    Blair Adams

                                                    51 Madison Avenue, 22nd Floor
                                                    New York, NY 10010
                                                    Telephone: (212) 849-7000

                                                    *Attorneys for Plaintiffs Zohar CDO 2003-*
                                                    *1, Ltd.; Zohar II 2005-1, Ltd; and Zohar*
                                                    *III, Ltd.*

Source: Zohar I Reporting Dates & Trustee Reports provided by US Bank

| Deal | Report Type | Report Year | Report Month | Payment Date | Trustee | As of Date | Over-collateralization Ratio Page(s) | Administrative Fees / Collateral Manager Fee Page(s) | Collateral Debt Obligation Report Page(s) | Defaulted Collateral Detail Report Page(s) | Equity Securities Page(s) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Zohar 1 | NVR | 2004 | 08 | 8/20/2004 | US Bank | N/A - NVR only 6 pages | | | | | |
| Zohar 1 | Monthly | 2004 | 09 | | US Bank | 9/30/2004 | 1 | N/A | 22-24 | 47 | 48 |
| Zohar 1 | Monthly | 2004 | 10 | | US Bank | 10/29/2004 | 1 | N/A | 24-26 | 47 | 48 |
| Zohar 1 | NVR | 2004 | 11 | 11/22/2004 | US Bank | 11/9/2004 | 47 | 10 & 13 of PDF | 14-17 of PDF | 18 of PDF | No Equities Report |
| Zohar 1 | Monthly | 2004 | 12 | | US Bank | 12/31/2004 | 1 | N/A | 23-26 | 48 | 49 |
| Zohar 1 | Monthly | 2005 | 01 | | US Bank | 1/31/2005 | 1 | N/A | 22-24 | 47 | 48 |
| Zohar 1 | NVR | 2005 | 02 | 2/22/2005 | US Bank | N/A - NVR only 6 pages | | | | | |
| Zohar 1 | Monthly | 2005 | 03 | | US Bank | 3/31/2005 | 1 | N/A | 24-27 | 50 | 51 |
| Zohar 1 | Monthly | 2005 | 04 | | US Bank | 4/29/2005 | 1 | N/A | 22-25 | 46 | 48 |
| Zohar 1 | NVR | 2005 | 05 | 5/20/2005 | US Bank | 5/9/2005 | 48 | 2 & 5 | 15-18 | 19 | Equities Report not attached (as indicated on page 1) |
| Zohar 1 | Monthly | 2005 | 06 | | US Bank | 6/30/2005 | 1 | N/A | 22-25 | 47 | 48 |
| Zohar 1 | Monthly | 2005 | 07 | | US Bank | 7/29/2005 | 1 | N/A | 22-25 | 48 | 49 |
| Zohar 1 | NVR | 2005 | 08 | 8/22/2005 | US Bank | 8/10/2005 | 47 | 2 & 4 | 13-16 | 17 | Equities Report not attached (as indicated on page 8) |
| Zohar 1 | Monthly | 2005 | 09 | | US Bank | 9/30/2005 | 1 | N/A | 23-26 | 49 | 50 |
| Zohar 1 | Monthly | 2005 | 10 | | US Bank | 10/31/2005 | 1 | N/A | 23-26 | 49 | 50 |
| Zohar 1 | NVR | 2005 | 11 | 11/21/2005 | US Bank | 11/8/2005 | 46 | 2 & 4 | 13-16 | 17 | Equities Report not attached (as indicated on page 8) |
| Zohar 1 | Monthly | 2005 | 12 | | US Bank | 12/30/2005 | 1 | N/A | 22-25 | 48 | 49 |
| Zohar 1 | Monthly | 2006 | 01 | | US Bank | 1/31/2006 | 1 | N/A | 22-25 | 48 | 49 |
| Zohar 1 | NVR | 2006 | 02 | 2/21/2006 | US Bank | 2/8/2006 | 47 | 2 & 4 | 13-16 | 17 | Equities Report not attached (as indicated on page 8) |
| Zohar 1 | Monthly | 2006 | 03 | | US Bank | 3/31/2006 | 1 | N/A | 22-25 | 48 | 49 |
| Zohar 1 | Monthly | 2006 | 04 | | US Bank | 4/28/2006 | 1 | N/A | 22-25 | 49 | 50 |
| Zohar 1 | NVR | 2006 | 05 | 5/22/2006 | US Bank | 5/9/2006 | 47 | 2 & 4 | 13-16 | 17 | Equities Report not attached (as indicated on page 8) |
| Zohar 1 | Monthly | 2006 | 06 | | US Bank | 6/30/2006 | 1 | N/A | 22-25 | 48 | 49 |
| Zohar 1 | Monthly | 2006 | 07 | | US Bank | 7/31/2006 | 1 | N/A | 22-25 | 48 | 49 |
| Zohar 1 | NVR | 2006 | 08 | 8/21/2006 | US Bank | 8/9/2006 | 47 | 2 & 4 | 13-16 | 17 | Equities Report not attached (as indicated on page 8) |
| Zohar 1 | Monthly | 2006 | 09 | | US Bank | 9/29/2006 | 1 | N/A | 22-25 | 48 | 49 |
| Zohar 1 | Monthly | 2006 | 10 | | US Bank | 10/31/2006 | 1 | N/A | 22-25 | 48 | 49 |
| Zohar 1 | NVR | 2006 | 11 | 11/20/2006 | US Bank | 11/8/2006 | 47 | 2 & 4 | 13-16 | 17 | Equities Report not attached (as indicated on page 8) |
| Zohar 1 | Monthly | 2006 | 12 | | US Bank | 12/29/2006 | 1 | N/A | 22-25 | 48 | 49 |
| Zohar 1 | Monthly | 2007 | 01 | | US Bank | 1/31/2007 | 1 | N/A | 22-25 | 48 | 49 |
| Zohar 1 | NVR | 2007 | 02 | 2/20/2007 | US Bank | 2/7/2007 | 47 | 2 & 4 | 13-16 | 17 | Equities Report not attached (as indicated on page 8) |
| Zohar 1 | Monthly | 2007 | 03 | | US Bank | 3/30/2007 | 1 | N/A | 22-25 | 50 | 51 |
| Zohar 1 | Monthly | 2007 | 04 | | US Bank | 4/30/2007 | 1 | N/A | 23-26 | 46 | 47 |
| Zohar 1 | NVR | 2007 | 05 | 5/21/2007 | US Bank | 5/9/2007 | 48 | 2 & 4 | 13-16 | 17 | Equities Report not attached (as indicated on page 8) |
| Zohar 1 | Monthly | 2007 | 06 | | US Bank | 6/29/2007 | 1 | N/A | 22-25 | 46 | 47 |
| Zohar 1 | Monthly | 2007 | 07 | | US Bank | 7/31/2007 | 1 | N/A | 22-25 | 48 | 49 |
| Zohar 1 | NVR | 2007 | 08 | 8/20/2007 | US Bank | 8/8/2007 | 48 | 2 & 4 | 13-16 | 17 | Equities Report not attached (as indicated on page 8) |
| Zohar 1 | Monthly | 2007 | 09 | | US Bank | 9/28/2007 | 1 | N/A | 22-25 | 46 | 47 |
| Zohar 1 | Monthly | 2007 | 10 | | US Bank | 10/31/2007 | 1 | N/A | 22-25 | 46 | 47 |
| Zohar 1 | NVR | 2007 | 11 | 11/20/2007 | US Bank | 11/7/2007 | 47 | 2 & 4 | 13-16 | 17 | Equities Report not attached (as indicated on page 8) |
| Zohar 1 | Monthly | 2007 | 12 | | US Bank | 12/31/2007 | 1 | N/A | 22-25 | 47 | 48 |
| Zohar 1 | Monthly | 2008 | 01 | | US Bank | 1/31/2008 | 1 | N/A | 22-25 | 48 | 49 |
| Zohar 1 | NVR | 2008 | 02 | 2/20/2008 | US Bank | 2/7/2008 | 49 | 2 & 4 | 13-16 | 17 | Equities Report not attached (as indicated on page 8) |
| Zohar 1 | Monthly | 2008 | 03 | | US Bank | 3/31/2008 | 1 | N/A | 22-25 | 49 | 50 |
| Zohar 1 | Monthly | 2008 | 04 | | US Bank | 4/30/2008 | 1 | N/A | 22-26 | 50 | 51 |
| Zohar 1 | NVR | 2008 | 05 | 5/20/2008 | US Bank | 5/7/2008 | 50 | 2 & 4 | 13-17 | 18 | Equities Report not attached (as indicated on page 8) |
| Zohar 1 | Monthly | 2008 | 06 | | US Bank | 6/30/2008 | 1 | N/A | 22-25 | 49 | 50 |
| Zohar 1 | Monthly | 2008 | 07 | | US Bank | 7/31/2008 | 1 | N/A | 22-25 | 49 | 50 |

**Zohar 1 - Trustee Reports Database - w/ OC Ratio and Category Pages**

**Zohar 1 - Trustee Reports Database - w/ OC Ratio and Category Trigge...**

| Deal | Report Type | Report Year | Report Month | Payment Date | Trustee | As of Date | Over-collateralization Ratio Page(s) | Administrative Fees / Collateral Manager Fee Page(s) | Collateral Debt Obligation Report Page(s) | Defaulted Collateral Detail Report Page(s) | Equity Securities Page(s) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Zohar I | NVR | 2008 | 08 | 8/20/2008 | US Bank | 8/8/2008 | 49 | 2 & 4 | 13-16 | 17 | |
| Zohar I | | | | | | | | | | | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2008 | 09 | | US Bank | 9/30/2008 | 1 | N/A | 22-25 | 50 | 51 |
| Zohar I | Monthly | 2008 | 10 | | US Bank | 10/31/2008 | 1 | N/A | 22-25 | 50 | 51 |
| Zohar I | NVR | 2008 | 11 | 11/20/2008 | US Bank | 11/6/2008 | 53 | 2 & 4 | 13-17 | 18 | |
| Zohar I | | | | | | | | | | | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2008 | 12 | | US Bank | 12/31/2008 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | Monthly | 2009 | 01 | | US Bank | 1/30/2009 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | NVR | 2009 | 02 | 2/20/2009 | US Bank | 2/9/2009 | 54 | 2 & 4 | 13-17 | 18 | |
| Zohar I | | | | | | | | | | | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2009 | 03 | | US Bank | 3/31/2009 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | Monthly | 2009 | 04 | | US Bank | 4/30/2009 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | NVR | 2009 | 05 | 5/21/2009 | US Bank | 5/7/2009 | 54 | 2 & 4 | 13-17 | 18 | |
| Zohar I | | | | | | | | | | | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2009 | 06 | | US Bank | 6/30/2009 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | Monthly | 2009 | 07 | | US Bank | 7/31/2009 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | NVR | 2009 | 08 | 8/20/2009 | US Bank | 8/10/2009 | 54 | 2 & 4 | 13-17 | 18 | |
| Zohar I | | | | | | | | | | | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2009 | 09 | | US Bank | 9/30/2009 | 1 | N/A | 22-24 | 46 | 48 |
| Zohar I | Monthly | 2009 | 10 | | US Bank | 10/30/2009 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | NVR | 2009 | 11 | 11/20/2009 | US Bank | 11/6/2009 | 54 | 2 & 4 | 13-17 | 18 | |
| Zohar I | | | | | | | | | | | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2009 | 12 | | US Bank | 12/31/2009 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | Monthly | 2010 | 01 | | US Bank | 1/29/2010 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | NVR | 2010 | 02 | 2/22/2010 | US Bank | 2/8/2010 | 54 | 2 & 4 | 13-17 | 18 | |
| Zohar I | | | | | | | | | | | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2010 | 03 | | US Bank | 3/31/2010 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | Monthly | 2010 | 04 | | US Bank | 4/30/2010 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | NVR | 2010 | 05 | 5/20/2010 | US Bank | 5/7/2010 | 54 | 2 & 4 | 13-17 | 18 | |
| Zohar I | | | | | | | | | | | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2010 | 06 | | US Bank | 6/30/2010 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | Monthly | 2010 | 07 | | US Bank | 7/30/2010 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | NVR | 2010 | 08 | 8/20/2010 | US Bank | 8/10/2010 | 54 | 2 & 4 | 13-17 | 18 | |
| Zohar I | | | | | | | | | | | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2010 | 09 | | US Bank | 9/30/2010 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | Monthly | 2010 | 10 | | US Bank | 10/29/2010 | 1 | N/A | 22-26 | 52 | 53 |
| Zohar I | NVR | 2010 | 11 | 11/22/2010 | US Bank | 11/8/2010 | 54 | 2 & 4 | 13-17 | 18 | |
| Zohar I | | | | | | | | | | | Equities Report not attached (as indicated on page 8) |
| Zohar I | Monthly | 2010 | 12 | | US Bank | 12/31/2010 | 4 | N/A | 10-12 | 38 | 39 |
| Zohar I | Monthly | 2011 | 01 | | US Bank | 1/31/2011 | 4 | N/A | 10-13 | 39 | 40 |
| Zohar I | NVR | 2011 | 02 | 2/22/2011 | US Bank | 2/9/2011 | 6 | 66 & 68 | 10-13 | 39 | 40 |
| Zohar I | Monthly | 2011 | 03 | | US Bank | 3/31/2011 | 4 | N/A | 10-13 | 39 | 40 |
| Zohar I | Monthly | 2011 | 04 | | US Bank | 4/29/2011 | 4 | N/A | 10-13 | 39 | 40 |
| Zohar I | NVR | 2011 | 05 | 5/20/2011 | US Bank | 5/9/2011 | 6 | 65 & 67 | 10-13 | 39 | 40 |
| Zohar I | Monthly | 2011 | 06 | | US Bank | 6/30/2011 | 4 | N/A | 10-13 | 39 | 40 |
| Zohar I | Monthly | 2011 | 07 | | US Bank | 7/29/2011 | 4 | N/A | 10-13 | 39 | 40 |
| Zohar I | NVR | 2011 | 08 | 8/22/2011 | US Bank | 8/10/2011 | 4 | 2 & 4 of PDF | 10-13 | 39 | 40 |
| Zohar I | Monthly | 2011 | 09 | | US Bank | 9/30/2011 | 4 | N/A | 10-13 | 39 | 40 |
| Zohar I | Monthly | 2011 | 10 | | US Bank | 10/31/2011 | 4 | N/A | 10-13 | 39 | 40 |
| Zohar I | NVR | 2011 | 11 | 11/21/2011 | US Bank | 11/7/2011 | 4 | 2 & 4 of PDF | 10-13 | 39 | 40 |
| Zohar I | Monthly | 2011 | 12 | | US Bank | 12/30/2011 | 4 | N/A | 10-13 | 39 | 40 |
| Zohar I | Monthly | 2012 | 01 | | US Bank | 1/31/2012 | 4 | N/A | 10-13 | 39 | 40-41 |
| Zohar I | NVR | 2012 | 02 | 2/21/2012 | US Bank | 2/8/2012 | 14 | 2 & 4 of PDF | 20-23 | 49 | 50-59 |
| Zohar I | Monthly | 2012 | 03 | | US Bank | 3/30/2012 | 4 | N/A | 10-12 | 38 | 39-40 |
| Zohar I | Monthly | 2012 | 04 | | US Bank | 4/30/2012 | 4 | N/A | 10-12 | 38 | 39-40 |
| Zohar I | NVR | 2012 | 05 | 5/22/2012 | US Bank | 5/9/2012 | 4 | 2 & 4 of PDF | 10-12 | 38 | 39-40 |
| Zohar I | Monthly | 2012 | 06 | | US Bank | 6/29/2012 | 4 | N/A | 10-12 | 38 | 39-40 |
| Zohar I | Monthly | 2012 | 07 | | US Bank | 7/31/2012 | 4 | N/A | 11-13 | 39 | 40-41 |
| Zohar I | NVR | 2012 | 08 | 8/20/2012 | US Bank | 8/8/2012 | 4 | 2 & 4 of PDF | 11-13 | 39 | 40-41 |
| Zohar I | Monthly | 2012 | 09 | | US Bank | 9/28/2012 | 4 | N/A | 11-13 | 38 | 39-40 |
| Zohar I | Monthly | 2012 | 10 | | US Bank | 10/31/2012 | 4 | N/A | 11-13 | 38 | 39-40 |
| Zohar I | NVR | 2012 | 11 | 11/20/2012 | US Bank | 11/7/2012 | 4 | 2 & 4 of PDF | 11-13 | 38 | 39-40 |
| Zohar I | Monthly | 2012 | 12 | | US Bank | 12/31/2012 | 4 | N/A | 11-13 | 38 | 39-40 |
| Zohar I | Monthly | 2013 | 01 | | US Bank | 1/31/2013 | 4 | N/A | 11-13 | 38 | 39-40 |
| Zohar I | NVR | 2013 | 02 | 2/20/2013 | US Bank | 2/6/2013 | 4 | 2 & 4 of PDF | 11-13 | 38 | 39-40 |

| Zohar 1 - Trustee Reports Database - w/ OC Ratio and Category Pages | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Deal | Report Type | Report Year | Report Month | Payment Date | Trustee | As of Date | Over-collateralization Ratio Page(s) | Administrative Fees / Collateral Manager Fee Page(s) | Collateral Debt Obligation Report Page(s) | Defaulted Collateral Detail Report Page(s) | Equity Securities Page(s) |
| Zohar I | Monthly | 2013 | 03 | | US Bank | 3/29/2013 | 4 | N/A | 11-13 | 37 | 38-39 |
| Zohar I | Monthly | 2013 | 04 | | US Bank | 4/30/2013 | 4 | N/A | 11-13 | 37 | 38-39 |
| Zohar I | NVR | 2013 | 05 | 5/21/2013 | US Bank | 5/8/2013 | 4 | 2 & 4 of PDF | 11-13 | 37 | 38-39 |
| Zohar I | Monthly | 2013 | 06 | | US Bank | 6/28/2013 | 4 | N/A | 11-13 | 38 | 39-40 |
| Zohar I | Monthly | 2013 | 07 | | US Bank | 7/31/2013 | 4 | N/A | 11-13 | 38 | 39-40 |
| Zohar I | NVR | 2013 | 08 | 8/20/2013 | US Bank | 8/8/2013 | 4 | 2 & 4 of PDF | 11-13 | 38 | 39-40 |
| Zohar I | Monthly | 2013 | 09 | | US Bank | 9/30/2013 | 4 | N/A | 11-13 | 37 | 38-39 |
| Zohar I | Monthly | 2013 | 10 | | US Bank | 10/31/2013 | 4 | N/A | 11-13 | 37 | 38-39 |
| Zohar I | NVR | 2013 | 11 | 11/20/2013 | US Bank | 11/7/2013 | 4 | 2 & 4 of PDF | 11-13 | 38 | 39-40 |
| Zohar I | Monthly | 2013 | 12 | | US Bank | 12/31/2013 | 4 | N/A | 11-13 | 37 | 38-39 |
| Zohar I | Monthly | 2014 | 01 | | US Bank | 1/31/2014 | 4 | N/A | 11-13 | 37 | 38-39 |
| Zohar I | NVR | 2014 | 02 | 2/20/2014 | US Bank | 2/7/2014 | 4 | 2 & 4 of PDF | 11-13 | 37 | 38-39 |
| Zohar I | Monthly | 2014 | 03 | | US Bank | 3/31/2014 | 4 | N/A | 11-13 | 37 | 38-39 |
| Zohar I | Monthly | 2014 | 04 | | US Bank | 4/30/2014 | 4 | N/A | 11-13 | 37 | 38-39 |
| Zohar I | NVR | 2014 | 05 | 5/20/2014 | US Bank | 5/7/2014 | 4 | 2 & 4 of PDF | 11-13 | 37 | 38-39 |
| Zohar I | Monthly | 2014 | 06 | | US Bank | 6/30/2014 | 4 | N/A | 11-13 | 37 | 38-39 |
| Zohar I | Monthly | 2014 | 07 | | US Bank | 7/31/2014 | 4 | N/A | 11-13 | 37 | 38-39 |
| Zohar I | NVR | 2014 | 08 | 8/20/2014 | US Bank | 8/8/2014 | 4 | 3 & 5 of PDF | 11-13 | 37 | 38-39 |
| Zohar I | Monthly | 2014 | 09 | | US Bank | 9/30/2014 | 4 | N/A | 11-13 | 37 | 38-39 |
| Zohar I | Monthly | 2014 | 10 | | US Bank | 10/31/2014 | 4 | N/A | 11-13 | 36 | 37-38 |
| Zohar I | NVR | 2014 | 11 | 11/20/2014 | US Bank | 11/6/2014 | 4 | 4 & 6 of PDF | 11-13 | 36 | 37-38 |
| Zohar I | Monthly | 2014 | 12 | | US Bank | 12/31/2014 | 4 | N/A | 11-13 | 36 | 38-39 |
| Zohar I | Monthly | 2015 | 01 | | US Bank | 1/30/2015 | 4 | N/A | 11-13 | 36 | 37-38 |
| Zohar I | NVR | 2015 | 02 | 2/20/2015 | US Bank | 2/6/2015 | 4 | 4 & 6 of PDF | 11-13 | 36 | 37-38 |
| Zohar I | Monthly | 2015 | 03 | | US Bank | 3/31/2015 | 4 | N/A | 11-13 | 35 | 36-37 |
| Zohar I | Monthly | 2015 | 04 | | US Bank | 4/30/2015 | 4 | N/A | 11-13 | 35 | 36-37 |
| Zohar I | NVR | 2015 | 05 | 5/20/2015 | US Bank | 5/7/2015 | 4 | 4 & 6 of PDF | 11-13 | 35 | 36-37 |
| Zohar I | Monthly | 2015 | 06 | | US Bank | 6/30/2015 | 4 | N/A | 11-13 | 35 | 36-37 |
| Zohar I | Monthly | 2015 | 07 | | US Bank | 7/31/2015 | 4 | N/A | 11-13 | 35 | 36-37 |
| Zohar I | NVR | 2015 | 08 | 8/20/2015 | US Bank | 8/10/2015 | 4 | 4 & 6 of PDF | 11-13 | 35 | 36-37 |
| Zohar I | Monthly | 2015 | 09 | | US Bank | 9/30/2015 | 4 | N/A | 11-13 | 33 | 35-35 |
| Zohar I | Monthly | 2015 | 10 | | US Bank | 10/30/2015 | 4 | N/A | 11-13 | 33 | 34-35 |
| Zohar I | NVR | 2015 | 11 | 11/20/2015 | US Bank | 11/19/2015 | 4 | 3 & 5 of PDF | 11-13 | 33 | 34-35 |
| Zohar I | Monthly | 2015 | 12 | | US Bank | 12/31/2015 | 4 | N/A | 11-13 | 33 | 34-35 |
| Zohar I | Monthly | 2016 | 01 | | US Bank | 1/29/2016 | 4 | N/A | 11-13 | 33 | 34-35 |
| Zohar I | NVR | 2016 | 02 | 2/22/2016 | US Bank | 2/8/2016 | 4 | 3 & 5 of PDF | 11-13 | 33 | 34-35 |

| Deal | Report Type | Report Year | Report Month | Payment Date | Trustee | As of Date | Over-collateralization Ratio Page(s) | Administrative Fees / Collateral Manager Fee Page(s) | Performing / Categorization Page(s) | Defaulted & Non Performing & Defaulted Page(s) | Equity Securities Page(s) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Zohar II | NVR | 2005 | 07 | 7/20/2005 | LaSalle | 7/8/2005 | 10 | 4 | 36-41 | 12 | 5 (summary page) |
| Zohar II | Monthly | 2005 | 08 | | LaSalle | 8/31/2005 | 7 | N/A | 30-35 | 10 | 2 (summary page) |
| Zohar II | Monthly | 2005 | 09 | | LaSalle | 9/30/2005 | 7 | N/A | 31-36 | 10 | 2 (summary page) |
| Zohar II | NVR | 2005 | 10 | 10/20/2005 | LaSalle | 10/7/2005 | 11 | 4 | 36-42 | 14 | 3 (summary page) |
| Zohar II | Monthly | 2005 | 11 | | LaSalle | 11/30/2005 | 10 | N/A | 34-37 | 14 | 13 |
| Zohar II | Monthly | 2005 | 12 | | LaSalle | 12/31/2005 | 10 | N/A | 34-37 | 14 | 13 |
| Zohar II | NVR | 2006 | 01 | 1/20/2006 | LaSalle | 1/10/2006 | 15 | 9 | 40-43 | 19 | 18 |
| Zohar II | Monthly | 2006 | 01 | | LaSalle | 1/31/2006 | 10 | N/A | 37-41 | 14 | 13 |
| Zohar II | Monthly | 2006 | 02 | | LaSalle | 2/28/2006 | 10 | N/A | 38-42 | 14 | 13 |
| Zohar II | Monthly | 2006 | 03 | | LaSalle | 3/31/2006 | 10 | N/A | 37-41 | 14 | 13 |
| Zohar II | NVR | 2006 | 04 | 4/20/2006 | LaSalle | 4/6/2006 | 15 | 9 | 42-46 | 19 | 18 |
| Zohar II | Monthly | 2006 | 05 | | LaSalle | 5/31/2006 | 10 | N/A | 37-41 | 14 | 13 |
| Zohar II | Monthly | 2006 | 06 | | LaSalle | 6/30/2006 | 10 | N/A | 37-41 | 14 | 13 |
| Zohar II | NVR | 2006 | 07 | 7/20/2006 | LaSalle | 7/10/2006 | 15 | 9 | 42-46 | 19 | 18 |
| Zohar II | Monthly | 2006 | 08 | | LaSalle | 8/31/2006 | 10 | N/A | 37-41 | 14 | 13 |
| Zohar II | Monthly | 2006 | 09 | | LaSalle | 9/30/2006 | 10 | N/A | 37-41 | 14 | 13 |
| Zohar II | NVR | 2006 | 10 | 10/20/2006 | LaSalle | 10/10/2006 | 15 | 9 | 42-46 | 19 | 18 |
| Zohar II | Monthly | 2006 | 11 | | LaSalle | 11/30/2006 | 10 | N/A | 37-41 | 14 | 13 |
| Zohar II | Monthly | 2006 | 12 | | LaSalle | 12/31/2006 | 10 | N/A | 37-41 | 14 | 13 |
| Zohar II | NVR | 2007 | 01 | 1/22/2007 | LaSalle | 1/9/2007 | 15 | 9 | 42-46 | 19 | 18 |
| Zohar II | Monthly | 2007 | 02 | | LaSalle | 2/28/2007 | 10 | N/A | 37-41 | 14 | 13 |
| Zohar II | Monthly | 2007 | 03 | | LaSalle | 3/31/2007 | 10 | N/A | 33-37 | 14 | 13 |
| Zohar II | NVR | 2007 | 04 | 4/20/2007 | LaSalle | 4/10/2007 | 15 | 9 | 38-42 | 19 | 18 |
| Zohar II | Monthly | 2007 | 05 | | LaSalle | 5/31/2007 | 10 | N/A | 34-38 | 14 | 13 |
| Zohar II | Monthly | 2007 | 06 | | LaSalle | 6/30/2007 | 10 | N/A | 34-38 | 14 | 13 |
| Zohar II | NVR | 2007 | 07 | 7/20/2007 | LaSalle | 7/10/2007 | 15 | 9 | 39-43 | 19 | 18 |
| Zohar II | Monthly | 2007 | 08 | | LaSalle | 8/31/2007 | 10-11 | N/A | 31-34 | 15 | 14 |
| Zohar II | Monthly | 2007 | 09 | | LaSalle | 9/30/2007 | 10-11 | N/A | 30-33 | 15 | 14 |
| Zohar II | NVR | 2007 | 10 | 10/22/2007 | LaSalle | 10/10/2007 | 15-16 | 9 | 35-38 | 20 | 19 |
| Zohar II | Monthly | 2007 | 11 | | LaSalle | 11/30/2007 | 10-11 | N/A | 30-33 | 15 | 14 |
| Zohar II | Monthly | 2007 | 12 | | LaSalle | 12/31/2007 | 10-11 | N/A | 30-33 | 15 | 14 |
| Zohar II | NVR | 2008 | 01 | 1/22/2008 | LaSalle | 1/9/2008 | 15-16 | 9 | 35-38 | 20 | 19 |
| Zohar II | Monthly | 2008 | 02 | | LaSalle | 2/29/2008 | 10-11 | N/A | 30-33 | 15 | 14 |
| Zohar II | Monthly | 2008 | 03 | | LaSalle | 3/31/2008 | 10-11 | N/A | 30-33 | 15 | 14 |
| Zohar II | NVR | 2008 | 04 | 4/21/2008 | LaSalle | 4/9/2008 | 15-16 | 9 | 35-38 | 20 | 19 |
| Zohar II | Monthly | 2008 | 05 | | LaSalle | 5/31/2008 | 10-11 | N/A | 30-33 | 15 | 14 |
| Zohar II | Monthly | 2008 | 06 | | LaSalle | 6/30/2008 | 10-11 | N/A | 30-33 | 15 | 14 |
| Zohar II | NVR | 2008 | 07 | 7/21/2008 | LaSalle | 7/9/2008 | 15-16 | 9 | 35-38 | 20 | 19 |
| Zohar II | Monthly | 2008 | 08 | | LaSalle | 8/31/2008 | 10-11 | N/A | 30-33 | 15 | 14 |
| Zohar II | Monthly | 2008 | 09 | | LaSalle | 9/30/2008 | 10-11 | N/A | 30-33 | 15 | 14 |
| Zohar II | NVR | 2008 | 10 | 10/20/2008 | LaSalle | 10/7/2008 | 15-16 | 9 | 35-38 | 20 | 19 |
| Zohar II | Monthly | 2008 | 11 | | LaSalle | 11/30/2008 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | Monthly | 2008 | 12 | | LaSalle | 12/31/2008 | 10-11 | N/A | 31-34 | 15 | 14 |
| Zohar II | NVR | 2009 | 01 | 1/20/2009 | LaSalle | 1/7/2009 | 15-16 | 9 | 35-38 | 20 | 19 |
| Zohar II | Monthly | 2009 | 02 | | LaSalle | 2/28/2009 | 10-11 | N/A | 30-33 | 15 | 14 |
| Zohar II | Monthly | 2009 | 03 | | LaSalle | 3/31/2009 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | NVR | 2009 | 04 | 4/20/2009 | LaSalle | 4/8/2009 | 15-16 | 9 | 36-40 | 20 | 19 |
| Zohar II | Monthly | 2009 | 05 | | LaSalle | 5/31/2009 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | Monthly | 2009 | 06 | | LaSalle | 6/30/2009 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | NVR | 2009 | 07 | 7/20/2009 | LaSalle | 7/8/2009 | 15-16 | 9 | 36-40 | 20 | 19 |
| Zohar II | Monthly | 2009 | 08 | | LaSalle | 8/31/2009 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | Monthly | 2009 | 09 | | LaSalle | 9/30/2009 | 10-11 | N/A | 31-35 | 15 | 14 |

Zohar II - Trustee Reports & Key Page Numbers

| Deal | Report Type | Report Year | Report Month | Payment Date | Trustee | As of Date | Over-collateralization Ratio Page(s) | Administrative Fees / Collateral Manager Fee Page(s) | Performing / Categorization Page(s) | Defaulted & Non Performing & Defaulted Page(s) | Equity Securities Page(s) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Zohar II | NVR | 2009 | 10 | 10/20/2009 | LaSalle | 10/7/2009 | 15-16 | 9 | 36-40 | 20 | 19 |
| Zohar II | Monthly | 2009 | 11 | | LaSalle | 11/30/2009 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | Monthly | 2009 | 12 | | Bank of America | 12/31/2009 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | NVR | 2010 | 01 | 1/20/2010 | Bank of America | 1/7/2010 | 15-16 | 9 | 36-40 | 20 | 19 |
| Zohar II | Monthly | 2010 | 02 | | Bank of America | 2/28/2010 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | Monthly | 2010 | 03 | | Bank of America | 3/31/2010 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | NVR | 2010 | 04 | 4/20/2010 | Bank of America | 4/8/2010 | 15-16 | 9 | 37-41 | 20 | 19 |
| Zohar II | Monthly | 2010 | 05 | | Bank of America | 5/31/2010 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | Monthly | 2010 | 06 | | Bank of America | 6/30/2010 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | NVR | 2010 | 07 | 7/20/2010 | Bank of America | 7/8/2010 | 15-16 | 9 | 37-41 | 20 | 19 |
| Zohar II | Monthly | 2010 | 08 | | Bank of America | 8/31/2010 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | Monthly | 2010 | 09 | | Bank of America | 9/30/2010 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | NVR | 2010 | 10 | 10/20/2010 | Bank of America | 10/7/2010 | 15-16 | 9 | 37-41 | 20 | 19 |
| Zohar II | Monthly | 2010 | 11 | | Bank of America | 11/30/2010 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | Monthly | 2010 | 12 | | Bank of America | 12/31/2010 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | NVR | 2011 | 01 | 1/20/2011 | Bank of America | 1/7/2011 | 15-16 | 9 | 37-41 | 20 | 19 |
| Zohar II | Monthly | 2011 | 02 | | Bank of America | 2/28/2011 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | Monthly | 2011 | 03 | | Bank of America | 3/31/2011 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | NVR | 2011 | 04 | 4/20/2011 | Bank of America | 4/8/2011 | 15-16 | 9 | 37-41 | 20 | 19 |
| Zohar II | Monthly | 2011 | 05 | | Bank of America | 5/31/2011 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | Monthly | 2011 | 06 | | Bank of America | 6/30/2011 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | NVR | 2011 | 07 | 7/20/2011 | Bank of America | 7/8/2011 | 15-16 | 9 | 37-41 | 20 | 19 |
| Zohar II | Monthly | 2011 | 08 | | US Bank | 8/31/2011 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | Monthly | 2011 | 09 | | US Bank | 9/30/2011 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | NVR | 2011 | 10 | 10/20/2011 | US Bank | 10/7/2011 | 15-16 | 9 | 37-41 | 20 | 19 |
| Zohar II | Monthly | 2011 | 11 | | US Bank | 11/30/2011 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | Monthly | 2011 | 12 | | US Bank | 12/31/2011 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | NVR | 2012 | 01 | 1/20/2012 | US Bank | 1/9/2012 | 15-16 | 9 | 37-41 | 20 | 19 |
| Zohar II | Monthly | 2012 | 02 | | US Bank | 2/29/2012 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | Monthly | 2012 | 03 | | US Bank | 3/31/2012 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | NVR | 2012 | 04 | 4/20/2012 | US Bank | 4/10/2012 | 15-16 | 9 | 36-40 | 20 | 19 |
| Zohar II | Monthly | 2012 | 05 | | US Bank | 5/31/2012 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | Monthly | 2012 | 06 | | US Bank | 6/30/2012 | 10-11 | N/A | 32-36 | 15 | 14 |
| Zohar II | NVR | 2012 | 07 | 7/20/2012 | US Bank | 7/10/2012 | 15-16 | 9 | 36-40 | 20 | 19 |
| Zohar II | Monthly | 2012 | 08 | | US Bank | 8/31/2012 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | Monthly | 2012 | 09 | | US Bank | 9/30/2012 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | NVR | 2012 | 10 | 10/22/2012 | US Bank | 10/10/2012 | 15-16 | 9 | 37-41 | 20 | 19 |
| Zohar II | Monthly | 2012 | 11 | | US Bank | 11/30/2012 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | Monthly | 2012 | 12 | | US Bank | 12/31/2012 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | NVR | 2013 | 01 | 1/22/2013 | US Bank | 1/9/2013 | 15-16 | 9 | 36-40 | 20 | 19 |
| Zohar II | Monthly | 2013 | 02 | | US Bank | 2/28/2013 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | Monthly | 2013 | 03 | | US Bank | 3/31/2013 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | NVR | 2013 | 04 | 4/22/2013 | US Bank | 4/10/2013 | 15-16 | 9 | 36-40 | 20 | 19 |
| Zohar II | Monthly | 2013 | 05 | | US Bank | 5/31/2013 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | Monthly | 2013 | 06 | | US Bank | 6/30/2013 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | NVR | 2013 | 07 | 7/22/2013 | US Bank | 7/10/2013 | 15-16 | 9 | 36-40 | 20 | 19 |
| Zohar II | Monthly | 2013 | 08 | | US Bank | 8/31/2013 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | Monthly | 2013 | 09 | | US Bank | 9/30/2013 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | NVR | 2013 | 10 | 10/21/2013 | US Bank | 10/8/2013 | 15-16 | 9 | 36-40 | 20 | 19 |
| Zohar II | Monthly | 2013 | 11 | | US Bank | 11/30/2013 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | Monthly | 2013 | 12 | | US Bank | 12/31/2013 | 10-11 | N/A | 31-35 | 15 | 14 |
| Zohar II | NVR | 2014 | 01 | 1/21/2014 | US Bank | 1/8/2014 | 15-16 | 9 | 36-40 | 20 | 19 |
| Zohar II | Monthly | 2014 | 02 | | US Bank | 2/28/2014 | 12-13 | N/A | 33-37 | 17 | 16 |
| Zohar II | Monthly | 2014 | 03 | | US Bank | 3/31/2014 | 12-13 | N/A | 33-37 | 17 | 16 |
| Zohar II | NVR | 2014 | 04 | 4/22/2014 | US Bank | 4/8/2014 | 17-18 | 11 | 38-42 | 22 | 21 |

| Deal | Report Type | Report Year | Report Month | Payment Date | Trustee | As of Date | Over-collateralization Ratio Page(s) | Administrative Fees / Collateral Manager Fee Page(s) | Performing / Categorization Page(s) | Defaulted & Non Performing & Defaulted Page(s) | Equity Securities Page(s) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Zohar II | Monthly | 2014 | 05 | | US Bank | 5/31/2014 | 12-13 | N/A | 33-37 | 17 | 16 |
| Zohar II | Monthly | 2014 | 06 | | US Bank | 6/30/2014 | 12-13 | N/A | 33-37 | 17 | 16 |
| Zohar II | NVR | 2014 | 07 | 7/21/2014 | US Bank | 7/9/2014 | 17-18 | 11 | 38-42 | 22 | 21 |
| Zohar II | Monthly | 2014 | 08 | | US Bank | 8/31/2014 | 12-13 | N/A | 33-37 | 17 | 16 |
| Zohar II | Monthly | 2014 | 09 | | US Bank | 9/30/2014 | 12-13 | N/A | 33-37 | 17 | 16 |
| Zohar II | NVR | 2014 | 10 | 10/20/2014 | US Bank | 10/7/2014 | 17-18 | 11 | 38-42 | 22 | 21 |
| Zohar II | Monthly | 2014 | 11 | | US Bank | 11/30/2014 | 12-13 | N/A | 32-35 | 17 | 16 |
| Zohar II | Monthly | 2014 | 12 | | US Bank | 12/31/2014 | 12-13 | N/A | 32-34 | 17 | 16 |
| Zohar II | NVR | 2015 | 01 | 1/20/2015 | US Bank | 1/7/2015 | 17-18 | 11 | 37-40 | 22 | 21 |
| Zohar II | Monthly | 2015 | 02 | | US Bank | 2/28/2015 | 12-13 | N/A | 32-34 | 17 | 16 |
| Zohar II | Monthly | 2015 | 03 | | US Bank | 3/31/2015 | 12-13 | N/A | 32-35 | 17 | 16 |
| Zohar II | NVR | 2015 | 04 | 4/20/2015 | US Bank | 4/8/2015 | 17-18 | 11 | 37-40 | 22 | 21 |
| Zohar II | Monthly | 2015 | 05 | | US Bank | 5/31/2015 | 12-13 | N/A | 32-35 | 17 | 16 |
| Zohar II | Monthly | 2015 | 06 | | US Bank | 6/30/2015 | 12-13 | N/A | 32-35 | 17 | 16 |
| Zohar II | NVR | 2015 | 07 | 7/20/2015 | US Bank | 7/8/2015 | 17-18 | 11 | 37-40 | 22 | 21 |
| Zohar II | Monthly | 2015 | 08 | | US Bank | 8/31/2015 | 12-13 | N/A | 32-35 | 17 | 16 |
| Zohar II | Monthly | 2015 | 09 | | US Bank | 9/30/2015 | 12-13 | N/A | 32-35 | 17 | 16 |
| Zohar II | NVR | 2015 | 10 | 10/20/2015 | US Bank | 10/7/2015 | 17-18 | 11 | 37-40 | 22 | 21 |
| Zohar II | Monthly | 2015 | 11 | | US Bank | 11/30/2015 | 12-13 | N/A | 32-35 | 17 | 16 |
| Zohar II | Monthly | 2015 | 12 | | US Bank | 12/31/2015 | 12-13 | N/A | 32-35 | 17 | 16 |
| Zohar II | NVR | 2016 | 01 | 1/20/2016 | US Bank | 1/7/2016 | 17-18 | 11 | 37-40 | 22 | 21 |
| Zohar II | Monthly | 2016 | 02 | | US Bank | 2/29/2016 | 12-13 | N/A | 32-35 | 17 | 16 |

Zohar II - Trustee Reports & Key Page Numbers

Source: Zohar III Reporting Dates 2007-2016 — Case 1:17-cv-01797-JEB-SF97 Document Appendix C 2/14/17 Page 176 of 377 PageID #: 664

## Zohar III - Trustee Reports & Key Page Numbers

| Deal | Read Only | Report Type | Report Month | Report Year | Report Month | Payment Date | Trustee | As of Date | Over-collateralization Ratio Page(s) | Administrative Fees / Collateral Manager Fee Page(s) | Performing / Categorization Page(s) | Defaulted & Non Performing & Defaulted Page(s) | Equity Securities Page(s) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Zohar III | No | | 200608 | 2006 | 08 | | LaSalle | 8/31/2006 | 7 | N/A | 23 | 13 | Equities Report not mentioned in Trustee Report |
| Zohar III | No | NVR | 200709 | 2007 | 09 | 9/18/2007 | LaSalle | 9/6/2007 | N/A | 9 | 24-25 | 28 | 29 |
| Zohar III | No | Monthly | 200709 | 2007 | 09 | | LaSalle | 9/30/2007 | N/A | N/A | 17-18 | 21 | 22 |
| Zohar III | No | Monthly | 200710 | 2007 | 10 | | LaSalle | 10/31/2007 | N/A | N/A | 18-20 | 23 | 24 |
| Zohar III | No | Monthly | 200711 | 2007 | 11 | | LaSalle | 11/30/2007 | N/A | N/A | 18-20 | 23 | 24 |
| Zohar III | No | NVR | 200712 | 2007 | 12 | 12/18/2007 | LaSalle | 12/6/2007 | N/A | 9 | 23-25 | 28 | 29 |
| Zohar III | No | Monthly | 200801 | 2008 | 01 | | LaSalle | 1/31/2008 | N/A | N/A | 19-21 | 29 | 24 |
| Zohar III | No | Monthly | 200802 | 2008 | 02 | | LaSalle | 2/29/2008 | N/A | N/A | 19-21 | 29 | 24 |
| Zohar III | No | NVR | 200803 | 2008 | 03 | 3/18/2008 | LaSalle | 3/6/2008 | N/A | 9 | 24-26 | 28 | 29 |
| Zohar III | No | Monthly | 200804 | 2008 | 04 | | LaSalle | 4/30/2008 | 11 | N/A | 22-24 | 32 | 27 |
| Zohar III | No | Monthly | 200805 | 2008 | 05 | | LaSalle | 5/31/2008 | 11 | N/A | 22-25 | 33 | 28 |
| Zohar III | No | NVR | 200806 | 2008 | 06 | 6/18/2008 | LaSalle | 6/6/2008 | 16 | 9 | 26-28 | 30 | 31 |
| Zohar III | No | Monthly | 200807 | 2008 | 07 | | LaSalle | 7/31/2008 | 11 | N/A | 26-30 | 38 | 32 |
| Zohar III | No | Monthly | 200808 | 2008 | 08 | | LaSalle | 8/31/2008 | 11 | N/A | 26-30 | 38 | 32 |
| Zohar III | No | NVR | 200809 | 2008 | 09 | 9/18/2008 | LaSalle | 9/8/2008 | 16 | 9 | 30-33 | 35 | 36 |
| Zohar III | No | Monthly | 200810 | 2008 | 10 | | LaSalle | 10/31/2008 | 11 | N/A | 23-26 | 34 | 28 |
| Zohar III | No | Monthly | 200811 | 2008 | 11 | | LaSalle | 11/30/2008 | 11 | N/A | 25-28 | 36 | 30 |
| Zohar III | No | NVR | 200812 | 2008 | 12 | 12/18/2008 | LaSalle | 12/8/2008 | 16 | 9 | 29-32 | 34 | 35 |
| Zohar III | No | Monthly | 200901 | 2009 | 01 | | LaSalle | 1/31/2009 | 11 | N/A | 35-40 | 48 | 42 |
| Zohar III | No | Monthly | 200902 | 2009 | 02 | | LaSalle | 2/28/2009 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | NVR | 200903 | 2009 | 03 | 3/18/2009 | LaSalle | 3/6/2009 | 16 | 9 | 31-35 | 37 | 38 |
| Zohar III | No | Monthly | 200904 | 2009 | 04 | | LaSalle | 4/30/2009 | 11 | N/A | 28-33 | 41 | 35 |
| Zohar III | No | Monthly | 200905 | 2009 | 05 | | LaSalle | 5/31/2009 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | NVR | 200906 | 2009 | 06 | 6/18/2009 | LaSalle | 6/8/2009 | 16 | 9 | 31-35 | 37 | 38 |
| Zohar III | No | Monthly | 200907 | 2009 | 07 | | LaSalle | 7/31/2009 | 11 | N/A | 29-34 | 42 | 36 |
| Zohar III | No | Monthly | 200908 | 2009 | 08 | | LaSalle | 8/31/2009 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | NVR | 200909 | 2009 | 09 | 9/18/2009 | LaSalle | 9/8/2009 | 16 | 9 | 31-36 | 38 | 39 |
| Zohar III | No | Monthly | 200910 | 2009 | 10 | | Bank of America | 10/31/2009 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | Monthly | 200911 | 2009 | 11 | | Bank of America | 11/30/2009 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | NVR | 200912 | 2009 | 12 | 12/18/2009 | Bank of America | 12/8/2009 | 16 | 9 | 31-35 | 37 | 38 |
| Zohar III | No | Monthly | 201001 | 2010 | 01 | | Bank of America | 1/31/2010 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | Monthly | 201002 | 2010 | 02 | | Bank of America | 2/28/2010 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | NVR | 201003 | 2010 | 03 | 3/8/2010 | Bank of America | 3/8/2010 | 16 | 9 | 31-36 | 38 | 39 |
| Zohar III | No | Monthly | 201004 | 2010 | 04 | | Bank of America | 4/30/2010 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | Monthly | 201005 | 2010 | 05 | | Bank of America | 5/31/2010 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | NVR | 201006 | 2010 | 06 | 6/18/2010 | Bank of America | 6/8/2010 | 16 | 9 | 31-36 | 38 | 39 |
| Zohar III | No | Monthly | 201007 | 2010 | 07 | | Bank of America | 7/31/2010 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | Monthly | 201008 | 2010 | 08 | | Bank of America | 8/31/2010 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | NVR | 201009 | 2010 | 09 | 9/20/2010 | Bank of America | 9/8/2010 | 16 | 9 | 31-36 | 38 | 39 |
| Zohar III | No | Monthly | 201010 | 2010 | 10 | | Bank of America | 10/31/2010 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | Monthly | 201011 | 2010 | 11 | | Bank of America | 11/30/2010 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | NVR | 201012 | 2010 | 12 | 12/20/2010 | Bank of America | 12/8/2010 | 16 | 9 | 31-36 | 38 | 39 |
| Zohar III | No | Monthly | 201101 | 2011 | 01 | | Bank of America | 1/31/2011 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | Monthly | 201102 | 2011 | 02 | | Bank of America | 2/28/2011 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | NVR | 201103 | 2011 | 03 | 3/18/2011 | Bank of America | 3/8/2011 | 16 | 9 | 31-36 | 38 | 39 |
| Zohar III | No | Monthly | 201104 | 2011 | 04 | | Bank of America | 4/30/2011 | 11 | N/A | 27-32 | 40 | 34 |
| Zohar III | No | Monthly | 201105 | 2011 | 05 | | Bank of America | 5/31/2011 | 11 | N/A | 27-32 | 41 | 35 |
| Zohar III | No | NVR | 201106 | 2011 | 06 | 6/20/2011 | Bank of America | 6/8/2011 | 16 | 9 | 32-37 | 40 | 41 |
| Zohar III | No | Monthly | 201107 | 2011 | 07 | | Bank of America | 7/31/2011 | 11 | N/A | 27-32 | 41 | 35 |
| Zohar III | No | Monthly | 201108 | 2011 | 08 | | US Bank | 8/31/2011 | 11 | N/A | 27-32 | 41 | 35 |
| Zohar III | No | NVR | 201109 | 2011 | 09 | 9/19/2011 | US Bank | 9/7/2011 | 16 | 9 | 32-37 | 40 | 41 |
| Zohar III | No | Monthly | 201110 | 2011 | 10 | | US Bank | 10/31/2011 | 11 | N/A | 27-33 | 42 | 36 |
| Zohar III | No | Monthly | 201111 | 2011 | 11 | | US Bank | 11/30/2011 | 11 | N/A | 27-33 | 42 | 36 |
| Zohar III | No | NVR | 201112 | 2011 | 12 | 12/19/2011 | US Bank | 12/7/2011 | 16 | 9 | 33-38 | 41 | 42 |
| Zohar III | No | Monthly | 201201 | 2012 | 01 | | US Bank | 1/31/2012 | 11 | N/A | 29-35 | 44 | 38 |

| Deal | Read Only | Report Type | Report Month | Report Year | Report Month | Payment Date | Trustee | As of Date | Over-collateralization Ratio Page(s) | Administrative Fees / Collateral Manager Fee Page(s) | Performing / Categorization Page(s) | Defaulted & Non Performing & Defaulted Page(s) | Equity Securities Page(s) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Zohar III | No | Monthly | 201202 | 2012 | 02 | | US Bank | 2/29/2012 | 11 | N/A | 28-34 | 43 | 37 |
| Zohar III | No | NVR | 201203 | 2012 | 03 | 3/19/2012 | US Bank | 3/7/2012 | 16 | 9 | 33-38 | 41 | 42 |
| Zohar III | No | Monthly | 201204 | 2012 | 04 | | US Bank | 4/30/2012 | 11 | N/A | 30-36 | 45 | 39 |
| Zohar III | No | Monthly | 201205 | 2012 | 05 | | US Bank | 5/31/2012 | 11 | N/A | 29-35 | 44 | 38 |
| Zohar III | No | NVR | 201206 | 2012 | 06 | 6/18/2012 | US Bank | 6/6/2012 | 16 | 9 | 34-40 | 44 | 45 |
| Zohar III | No | Monthly | 201207 | 2012 | 07 | | US Bank | 7/31/2012 | 11 | N/A | 28-34 | 44 | 38 |
| Zohar III | No | Monthly | 201208 | 2012 | 08 | | US Bank | 8/31/2012 | 11 | N/A | 28-34 | 44 | 38 |
| Zohar III | No | NVR | 201209 | 2012 | 09 | 9/18/2012 | US Bank | 9/6/2012 | 16 | 9 | 32-38 | 42 | 43 |
| Zohar III | No | Monthly | 201210 | 2012 | 10 | | US Bank | 10/31/2012 | 11 | N/A | 28-34 | 44 | 38 |
| Zohar III | No | Monthly | 201211 | 2012 | 11 | | US Bank | 11/30/2012 | 11 | N/A | 28-34 | 44 | 38 |
| Zohar III | No | NVR | 201212 | 2012 | 12 | 12/18/2012 | US Bank | 12/6/2012 | 16 | 9 | 32-38 | 42 | 43 |
| Zohar III | No | Monthly | 201301 | 2013 | 01 | | US Bank | 1/31/2013 | 11 | N/A | 28-34 | 44 | 38 |
| Zohar III | No | Monthly | 201302 | 2013 | 02 | | US Bank | 2/28/2013 | 11 | N/A | 28-34 | 44 | 38 |
| Zohar III | No | NVR | 201303 | 2013 | 03 | 3/18/2013 | US Bank | 3/6/2013 | 16 | 9 | 32-37 | 41 | 42 |
| Zohar III | No | Monthly | 201304 | 2013 | 04 | | US Bank | 4/30/2013 | 11 | N/A | 28-34 | 44 | 38 |
| Zohar III | No | Monthly | 201305 | 2013 | 05 | | US Bank | 5/31/2013 | 11 | N/A | 28-34 | 44 | 38 |
| Zohar III | No | NVR | 201306 | 2013 | 06 | 6/18/2013 | US Bank | 6/6/2013 | 16 | 9 | 32-37 | 41 | 42 |
| Zohar III | No | Monthly | 201307 | 2013 | 07 | | US Bank | 7/31/2013 | 11 | N/A | 28-34 | 44 | 38 |
| Zohar III | No | Monthly | 201308 | 2013 | 08 | | US Bank | 8/31/2013 | 11 | N/A | 28-34 | 44 | 38 |
| Zohar III | No | NVR | 201309 | 2013 | 09 | 9/18/2013 | US Bank | 9/6/2013 | 16 | 9 | 32-37 | 41 | 42 |
| Zohar III | No | Monthly | 201310 | 2013 | 10 | | US Bank | 10/31/2013 | 11 | N/A | 28-34 | 44 | 38 |
| Zohar III | No | Monthly | 201311 | 2013 | 11 | | US Bank | 11/30/2013 | 11 | N/A | 28-34 | 44 | 38 |
| Zohar III | No | NVR | 201312 | 2013 | 12 | 12/18/2013 | US Bank | 12/6/2013 | 16 | 9 | 32-37 | 41 | 42 |
| Zohar III | No | Monthly | 201401 | 2014 | 01 | | US Bank | 1/31/2014 | 12 | N/A | 29-35 | 45 | 39 |
| Zohar III | No | Monthly | 201402 | 2014 | 02 | | US Bank | 2/28/2014 | 13 | N/A | 30-36 | 46 | 40 |
| Zohar III | No | NVR | 201403 | 2014 | 03 | 3/18/2014 | US Bank | 3/6/2014 | 18 | 11 | 34-39 | 43 | 44 |
| Zohar III | No | Monthly | 201404 | 2014 | 04 | | US Bank | 4/30/2014 | 13 | N/A | 30-36 | 46 | 40 |
| Zohar III | No | Monthly | 201405 | 2014 | 05 | | US Bank | 5/31/2014 | 13 | N/A | 30-36 | 46 | 40 |
| Zohar III | No | NVR | 201406 | 2014 | 06 | 6/18/2014 | US Bank | 6/6/2014 | 18 | 11 | 34-39 | 43 | 44 |
| Zohar III | No | Monthly | 201407 | 2014 | 07 | | US Bank | 7/31/2014 | 13 | N/A | 30-36 | 46 | 40 |
| Zohar III | No | Monthly | 201408 | 2014 | 08 | | US Bank | 8/31/2014 | 13 | N/A | 30-36 | 46 | 40 |
| Zohar III | No | NVR | 201409 | 2014 | 09 | 9/18/2014 | US Bank | 9/8/2014 | 18 | 11 | 34-39 | 43 | 44 |
| Zohar III | No | Monthly | 201410 | 2014 | 10 | | US Bank | 10/31/2014 | 13 | N/A | 30-35 | 45 | 39 |
| Zohar III | No | Monthly | 201411 | 2014 | 11 | | US Bank | 11/30/2014 | 13 | N/A | 30-35 | 45 | 39 |
| Zohar III | No | NVR | 201412 | 2014 | 12 | 12/18/2014 | US Bank | 12/8/2014 | 18 | 11 | 34-39 | 43 | 44 |
| Zohar III | No | Monthly | 201501 | 2015 | 01 | | US Bank | 1/31/2015 | 13 | N/A | 30-35 | 45 | 39 |
| Zohar III | No | Monthly | 201502 | 2015 | 02 | | US Bank | 2/28/2015 | 13 | N/A | 30-36 | 46 | 40 |
| Zohar III | No | NVR | 201503 | 2015 | 03 | 3/18/2015 | US Bank | 3/6/2015 | 18 | 11 | 34-39 | 43 | 44 |
| Zohar III | No | Monthly | 201504 | 2015 | 04 | | US Bank | 4/30/2015 | 13 | N/A | 30-35 | 45 | 39 |
| Zohar III | No | Monthly | 201505 | 2015 | 05 | | US Bank | 5/31/2015 | 13 | N/A | 30-35 | 45 | 39 |
| Zohar III | No | NVR | 201506 | 2015 | 06 | 6/18/2015 | US Bank | 6/8/2015 | 18 | 11 | 34-39 | 43 | 44 |
| Zohar III | No | Monthly | 201507 | 2015 | 07 | | US Bank | 7/31/2015 | 13 | N/A | 30-36 | 46 | 40 |
| Zohar III | No | Monthly | 201508 | 2015 | 08 | | US Bank | 8/31/2015 | 13 | N/A | 30-35 | 45 | 39 |
| Zohar III | No | NVR | 201509 | 2015 | 09 | 9/18/2015 | US Bank | 9/8/2015 | 18 | 11 | 34-39 | 43 | 44 |
| Zohar III | No | Monthly | 201510 | 2015 | 10 | | US Bank | 10/31/2015 | 13 | N/A | 30-36 | 46 | 40 |
| Zohar III | No | Monthly | 201511 | 2015 | 11 | | US Bank | 11/30/2015 | 13 | N/A | 30-35 | 45 | 39 |
| Zohar III | No | NVR | 201512 | 2015 | 12 | 12/18/2015 | US Bank | 12/8/2015 | 18 | 11 | 34-39 | 43 | 44 |
| Zohar III | No | Monthly | 201601 | 2016 | 01 | | US Bank | 1/31/2016 | 13 | N/A | 29-34 | 44 | 38 |
| Zohar III | No | Monthly | 201602 | 2016 | 02 | | US Bank | 2/29/2016 | 13 | N/A | 29-34 | 44 | 38 |